IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL CASE NO. |
| v. | 1:09-CR-0184-JEC-JFK |
| OTHA BARNES (4),<br>GERALD EDWARD DURANCE (5),<br>MARTINA CASAS FLORES (6),<br>JORGE ALEJANDRO ANAYA-<br>MEDINA (15),<br>LUIS MANUEL HACES-DELGADO<br>(16),<br>ALEJANDRO DE LA CRUZ-<br>PLANCARTE (17),<br>JAVIER DE LE CRUZ-LOYA (18),<br>ANDRES BAUTISTA-GALLOS (19),<br>and NOE AGUILAR-CAMUDIO (20), | **SECOND SUPERSEDING INDICTMENT** |
| Defendants. | |

## ORDER AND REPORT AND RECOMMENDATION

Pending before the court are the following motions:

Defendant Jorge Anaya-Medina's motion [Doc. 301] to suppress voice exemplars and statements obtained on April 29, 2009, and motion [Doc. 302] to suppress evidence seized pursuant to a warrantless search on April 29, 2009;

Defendant Alejandro De La Cruz-Plancarte's motion [Doc. 322] to suppress evidence obtained during the same warrantless search; and Defendant Javier De La Cruz-Loya's motion [Doc. 297] to suppress the voice exemplars taken for purpose of identification on April 29, 2009, and his post-<u>Miranda</u> statements obtained on April 29, 2009, and the evidence seized during the same warrantless search; Defendant Otha Barnes' motion [Doc. 315] to suppress evidence seized based on a warrantless search on December 10, 2008, and the voice exemplars obtained that date; Defendant Gerald Durrance's motions [Doc. 304 and 455] to suppress evidence seized pursuant to a warrantless search on April 29, 2009; Defendant Martina Flores' motion [Doc. 349] to suppress evidence seized on April 29, 2009, seized pursuant to federal search warrants for the residences located at 604 and 608 Sandyhills Avenue, McAllen, Texas; Defendant Noe Aguilar-Camudio's motions [Docs. 331, 332, and 334] to suppress  evidence seized based on a warrantless search and statements obtained on April 29, 2009; Defendants Jorge Anaya-Medina's motion [Doc. 328], Defendant Luis Haces-Delgado's motion [Doc. 342] and Defendant Martina Flores' motion [Doc. 351] to suppress the evidence obtained from the wiretap orders; Defendant Luis Haces-Delgado's motions [Docs. 340 and 341] to suppress evidence seized pursuant to a warrantless search and statements obtained on April 29, 2009; Defendants Otha

Barnes', Andres Bautista-Gallegos', Noe Aguilar-Camudio's, and Luis Haces-Delgado's motions [Docs. 306, 329, 333 and 381] for severance; Defendant Jorge Anaya-Medina's request [Doc. 487] for a hearing on his wire tap motion; Defendant Martina Flores' request [Doc. 575] for a <u>Franks</u> hearing in connection with her wire tap motion; Defendants Otha Barnes' and Luis Haces-Delgado's motions [Docs. 306 and 381] in limine; Defendant Noe Aguilar-Camudio's request [Doc. 333] for an evidentiary hearing in connection with his motion for severance; Defendants Alfonso Rios' and Noe Aguilar-Camudio's motions [Docs. 335 and 338] for a bill of particulars; and Defendants Otha Barnes', Noe Aguilar-Camudio's and Luis Haces-Delgado's motions [Docs. 309, 330, 382] to disclose confidential informant.

After consideration of the facts established at the various evidentiary held on the motions to suppress, of the arguments and briefs of the Defendants and the Government, and of the binding and persuasive legal authority, the court makes the following recommendations and enters the following orders resolving the pending motions.

3

### Defendants Anaya-Medina's, Cruz-Plancarte's and Cruz-Loya's
### Motions to Suppress Evidence and Statements

Pending before the court are Defendant Jorge-Alejandro Anaya-Medina's ("Cokis") motion [Doc. 301] to suppress statements[1] obtained on April 29, 2009, and motion [Doc. 302] to suppress evidence seized pursuant to a warrantless search on April 29, 2009, at 2265 Ranch Trial, Norcross, Georgia; Defendant Alejandro De La Cruz-Plancarte's ("Valda-Ceja") motion [Doc. 322] to suppress evidence obtained during the same warrantless search; and Defendant Javier De Le Cruz-Loya's ("Loza-Cruz") motion [Doc. 297] to suppress statements obtained on April 29, 2009, and evidence seized during the same warrantless search.[2]  An evidentiary hearing was held on the motions to suppress on January 28, 2010.[3]  [Doc. 408].  Defendants Cokis and Loza-Cruz contend that the voice exemplars that they gave on April 29, 2009, prior to being advised of their rights pursuant to <u>Miranda</u> violated their Fifth and Sixth Amendment rights to remain silent and to counsel.  [Doc. 438; Doc. 442 at 12].

---

[1]Included therein was a motion for a Jackson Denno hearing which was granted and held on January 28, 2010.  [Doc. 408].

[2]At the evidentiary hearing, the witnesses referred to Defendants by the names "Cokis," "Valda-Ceja," and "Loza-Cruz."  Therefore, to avoid confusion, the court will refer to Defendants by their "also known as" names.

[3]Citations to the transcript are:  (Tr. at ).

4

Defendants Cokis and Valda-Ceja contend that the consent to search obtained from Valda-Ceja was not voluntary; therefore, the warrantless search of their residence violated their Fourth Amendment rights. And Defendant Loza-Cruz contends that he refused entry into the residence or any search of the residence; therefore, the warrantless search of the residence violated his Fourth Amendment rights. [Doc. 442 at 8-12].

The Government responds to the motions to suppress evidence contending that Defendant Valda-Ceja's consent was voluntary and gave the agents authority to search all common areas of the residence and all bedrooms with the exception of the bedroom of Defendant Loza-Cruz; therefore, excepting evidence seized from that bedroom, the Government intends to offer at trial all other items seized at the residence against all three Defendants. [Doc. 466 at 8-10]. As to the motions to suppress the voice exemplars, the Government acknowledges that Defendants Cokis and Loza-Cruz were not advised of their <u>Miranda</u> rights prior to the voice exemplars being taken; however, the Government contends Defendants were not in custody at the time the voice exemplars were taken. Therefore, the Government argues that taking the voice exemplars did not violate Defendants' rights. [<u>Id.</u> at 10-12]. And the Government has

5

advised the court and counsel for Defendants that the voice exemplars will only be used for the purpose of identification.

## I.    Facts

On April 29, 2009, members of one of the Strike Force ("SF") Groups were assisting another group within the SF, made up of Federal Bureau of Investigation ("FBI") Special Agents, with the arrest of an individual known as Cokis for whom a federal arrest warrant had been issued.  (Tr. at 7-8, 54-55, 73, 85).   Based on information provided to the SF identifying the residence where Cokis was believed to be residing, the agents went to 2265 Ranch Trial in Norcross, Georgia.  (Tr. at 8-9, 54-55).  The agents, numbering eleven to thirteen, attired in tactical gear[4] arrived at the residence at approximately 8:00 a.m.  Some of the agents established a perimeter around the house. (Tr. at 9, 38, 56).  Agents Bowen, Cromer and Barnes went to the front door and knocked.  (Tr. at 9-10, 56).  No one answered; however, the agents heard noise from inside the residence and observed someone looking out of one of the front windows.  The agents continued to knock and call for someone to answer the door.  (Tr. at 10, 57).  After ten to fifteen minutes, at about 8:30 a.m., the door opened

---

[4]That gear included bullet-proof vests with POLICE and DEA written on the front and back and holstered weapons.  (Tr. at 9, 39-40).  Agent Barnes had a long-gun which was hanging down on a strap.  (Tr. at 39, 56).

AO 72A
(Rev.8/82)

approximately four to five inches and a male, later identified as Loza-Cruz, looked out. The agents could only see his face.  (Tr. at 10-11, 41, 57-58, 77).

Agent Bowen, who is proficient in Spanish, after identifying the agents as police, asked Loza-Cruz who else was inside and if the occupants could come outside. (Tr. at 11-12, 57-58).  When Loza-Cruz responded that others were in the residence, the agent stated that she needed to see them.  Loza-Cruz called to the others in the residence, and when they came to the door, Agent Bowen asked them to step outside. (Tr. at 11, 57-58).  Loza-Cruz asked if the agents had a warrant.  Agent Bowen responded, no, and Loza-Cruz told the agents that they could not come into the residence, and as he exited, he closed the door to the residence behind him.  (Tr. at 11, 58, 78).  Four individuals exited the residence.  Along with Loza-Cruz, a juvenile and two males subsequently identified as Cokis and Valda-Ceja exited.  (Tr. at 11-12, 58). No weapons had been drawn by the agents.  (Tr. at 14).  Agent Bowen stated that until Cokis was identified, none of the men were free to leave.  (Tr. at 85).

As the four men exited the residence, the agents separated the men by a few feet to prevent them from whispering to one another; however, all of the men remained within eye-sight of each other and in the area of the walk-way to the front door.  (Tr. at 13, 37-38, 58-59).  Agent Bowen was not sure how many of the agents were in

Defendants' view.  (Tr. at 38, 42, 59).  The agents began trying to identify the four

men by asking for names and any identification and obtaining biographical information

for DEA forms.  (Tr. at 13, 43, 59-60, 76, 81-82).  Agent Bowen did not recall seeing

any of the men handcuffed while she was outside and did not recall seeing any of the

men pushed to or lying on the ground.  (Tr. at 60-61).  She stated that while she was

outside no one was pushed to the ground.[5]  (Tr. at 61-62).

When Valda-Ceja appeared cooperative, Agents Bowen and Cromer walked him

away from the others to speak with him.  (Tr. at 13, 76).  Although Agent Bowen

began speaking to him in Spanish, Valda-Ceja responded in English.  Except for Agent

Bowen explaining some things in Spanish, the conversation was conducted in English.

(Tr. at 13-14, 63).   The agents asked Valda-Ceja about the residence and his

association with the residence and about how he knew the other men.  He identified

one of the men as Cokis.  (Tr. at 14, 63).  The agents also asked him about the vehicle

parked in the driveway, and Valda-Ceja responded that the vehicle was his and that he

had registration for the vehicle in his name inside in his room.  (Tr. at 14-15, 64).

---

[5]Later, Defendants and the juvenile were sitting on the ground.  (Tr. at 61-62).
Agent Bowen acknowledged that a photograph of Loza-Cruz taken at a later time
showed some grass debris on his shoulder.  (Tr. at 61).

AO 72A
(Rev.8/82)

The agents asked Valda-Ceja if they could see the registration, and he responded, yes. (Tr. at 15, 64). They asked if Valda-Ceja would allow them to go with him into the residence to see the paperwork, and he responded, yes. (Tr. at 64-65). As the agents and Valda-Ceja were about to enter the residence, approximately ten to fifteen minutes after the men had exited, Loza-Cruz stated in Spanish, "you know, I don't want them in the house." Valda-Ceja responded in Spanish that he did not have anything in the house and that the agents could come inside if they wanted. (Tr. at 15-16, 44, 64, 80). As they entered, the agents asked Valda-Ceja if other agents could come inside to check to see if there was anyone else inside. He responded, yes. A couple of agents checked the residence for other occupants as Agents Bowen and Cromer went with Valda-Ceja to his bedroom which he stated he shared with Cokis - the second bedroom on the left.[6]  (Tr. at 15, 42, 44, 65-66).

In the bedroom, Valda-Ceja, who was not handcuffed, sat on the bed and produced the registration for the agents to examine.[7]  As the agents discussed the

---

[6]The rooms of the residence are identified in a rough diagram of the residence. (Tr. at 19; Gov't Ex. 3).

[7]Another agent, Barnes, who had participated in the protective sweep, stood just outside the doorway to the bedroom as security; he was not involved in the conversation with Valda-Ceja.  (Tr. at 45, 66, 70).

9

registration and asked Valda-Ceja about Cokis, Agent Bowen stated that Valda-Ceja appeared nervous, fidgeting on the bed, therefore, making the agents nervous.  (Tr. at 16, 44-47, 67-68).  Agent Cromer asked him if there was anything in the room that the agents needed to know about, including guns, and Valda-Ceja responded, no.  (Tr. at 16, 47).  Agent Cromer asked if they could quickly search for the agents and his safety. He responded, that's fine.  (Tr. at 16, 47, 68).  A few feet from the bed was an open closet, about an arm's length from Valda-Ceja.  (Tr. at 16, 48).  In the closet, on top of some plastic containers and partially under some clothing, Agent Cromer located a handgun.  (Tr. at 16, 49, 68-69).  Valda-Ceja denied knowledge of the handgun.  (Tr. at 17, 49, 70).  The agents also found a very small quantity of cocaine in a trash can in the bedroom.  (Tr. at 17, 70).  The agents did not handcuff Valda-Ceja.  (Tr. at 70).

The agents then asked Valda-Ceja if there were any other guns in the residence, and he responded, no.  (Tr. at 17, 49).  They asked him if they could search the residence for guns, drugs or large amounts of currency.  (Tr. at 17, 49-50, 71).  Valda-Ceja responded that he thought the agents had already searched the residence.  Agent Bowen explained that the agents had not searched the residence only conducted a security sweep looking for people.  (Tr. at 17, 50, 71).  At approximately 8:36 a.m., Valda-Ceja agreed to the search, and Agent Bowen gave him a written consent to

10

search form in Spanish for him to read.  (Tr. at 17-18, 50, 71; Gov't Ex. 1).  Defendant

still was not handcuffed.  (Tr. at 50).  The form stated, as translated by Agent Bowen:

Consent to Search

1. I've been asked to authorize agents of the Drug Enforcement
   Administration to search.  (Describe the person, place or thing to search)
   *2265 Ranch Trail, Norcross*.
2. I haven't been threatened or forced in any manner.
3. I have consented freely to this search.

(Tr. at 18-19; Gov't Ex. 1 (italics handwritten)).  Then Agent Bowen observed Valda-

Ceja sign the form, which she and Agent Barnes also signed.  (Tr. at 19).  After a few

minutes, the agents and Valda-Ceja returned outside.  (Tr. at 51).  Agent Bowen, who

did not recall exactly when Defendants were handcuffed, stated that Defendants were

not handcuffed at this time.  (Tr. at 41-42, 50).  And at some point, Defendants were

relocated to sit in the area in front of the garage door.  (Tr. at 39).

The agents conducted a search of the residence seizing various firearms,

controlled substances, packaging materials, cell phones, documents and other items.

(Tr. at 21-30; Gov't Exs. 2, 4).  Before Defendants were advised of their <u>Miranda</u>

rights, sometime prior to 9:00 a.m., each was asked to give a voice exemplar by

answering questions over the telephone.  (Tr. at 30-31).  At 8:46 a.m. (Tr. at 90), Cokis

answered the following questions over the telephone:

11

What is your name?  *Alberto Zuniga*
Do you have any other names or nicknames?  *No, well just Cokis.*
What is your DOB?  *01/09/87*
How old are you?  *21*
Where are you from?  *San Luis Potosi, Mexico*
Where do you live now?  *Here.  I just moved so I don't know the address.*
How long ago did you move?  *1 month ago*
There at the location you are now?  *Yes*
Do you have a phone?  *Yes but I don't know it.*
Is it a cell phone?  *Yes*
How long have you had the phone?  *About 3 months*
Do you work?  *No - sometimes yes sometimes no as I work in landscaping.*
Do you work for a company?  *No I just work for cash.*
Is there a phone you call to look for work?  *No - I don't know the number.*
Are you married?  *No*

[Doc. 438 at 5].[8]

Agent Bowen subsequently, at 9:36 a.m. for Valda-Ceja, at 9:52 a.m. for Cokis,

and at 10:17 a.m. for Loza-Cruz, advised each Defendant of his <u>Miranda</u> rights using

a DEA 13A card, reading from the Spanish side.  (Tr. at 31-32; Gov't Ex. 5).  Each

Defendant was advised:

Before we ask you any questions, you must understand:
-       You have the right to remain silent.
-       Anything you say can be used against you in court.

_____

[8]The parties did not offer the transcripts of the voice exemplars or the testimony of the government agents who participated in the voice exemplars at the hearing.  The Government does not dispute that the transcript offered by Defendant is the voice exemplar for Cokis.

- You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

Do you understand?

Are you willing to answer some questions?

(Gov't Ex. 5).[9]  As she began to the read the card, she asked each Defendant to advise her if he did not understand something she said in order for her to explain, and after each bullet point, she asked if each Defendant understood.  Finally, as she finished, she asked each Defendant if he understood.  (Tr. at 32).  Each Defendant appeared to understand the advice of rights.  (Tr. at 32).  She also gave each Defendant the opportunity to read the card.  (Tr. at 32).  No agent had his or her firearm drawn on Defendants.  (Tr. at 33).  Agent Bowen did not recall if Defendants were handcuffed when advised of their rights or when they made statements.  (Tr. at 52-53).  Although Defendants Loza-Cruz and Valda-Ceja were non-responsive to some questions asked, no Defendant stated that he did not want to make a statement or answer questions and no Defendant asked for a lawyer.[10]  (Tr. at 34-36).

_____

[9]Agent Bowen testified that the English side of the card is an accurate translation for the Spanish side that she read to Defendants.  (Tr. at 32).

[10]During his statement, Cokis advised that he and the three other men had lived in the residence for twenty-eight to thirty days, but he was not sure who paid the rent or stayed in the master bedroom.  (Tr. at 53).  And Valda-Ceja advised that he had

13

According to Agent Bowen, after the agents completed the search and conducted the post-<u>Miranda</u> interviews of Defendants, her supervisor, Agent Murphy spoke with his counter-part with the FBI about what had been found and whom to arrest. After being advised whom to arrest, the agents advised Defendants that they were under arrest.[11] (Tr. at 86). She stated that the agents were at the residence with Defendants for approximately two hours, from 8:30 a.m. to about 10:17 a.m. (Tr. at 61).

Defendants Anaya-Medina/Cokis and Cruz-Plancarte/Valda-Ceja testified at the evidentiary hearing on the motions to suppress. (Tr. at 92-119). The court does not find the testimony of Valda-Ceja credible based on the court's observation of the witness, the inconsistencies within his story and with other witnesses, and the lack of plausibility in the testimony. Therefore, the court will not rely on this testimony in resolving the motions to suppress. However, except as noted *infra*, having observed and considered the testimony of Cokis, the court finds his testimony credible.

---

lived at the residence for twenty to thirty days. (Tr. at 71). He stated that Loza-Cruz and the juvenile slept in the first bedroom. (Tr. at 83). Loza-Cruz also stated that he had lived in the residence for about twenty-eight days and that he slept in the first bedroom. (Tr. at 83).

[11]Agent Bowen could not remember if the agents stated earlier to Defendants that they had a warrant for Cokis. (Tr. at 85-86).

14

Cokis testified that as of April 29, 2009, he had been living at the residence for about one month with the other Defendants and a juvenile with the rent due at the end of the month in the amount of $100. (Tr. at 93-94). He and Valda-Ceja stayed in the second bedroom. (Tr. at 94). He recalled that at 8:00 a.m., the agents knocked on the door. He did not recall who opened the door but did recall that the agents asked if they could come outside. (Tr. at 95-96). He recalled four officers being around them and a bunch of questions being asked to which he responded that he did not know the answers. (Tr. at 96). He did not hear anyone consent to the agents going into the residence, but he did hear "Pedro," that is, Loza-Cruz, state that the agents could not enter. (Tr. at 98). According to Cokis, after Loza-Cruz made this statement, the agents took him out front and threw him face front onto the grass.[12] (Tr. at 98). Cokis also said that he was handcuffed and told there was a warrant for him about fifteen minutes

---

[12]The court notes that Cokis and Valda-Ceja, who both claim that Loza-Cruz was thrown to the ground, are not consistent as to when this event allegedly occurred. Cokis claims this happened as soon as Loza-Cruz stated agents could not enter as they were exiting the residence. However, as will be recounted, Valda-Ceja contends that this did not happen until over an hour later when the agents were trying to follow him back into the residence and Loza-Cruz tried to stop them. (Tr. at 98, 108-09, 115-16). Agent Bowen testified that she never saw Loza-Cruz thrown to the ground. (Tr. at 60-61). The court concludes that Defendants, given the photograph of Loza-Cruz taken at some unknown time showing some grass debris on his shoulder, concocted the story about Loza-Cruz being thrown to the ground but failed to work out the inconsistencies in how and when this occurred.

15

after exiting the residence.  (Tr. at 97-98, 100-01).  He was told the others would be let go but not him because of the warrant for his arrest.  (Tr. at 100-01).  However, Cokis said that he could not remember if he was advised of the warrant for his arrest before or after he answered the questions on the telephone.  (Tr. at 101-02).

Valda-Cruz, after confirming that he had lived at the residence for twenty-seven days and stayed in the second bedroom (Tr. at 103-05), began to tell a story - which is exactly how the court views his testimony - about what he claims occurred on April 29, 2009.  He contends that before the four men exited the residence, with thirteen to fourteen officers all around the house, and while he and the others were all standing together at the entrance, the female officer asked to speak with him and for identification.  He said he gave her identification before exiting the residence.  (Tr. at 106-07).  While not significant, the court does not believe that with four people crowded in the doorway and agents standing outside, the questions about identity and obtaining identifications took place.  Then, once the men had exited the residence, Valda-Ceja said the female agent immediately asked him if they could go in the residence, and that he responded, no.[13]  He claimed to have asked for the "order –

_____

[13]At some point after exiting, Valda-Ceja said that he identified the other men. (Tr. at 112).

AO 72A
(Rev.8/82)

search?" (Tr. at 106-07). However, on cross-examination, Valda-Ceja was asked, "You never told the agents they couldn't come in the house, did you?" And, he responded, "No, no, no, no, no." (Tr. at 115). That response – which the court understood to be Valda-Ceja's agreement that he did not refuse entry into the residence – is another inconsistency in Defendant's recounting of the events. Then, according to Valda-Ceja, for almost an hour, the agents were in his face asking to be allowed in the residence while threatening him with calling immigration agents if he did not agree. (Tr. at 107-08, 118). The time line of events refutes Defendant's exaggeration of the time the agents allegedly spent threatening him to allow them into the residence, especially when considered in conjunction with his claim that another hour was spent intimidating him in the bedroom for consent to search the residence. The voice exemplars of the three Defendants all took place before 9:00 a.m. - a difficult task if Valda-Ceja was outside being badgered or in the second bedroom being threatened for hours. (Tr. at 30). And, approximately a hour after the men exited the residence, Valda-Ceja was being advised of his Miranda rights, at 9:36 a.m. - again, a slight interruption in the intimidation tactics allegedly being used by the agents. (Tr. at 31, 41, 61).

17

At some point, while outside, Valda-Ceja agreed that the agents asked about the car parked on the driveway and that he responded that it was his and that the registration for it was in his room inside. (Tr. at 108). He said he asked to go in to get the registration, and the agents followed him. Valda-Ceja stated that the agents did not ask to follow him into the residence. (Tr. at 108, 115). He stated that as they started inside, Loza-Cruz wanted to close the door but that agents took him away towards the garage and threw him on the ground while saying bad words.[14] (Tr. at 108-09, 115). On cross-examination, when specifically asked, he said Loza-Cruz called out that the agents did not have a warrant and not to let them inside. (Tr. at 115-16). He also stated that the agents did not ask permission to check the house for other people. (Tr. at 110). Given Agent Bowen's straight-forward accounting of Loza-Cruz's refusal to allow the agents into the residence and his subsequent statements to Valda-Ceja not to allow the agents inside, the court finds no reason to disbelieve her testimony that Valda-Ceja did consent to the agents' entry and to the subsequent search of the residence.

---

[14]On cross-examination, Valda-Ceja stated that Loza-Cruz closed the door as Valda-Ceja entered and as the agents tried to enter. Then the agents took Loza-Cruz away and threw him on the ground. (Tr. at 119).

18

Once in the bedroom, Valda-Ceja said that he sat on the bed to look for the registration but that the agents found it, although he does not explain how or where, and that they searched the room, finding the gun in the closet, without asking his permission to search.  (Tr. at 110-11).  When the gun was found, Valda-Ceja stated, "And he [the male agent] said, You said was no guns, that there was nothing here." (Tr. at 111).  The court notes that this statement attributed to Agent Cromer by Valda-Ceja makes no sense unless as testified by Agent Bowen the agents did not search the room until after Valda-Ceja started fidgeting and they asked him about weapons being in the room which he denied.  (Tr. at 16-17).  Valda-Ceja did state that he denied knowing about the gun after the agents found the weapon.  Then, according to him, the agents came very close to him and asked permission to search.  They were intimidating.  (Tr. at 111).  They told him if he cooperated, nothing would happen to him, but if not, they would call immigration.  (Tr. at 111).  After an hour, Valda-Ceja said that he gave verbal permission to search but that he did not sign the form until later when the agents told him to sign it.  (Tr. at 111-12, 116, 118).  The court has already noted that the amount of time that Valda-Ceja claims the agents spent with him in the bedroom to obtain consent simply is inconsistent with all of the other testimony and events on April 29, 2009.  In fact, he asserts that it was another hour later when he

19

eventually signed the consent to search form. Agent Bowen testified that the form was signed at approximately 8:36 a.m. (Tr. at 71, 112). Valda-Ceja's recounting of the events on April 29, 2009, is simply not believable. And, as noted, the court will not consider his testimony in analyzing Defendants' motions to suppress.

Additional facts will be set forth as necessary during the discussion of Defendants' claims.

## II. Discussion

### a. Search of Residence

Defendants Anaya-Medina/Cokis [Docs. 302 and 437] and Cruz-Plancarte/ Valda-Ceja [Docs. 322 and 439] contend that the warrantless search of the residence violates their Fourth Amendment rights because Valda-Ceja's consent to search the residence was involuntary. Defendant Cruz-Loya/Loza-Cruz [Docs. 297 and 442], citing the Supreme Court decision in <u>Georgia v. Randolph</u>, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006), contends that the search of the residence violates his Fourth Amendment rights, regardless of any consent by one of the other Defendants, because he specifically refused consent for the agents to enter the residence. The Government responds contending that Valda-Ceja, a co-tenant in the residence, who had authority to consent, voluntarily consented to the agents' entry into the residence

20

and to the subsequent search of the residence. [Doc. 466]. And, although the Government agrees not to introduce evidence obtained from the bedroom in which Loza-Cruz slept, the Government does not otherwise address the binding legal authority set forth in <u>Randolph</u> which appears, as Loza-Cruz contends, to require suppression of any evidence found in the residence as to Loza-Cruz.

The Government relies on the consent to enter the residence and subsequently to search the residence obtained from Valda-Ceja to justify the warrantless search. [Doc. 466 at 8]. "It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search [a residence] without a warrant so long as they first obtain the voluntary consent [for the search]." <u>United States v. Blake</u>, 888 F.2d 795, 798 (11th Cir. 1989) (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)). "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." <u>Blake</u>, 888 F.2d at 798 (citing <u>Schneckloth</u>, 412 U.S. at 249-50, 93 S. Ct. at 2059); <u>see also</u> <u>United States v. Nuyens</u>, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances."). "The government bears the burden of proving both the existence of consent and that the consent was not a function of

21

acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Blake, 888 F.2d at 798 (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)); see also United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).   Factors in assessing voluntariness include: "'voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'" Blake, 888 F.2d at 798 (citations omitted); see also Purcell, 236 F.3d at 1281 (same).

However, "the government need not establish [defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of effective consent.'" United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 519 U.S. 33, 39, 117 S. Ct. 417, 421, 136 L. Ed. 2d 374 (1996)).  And, contrasting the test for the waiver of "rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment," Schneckloth, 412 U.S. at 241, 93 S. Ct. at 2055, the Supreme Court explained that, while a consent to search must be voluntary, it need not be "'an

22

intentional relinquishment or abandonment of a known right or privilege,'" that is, knowing and intelligent.  Id. at 241-46, 93 S. Ct. at 2055-56 (citation omitted); see also Tukes v. Dugger, 911 F.2d 508, 516 (11th Cir. 1990) (same).  According to the former Fifth Circuit in United States v. Elrod, 441 F.2d 353 (5th Cir. 1971), a case decided before Schneckloth, "[t]he question [whether an individual has validly consented to a search] is one of mental awareness so that the act of consent was the consensual act of one who knew what he was doing and had a reasonable appreciation of the nature and significance of his actions."  Id. at 355.  Nonetheless, that standard does not, after Schneckloth, mean that a voluntary consent to search requires a comprehension of Fourth Amendment rights.  United States v. Jennings, 491 F. Supp. 2d 1072, 1078-79 & n.3 (M.D. Ala. 2007).

And, as the Seventh Circuit Court of Appeals stated, "A third party with common authority over the premises [or effects] sought to be searched may provide such consent. . . .  Common authority is based upon mutual use of property by persons generally having joint access or control."  United States v. Aghedo, 159 F.3d 308, 310 (7th Cir. 1998) (citations omitted); accord United States v. Fernandez, 58 F.3d 593, 597-98 (11th Cir. 1995).  As noted by the Supreme Court, "[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the

23

property . . . but rests rather on the mutual use of the property by persons generally having joint access or control for most purposes. . . ." United States v. Matlock, 415 U.S. 164, 171-72 n.7, 94 S. Ct. 988, 993 n.7, 39 L. Ed. 2d 242 (1974); see also United States v. Backus, 349 F.3d 1298, 1299 (11th Cir. 2003) (same).  Furthermore, "a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed common authority over the premises, even if the third party does not in fact possess such authority." United States v. Fernandez, 58 F.3d 593, 597 (11th Cir. 1995); see also United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997).  "As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" Illinois v. Rodriguez, 497 U.S. 177, 188, 110 S. Ct. 2793, 2801, 111 L. Ed. 2d 148 (1990) (quoting Terry v. Ohio, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889 (1968)); see also United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008) (same).  It is the Government's burden to establish that Valda-Ceja had actual authority or apparent authority to consent to the searches.  See Rodriguez, 497 U.S. at 181, 110 S. Ct. at 2797.  The validity of the search as to Cokis and Valda-Ceja

24

depends on the voluntariness of Valda-Ceja's consent.[15]  Based on the totality of the circumstances, the court finds that Valda-Ceja's consent to allow the agents into the residence and to subsequently search the residence was voluntary.

On April 29, 2009, at approximately 8:00 a.m., federal agents arrived at 2265 Ranch Trail, Norcross, seeking to execute an arrest warrant for a person known to them as Cokis.  (Tr. at 7-9, 54-55, 73).  Eleven to thirteen agents surrounded the residence, and three of those agents, two with weapons holstered and the third with a long gun on strap pointing towards the ground, knocked at the front door.  (Tr. at 9-10, 14, 38-39, 56).  When the door was eventually answered at approximately 8:30 a.m., by Loza-Cruz, Agent Bowen, in Spanish, identified herself and asked Loza-Cruz if there was anyone else in the residence.  (Tr. at 10-11, 41, 57, 77-78).  When Loza-Cruz responded, yes, she asked that the others come to the door, and then she asked that the four men exit the residence.  (Tr. at 11-12, 57-58).  As the men exited, no weapons were drawn and no one was handcuffed.  (Tr. at 14, 51, 58).  The agents tried to identify each man and asked for identification.  (Tr. at 13, 43, 59-60, 76).

---

[15]Neither Defendant contends that Valda-Ceja lacked authority to consent to the search, and the evidence establishes that he was a co-tenant in the residence with the same authority to allow - or to refuse to allow - the agents into the residence as any of the tenants.  (Tr. at 53, 71-72, 82-83, 93-95, 103-05).

25

When Agent Bowen determined that one of the men, Valda-Ceja, appeared cooperative, she asked to speak with him away from the other men.  (Tr. at 13, 76). She and Agent Cromer spoke with Valda-Ceja, who conversed with them for the most part in English.  (Tr. at 13-14, 63).  Valda-Ceja identified the other men and claimed ownership of the car parked on the driveway.  (Tr. at 14-15, 63-64).  The agents asked to see the registration which Valda-Ceja stated was in his bedroom in the house.  (Tr. at 15, 64).  Valda-Ceja agreed to show the registration to the agents and to allow them to accompany him into the residence to obtain the paperwork.  (Tr. at 15, 64-65).  Over the objection of Loza-Cruz, who did not want the agents in the residence, Valda-Ceja stated that the agents could come inside because he did not have anything to hide.  (Tr. at 15, 80).  As they entered, Agent Bowen also asked if other agents could look through the residence to be sure no one else was inside, and Valda-Ceja agreed.  (Tr. at 15, 65-66).   According to Agent Bowen, during this ten to fifteen minute conversation, Valda-Cruz was not handcuffed, and the agents did not have weapons drawn.  (Tr. at 45, 64).

Nothing about the circumstances of the initial interaction between the agents and Defendants, especially Valda-Ceja, establish that his consent to allow the agents into the residence or to conduct the protective sweep was coerced.  The fact that Valda-Ceja

26

and the other men were being detained for the purpose of identifying Cokis to execute the arrest warrant (Tr. at 85) does not alter this finding.  Factual situations involving a much greater show of force and restraints on suspects have not been found sufficiently coercive to invalidate consents to enter residences or to search.  See, e.g., United States v. Kimoana, 383 F.3d 1215, 1225-26 (10th Cir. 2004) (although "officers entered the motel room with guns drawn, raising their voices at the occupants and ordering them to put their hands where the officers could see them[,]" the trial court found that "[a]fter performing a pat down, the officers put their weapons back in their holsters, the atmosphere was described as 'calm,' and then [the officer] 'immediately' asked [the defendant] for consent to search the room[;]" therefore, when the consent to search was obtained, the situation had calmed down and no show of force was being exhibited); United States v. Taylor, 31 F.3d 459, 463-64 (7th Cir. 1994) ("The record shows that the initial melee of agents, badges and weapons, necessary to protect the safety of the agents . . ., dissipated only seconds after it had begun and that all was routine once the premises had been secured.  Though certainly unpleasant, there is nothing so inherently coercive about such tactics, commonly used where a danger to life or limb is perceived by law enforcement agents, to render subsequent cooperation involuntary."); United States v. Hidalgo, 7 F.3d 1566, 1570-71 (11th Cir. 1993) (facts

27

that the defendant was arrested by "SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint" did not establish consent to search was involuntary, even though consent was given after invocation of <u>Miranda</u> rights); <u>United States v. Garcia</u>, 890 F.2d 355, 360-62 (11th Cir. 1989) (the court found voluntary a consent to search which was given after the defendant was arrested by numerous officers, patted down for weapons and a protective sweep of his house was conducted and after he was seated in his living room in handcuffs, given his <u>Miranda</u> rights, and the officers had refused to accept a limited consent).  Valda-Ceja's consent allowing the agents to enter the residence and to conduct the protective sweep was voluntary.

Likewise, nothing about the events that occurred once the agents and Valda-Ceja entered the residence and went to his bedroom establishes that the consent to search the residence was involuntary.  After Valda-Ceja found the registration form, as the agents were discussing the form with him and continuing to ask him about the other occupants, he began fidgeting and moving on the bed.  (Tr. at 16, 46-47, 67-68).  The agents were concerned about his actions, and Agent Cromer asked him if there was anything, such as guns, in the room that the agents needed to know about.  (Tr. at 16, 47).  When Valda-Ceja responded, no, the agent asked if they could search the room

28

for his and their safety.  He responded, yes.  (Tr. at 16, 47-48, 68).  That search revealed a handgun in the open closet a few feet from Valda-Ceja's location on the bed.  He denied knowledge of the firearm.  (Tr. at 16-17, 48-49, 68-70).  Valda-Ceja denied knowing of any other guns in the residence.  (Tr. at 17, 49).  The agents then asked for consent to search for guns, drugs and large amounts of currency in the residence.  After Agent Bowen explained to Valda-Ceja that the previous walk through to look for other occupants was not a search, he agreed to the search.  (Tr. at 17, 49-50, 70-71).  He was provided with a consent to search form, which he was asked to read.  Valda-Ceja then signed the form.  (Tr. at 17-19, 71; Gov't Ex. 1).  The agents conducted a search of the residence finding additional firearms, some drugs, packaging materials, cell phones and various documents. (Tr. at 21-30).  Although Agent Barnes, who had the long gun, stood outside the bedroom doorway while Agents Bowen and Cromer spoke with Valda-Ceja, he did not participate in the conversation with Valda-Ceja.  Agents Bowen and Cromer had their weapons holstered.  And Defendant was not handcuffed.  (Tr. at 45-46, 50, 56, 70).

Contrasted with the facts in other cases which courts have found did not invalidate the voluntariness of a consent to search, nothing in the events surrounding Valda-Ceja's consent to search was sufficiently coercive to result in a finding that his

29

consent was involuntary.  In <u>United States v. Strickland</u>, 245 F.3d 368 (4th Cir. 2001), the Fourth Circuit Court of Appeals refused to find that a consent to search was involuntary.  In <u>Strickland</u>, officers arrived at the defendant's residence at 6:30 a.m. and unsuccessfully attempted to wake him by pounding on the door and the side of the trailer.  They, therefore, broke open the front door, entered, and handcuffed both the defendant's wife and the defendant, who at the time was dressed only in his underwear.[16]  Both were seated, handcuffed, in the living room - the defendant still in his underwear.  The agents asked if there were any weapons in the residence or any more marijuana, the agents having seen the latter on a kitchen counter.  The defendant pointed out the location of a firearm and responded negatively to the question about additional marijuana.  The agents then asked for consent to search the residence, and both the defendant and his wife consented.  <u>Id.</u> at 382-83.  The court upheld the consent finding that the officers did not use any force other than that necessary to effect the entry into the residence and to arrest the defendant and that no facts indicated that the defendant was coerced into consenting to the search.  <u>Id.</u>  <u>See also</u> <u>United States v. Guiterrez</u>, 92 F.3d 468, 470-71 (7th Cir. 1996) (the circumstances surrounding

---

[16]The defendant's wife was advised that she was not under arrest but only handcuffed for officer safety.  <u>Id.</u> at 382-83.

30

the consent, including approximately a dozen federal agents entering the premises with weapons drawn, handcuffing the individuals present and ordering them up against the wall, including the defendant, and the fear of being arrested, was not so inherently coercive to render the consent involuntary); United States v. Espinosa-Orlando, 704 F.2d 507, 512-13 (11th Cir. 1983) (the court found that the consent to search was voluntary although the defendant had been detained and placed on the ground by armed officers and although one of the officers still had his weapon drawn pointed away from the defendant at the ground, because there was no abusive language used and no threats, because the request was made in a conversational tone, and because the defendant was not handcuffed or removed from the scene of the stop and detention).

The facts establish that Valda-Ceja was cooperative with the agents from the initial encounter and throughout the time spent at the residence. No credible evidence establishes that the agents threatened Valda-Ceja to obtain his cooperation or the consent to search. He, in fact, in the face of Loza-Cruz's objections to the agents entering the residence, told Loza-Cruz that the agents could enter because he did not have anything to hide inside. (Tr. at 15, 80). He repeatedly denied being aware of any firearms or other contraband in the residence indicating that he had no reason to refuse to allow the search of the residence. For these reasons, the court finds that Valda-

Ceja's consent to search was voluntary.  As to Defendants Anaya-Medina/Cokis and Cruz-Plancarte/Valda-Ceja, the evidence found in the residence is admissible at trial.

However, the same result does not apply to Defendant Cruz-Loya/Loza-Cruz. In Randolph, 547 U.S. 103, 126 S. Ct. 1515, the Supreme Court addressed a situation not present in its earlier decisions addressing third party consents to search, that is, the impact of a present and objecting co-tenant to the search.  In Randolph, Janet Randolph, the defendant's wife, who had recently returned to the marital residence after moving out, advised police that she and her husband had a domestic dispute and that the defendant had taken her son and left him at another location.  She also advised officers that the defendant used cocaine causing financial problems.  Id. at 106-07, 126 S. Ct. at 1519.  The defendant arrived at the residence and explained about removing the child, and he also denied drug use accusing his wife of the drug use.  Id. at 107, 126 S. Ct. at 1519.  Shortly thereafter, Janet Randolph advised officers that there were "items of drug evidence" in the house.  When the defendant was asked for his consent to search the residence, he "unequivocally" refused.  Id.  The officer then asked Janet Randolph for consent which she "readily" gave, and she assisted the officer in locating

32

an item of evidence before subsequently withdrawing her consent.[17] Id. The defendant

moved to suppress the evidence seized from the residence.  Id.

On these facts, and specifically not undercutting the rulings in Matlock, 415 U.S.

at 171-72 n.7, 94 S. Ct. at 993 n.7, and Rodriguez, 497 U.S. 177, 110 S. Ct. 2793, the

Supreme Court held that "a warrantless search of a shared dwelling for evidence over

the express refusal of consent by a physically present resident cannot be justified as

reasonable as to him on the basis of consent given to the police by another resident."

Randolph, 547 U.S. at 120, 126 S. Ct. at 1526; see also United States v. Harris, 526

F.3d 1334, 1339 (11th Cir. 2008) (same).  Recognizing that the decision in Matlock

involved a situation where the defendant was not present with an opportunity to object

because he was in police custody close by and that Rodriguez involved a situation

where the defendant was asleep in the residence and could have been roused before the

consent was obtained but was not, the Supreme Court acknowledged that it "drew a

fine line" and concluded:  "if a potential defendant with self-interest in objecting is in

fact at the door and objects, the co-tenant's permission does not suffice for a

reasonable search, whereas the potential objector, nearby but not invited to take part

in the threshold colloquy, loses out."  Randolph, 547 U.S. at 121, 126 S. Ct. at 1527.

_____

[17]A search warrant was obtained for a search of the house.  Id.

Loza-Cruz falls precisely within the category of objecting defendants, with a self-interest in objecting, who stand at the door of the residence and object to the agents' entry.

When Agent Bowen asked the four men to exit the residence, Loza-Cruz asked her if she had a warrant. (Tr. at 11, 58, 78). After the agent responded, no, he stated that the agents could not come into the residence. And as he exited the residence, Loza-Cruz closed the door. (Tr. at 11, 78). He explicitly stated and demonstrated his refusal to allow agents into the residence. Then, subsequently, as the agents started to enter the residence with Valda-Ceja, Loza-Cruz stated, "you know, I don't want them in the house." (Tr. at 15, 80). Loza-Cruz affirmed his objection to the agents' entry.

And Valda-Ceja's consent to the entry and search, which was disputed by Loza-Cruz, "without more, [gave the agents] no better claim to reasonableness in entering than the officer would have in the absence of any consent at all."[18] Randolph, 547 U.S.

_____

[18]Since the Government ignored the controlling authority in Randolph, there was no argument presented that Velda-Ceja's consent, due to some recognized hierarchy, was entitled to trump Loza-Cruz's refusal. Randolph, 547 U.S. at 114, 126 S. Ct. at 1523 ("Unless the people living together fall within some recognized hierarchy, like a household of parent and child or barracks housing military personnel of different grades, there is no societal understanding of superior or inferior. . . . [T]here is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another, whether the issue is the color of the curtains or invitations to outsiders."). Nor does the evidence before the court indicate that Valda-

34

at 114-15, 126 S. Ct. at 1523.  As the Supreme Court stated, "[T]he cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place."  Id. at 115, 126 S. Ct. at 1523; see also United States v. Travis, 311 Fed. Appx. 305, 310 (11th Cir. 2009) ("Where co-tenants are present at the entrance, and one consents while the other objects, police may not search.").  As was true in Randolph, "[t]his case invites a straightforward application of the rule that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant."  Randolph, 547 U.S. at 122-23, 126 S. Ct. at 1528.  Loza-Cruz's Fourth Amendment rights were violated by the warrantless search of the residence; therefore, no evidence seized during the warrantless search, from any areas within the residence, may be used against him at trial.

For these reasons, the court **RECOMMENDS** that Defendant Anaya-Medina/Cokis' motion [Doc. 302] and Defendant Cruz-Plancarte/Valda-Ceja's motion

---

Ceja's authority over the residence was in any way superior to that of Loza-Cruz.  All of the men had been in the residence for approximately one month; no one had yet to pay any rent; and each slept in designated rooms within the residence but apparently all equally enjoyed use of all of the common areas.  (Tr. at 53, 71-72, 82-83, 93-95, 103-05).

[Doc. 322] to suppress evidence be **DENIED** and that Defendant Cruz-Loya/Loza-Cruz's motion [Doc. 297]to suppress evidence be **GRANTED**.

    **b.**    **Statements**

Defendants Anaya-Medina/Cokis and Cruz-Loya/Loza-Cruz also argue that the voice exemplars taken on April 29, 2009, prior to their being advised of their <u>Miranda</u> rights violated their Fifth Amendment right to remain silent and their Sixth Amendment right to counsel.  [Docs. 297 and 301].   Neither Defendant specifically addresses the statements made after being advised of their <u>Miranda</u> rights.[19]  And, although an issue that needs to be addressed and seemingly raised in his motion to suppress [Doc. 297 at 1-2],[20] Loza-Cruz did not present any argument in his post-hearing brief regarding the potential taint on his statements flowing from the unlawful search of the residence.   Based on the arguments presented by Defendants, the

---

[19]In fact, Cokis states in his brief that he was unaware of any post-<u>Miranda</u> statements attributed to him [Doc. 438 at 9], which is surprising given the testimony of Agent Bowen at the evidentiary hearing that all three Defendants made statements after being advised of and waiving their rights and because portions of the statements were offered into evidence.  (Tr. at 31-36; 52-54; 71-72; 82-83).  And Loza-Cruz's challenge to his statements is a one-line conclusory assertion that his statements violated his rights.  [Doc. 442 at 12].

[20]Defendant sought to suppress all evidence "seized as incident to, as a result of, and that results from the search . . . and any statements thereafter made" because of the unlawful search.  [<u>Id.</u>].

36

Government's response to the motions to suppress statements focuses on the voice exemplars taken prior to Defendants being advised of their <u>Miranda</u> rights. The Government's contention is that neither Defendant was subjected to custodial interrogation. [Doc. 466 at 10-12]. Significantly, the Government will only use the voice exemplars for the purpose of identification.

### 1.    Fruit of the Poisonous Tree

Although left unaddressed by either Defendant Cruz-Loya/Loza-Cruz or the Government, the court believes that the issue of whether the voice exemplar and/or the post-<u>Miranda</u> statement given by Defendant should be suppressed as fruits of the unlawful search of the residence deserves the attention of the court. Loza-Cruz's Fourth Amendment right to be free from a warrantless search of his residence was undisputedly violated by the agents' entry into and search of the residence over his clearly stated and repeated objection. In both the case of the voice exemplar and Defendant's <u>Miranda</u> waiver and statement, the question for this court is whether:

> "[G]ranting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." . . . [This court is] obliged to determine whether the [statement and] consent [were] "sufficiently an act of free will to purge the primary taint of the unlawful invasion," or, alternatively, whether the causal connection had "become so attenuated as to dissipate the taint."

37

United States v. Delancy, 502 F.3d 1297, 1309 (11th Cir. 2007) (quoting Wong Sun v.

United States, 371 U.S. 471, 486-87, 83 S. Ct. 407, 416-17, 9 L. Ed. 2d 1963 (1963)

(citations and internal quotations omitted)); see also United States v. Lopez-Garcia,

565 F.3d 1306, 1315 (11th Cir. 2009) (same).

The Supreme Court, as well as the Eleventh Circuit Court of Appeals, has

generally applied three factors to determine whether a prior illegality has become

sufficiently attenuated from the evidence sought to be introduced:  "'[t]he temporal

proximity of the [illegal search] and the confession [or consent], the presence of

intervening circumstances, . . . and, particularly, the purpose and flagrancy of the

official misconduct.'"  Taylor v. Alabama, 457 U.S. 687, 690, 102 S. Ct. 2664, 2667,

73 L. Ed. 2d 314 (1982) (citation omitted); see also Lopez-Garcia, 565 F.3d at 1315

(same); United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003) (same).

The court's application of these factors and the determination "whether there is a nexus

between the evidence in question and the police conduct . . . is essentially a common

sense evaluation of the facts and circumstances of the particular case."  United States

v. Kapperman, 764 F.2d 786, 793 (11th Cir. 1985); see also Delancy, 502 F.3d at 1310

("Moreover, we will not allow a factor-based analysis to obscure the underlying

AO 72A
(Rev.8/82)

question, which 'generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response.'") (citation omitted).

With respect to the voice exemplar, these factors need not be addressed in detail because the court finds that the voice exemplar, taken for the purpose of assisting in the identification of the men who exited the residence, particularly to identify Cokis for whom an arrest warrant had been issued, was not obtained "'by exploitation of'" the illegal search of the residence but "'by means sufficiently distinguishable to be purged of the primary taint.'" Delancy, 502 F.3d at 1309 (citation omitted). Given the reason for taking the voice exemplars, whether the residence was searched or not, the court finds that the exemplars would have been and, as discussed *infra*, could have been obtained. The search of the residence and the items found therein did not cause the exemplars to be obtained. The fact of the arrest warrant for Cokis and, the court infers, the intent to determine whether any of other occupants of the residence had been captured on the various wire intercepts, caused the exemplars to be obtained. For this reason, the court finds that the voice exemplar of Loza-Cruz does not constitute fruits of the illegal search of his residence.

With respect to his post-Miranda statements, the court reaches a contrary conclusion. In the case of a statement following an illegal arrest, the Supreme Court

39

in <u>Taylor</u> noted it was "firmly established that the fact that the confession may be 'voluntary' for purposes of the Fifth Amendment, in the sense that <u>Miranda</u> warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest [or search]." <u>Taylor</u>, 457 U.S. at 690, 102 S. Ct. at 2667. This court, although the facts herein differ, likewise finds that, even if Loza-Cruz was advised of and voluntarily, knowingly and intelligently waived his <u>Miranda</u> rights, such a finding does not in and of itself purge any taint from the illegal search. Applying the factors in <u>Taylor</u>, in fact, results in the conclusion that the waiver and statement were not sufficiently attenuated from the illegal search to purge the taint of that illegality.

First, as the Eleventh Circuit Court of Appeals has acknowledged, "there is no hard-and-fast rule for determining how much time must have passed before the link between an unlawful [search] and a confession can be considered sufficiently attenuated." <u>Lopez-Garcia</u>, 565 F.3d at 1315. In <u>Lopez-Garcia</u>, the court held that "the temporal proximity between the two events [therein] is limited" because the illegal arrest took place a day before the statements were obtained. <u>Id.</u> In reaching this conclusion, the court stated, "[W]e have observed that the amount of time found sufficient to meet the temporal proximity factor ranges from immediate or close in time, to three minutes, to two hours." <u>Id.</u> (citations and internal quotations omitted);

40

and see Chanthasouxat, 342 F.3d at 1280 (noting that period of three minutes between illegal search and statements "favored exclusion").  In this case, Lopez-Cruz's waiver of Miranda rights, which occurred at 10:17 a.m. (Tr. at 31) with his statement immediately being taken (Tr. at 35-36, 82-83), followed closely upon the illegal search of the residence, which began sometime after the consent to search was signed at 8:36 a.m. (Tr. at 71) and which continued for some undisclosed period of time but may very well have been ongoing while Loza-Cruz was being questioned inside the residence. This factor favors exclusion.

Likewise, the second factor, the presence – or absense – of intervening circumstances, supports exclusion of the evidence.  The very same agents who entered the residence over Loza-Cruz's objection and obtained the consent to search participated in the questioning of Loza-Cruz, and the topic of the questioning, Loza-Cruz's association with the residence and the other occupants, was linked to the illegal search.  Cf. Lopez-Garcia, 565 F.3d at 1316 (finding intervening circumstances because different agents conducted the interview from those effecting the illegal arrest and because the topic of the interview, the defendant's immigration status, differed from the subject of his arrest, drugs).

41

Finally, the purpose and flagrancy factor also supports finding the waiver and statement were tainted by the arrest.  Although Loza-Cruz explicitly stated to the agents that they could not enter the residence without a warrant and firmly closed the door behind him as he exited, the agents still entered the residence and conducted a search – granted with the consent of another resident.  (Tr. at 11, 14-20, 58, 64-71, 78, 80).  And, although Agent Bowen indicated that she did not honor Loza-Cruz's refusal to allow agents into the residence because she did not know if he rented the house or who had authority to give consent (Tr. at 78), she could have easily determined, before going into the residence, that Loza-Cruz had just as much right to exclude the agents as Valda-Ceja had to allow them inside and that, therefore, the agents should have honored Loza-Cruz's refusal.  The facts before the court indicate that the agents simply ignored Loza-Cruz's assertion of his Fourth Amendment rights in hopes of securing, as they did, the consent of another of the tenants to gain entry and the opportunity to search.

For these reasons, the court finds that Loza-Cruz's waiver of rights and post-Miranda statements constitute fruits of the illegal search of the residence and the violation of his Fourth Amendment rights and that the Government cannot use the statements at trial against him.

42

### 2. Voice Exemplars

Defendants Anaya-Medina/Cokis and Cruz-Loya/Loza-Cruz contend that taking the voice exemplars while they were allegedly in custody violated their Fifth Amendment right to remain silent and Sixth Amendment right to counsel. Before addressing the substance of these claims, the court notes that Loza-Cruz's Sixth Amendment right to counsel had not attached at the time of his statements, either before or after being advised of <u>Miranda</u> rights, on April 29, 2009. He had not been charged in any manner, not even by criminal complaint, with any criminal activity. <u>See</u> <u>United States v. Alvarado</u>, 440 F.3d 191, 199-200 (4th Cir. 2006) (because the Sixth Amendment right to counsel does not attach until a criminal prosecution begins, as opposed to during criminal investigations, the court held that the Sixth Amendment right to counsel does not attach with the filing of a criminal complaint) (citing cases, including <u>United States v. Langley</u>, 848 F.2d 152, 153 (11th Cir. 1988)); <u>Lumley v. City of Dade City, Florida</u>, 327 F.3d 1186, 1195 (11th Cir. 2003) (same). Therefore, only Loza-Cruz's Fifth Amendment right to counsel, if invoked during custodial interrogation, is applicable. The situation as to Cokis is less clear. He had been indicted but had not yet appeared before a judicial officer.

43

In <u>Fellers v. United States</u>, 540 U.S. 519, 124 S. Ct. 1019, 157 L. Ed. 2d 1016 (2004), the Supreme Court suppressed statements intentionally elicited by officers made by an indicted individual, prior to his appearance before a judicial officer, who did not have counsel present and who had not waived his right to presence of counsel. <u>Id.</u> at 523-24, 124 S. Ct. at 1022-23.  Citing Supreme Court precedent, the Court stated, "We have held that an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel.'"  <u>Id.</u> at 523, 124 S. Ct. at 1022 (citation omitted).  However, in <u>Rothgery v. Gillespie County, Texas</u>, 554 U.S. 191, 128 S. Ct. 2578, 171 L. Ed. 2d 366 (2008), the Supreme Court, resolving an issue involving when a defendant's Sixth Amendment right to counsel attached, held, "We merely reaffirm what we have held before and what an overwhelming majority of American jurisdictions understand in practice:   a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, *marks the start* of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."  <u>Id.</u> at 213, 128 S. Ct. at 2592 (emphasis added).  The Court did not reconcile this statement with the holding

44

in Fellers that, in the case of an individual who has been indicted, the Sixth Amendment right might attach at an earlier point in time.  As noted, Cokis had been indicted and a warrant issued for his arrest on April 29, 2009, but he had not yet appeared before a federal magistrate judge.  However, the court need not settle the apparent conflict in the Supreme Court's decisions in order to resolve the issues before this court, and the court will apply the rule stated in Fellers and find that Cokis' Sixth Amendment, as well as his Fifth Amendment, right to counsel had attached on April 29, 2009.

Cokis and Loza-Cruz contend that obtaining the voice exemplars while they were in custody constituted interrogation and, because they were not advised of their rights before the exemplars were obtained, that the exemplars must be suppressed. [Docs. 438 and 442].  As noted, the Government intends to only use the voice exemplars for purposes of identification at trial.  Based on this representation, the court finds that the taking of the voice exemplars, whether or not either Defendant was in "custody" and had been advised of his rights, does not violate Cokis' Fifth or Sixth Amendment rights and does not violate Loza-Cruz' Fifth Amendment rights.

The facts establish that sometime shortly after Defendants and the juvenile exited the residence at approximately 8:30 a.m., but before 9:00 a.m., each of the men

45

was asked to answer questions in Spanish, such as name, residence, length of stay, citizenship, over a telephone. (Tr. at 30-31, 51). The voice exemplar for Cokis, which occurred at 8:46 a.m. (Tr. at 90), involved the following questions and answers:

> What is your name? *Alberto Zuniga*
> Do you have any other names or nicknames? *No, well just Cokis.*
> What is your DOB? *01/09/87*
> How old are you? *21*
> Where are you from? *San Luis Potosi, Mexico*
> Where do you live now? *Here. I just moved so I don't know the address.*
> How long ago did you move? *1 month ago*
> There at the location you are now? *Yes*
> Do you have a phone? *Yes but I don't know it.*
> Is it a cell phone? *Yes*
> How long have you had the phone? *About 3 months*
> Do you work? *No - sometimes yes sometimes no as I work in landscaping.*
> Do you work for a company? *No I just work for cash.*
> Is there a phone you call to look for work? *No - I don't know the number.*
> Are you married? *No*

[Doc. 438 at 5].

As the Former Fifth Circuit Court of Appeals held in rejecting a defendant's claim that his un-counseled voice exemplar taken before the grand jury violated his rights: "More importantly, the taking of a voice exemplar impinges upon no right protected by either the Fourth, Fifth or Sixth Amendments to the Constitution." United States v. Shaw, 555 F.2d 1295, 1300 (5th Cir. 1977); see, e.g., United States v. Gallo-Moreno, 584 F.3d 751, 762-63 (7th Cir. 2009) (taking of voice exemplar did not violate

the defendant's rights); <u>United States v. Askew</u>, 203 Fed. Appx. 414, 416-17 (3rd Cir. 2006) ("Moreover, it is a 'well-settled rule that the sound of a defendant's voice, even if heard during privileged communications, is not itself testimonial, and therefore is not protected by the Fifth Amendment privilege against self-incrimination.'") (citations omitted); <u>United States v. Lanier</u>, 103 F.3d 121, 1996 WL 721894, at \*\*1-2 (4th Cir. December 1, 1996) (obtaining voice exemplars for the purpose of identification does not violate Fifth or Sixth Amendment rights); <u>United States v. Suarez</u>, 553 F. Supp. 345, 347 (S.D. Fla. 1982) (taking of informal voice exemplar did not violate the defendant's Sixth Amendment right to counsel).

For these reasons, the court finds that obtaining the voice exemplars solely for the purpose of identification at trial did not violate Defendants' rights and may be used at trial.

### 3.    Post-<u>Miranda</u> Statements

Although not addressed by Cokis in his post-hearing brief, the court will briefly address Defendant's waiver of his <u>Miranda</u> rights and the admissibility of his subsequent statement.  For the purpose of resolving the motion to suppress, the court will assume that Defendant was in custody at the time of the advice of rights.  After

47

considering the totality of the circumstances, the court finds that Cokis voluntarily, knowingly, and intelligently waived his rights.[21]

"<u>Miranda</u> 'warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation.'"[22] <u>United States v. Adams</u>, 1 F.3d 1566, 1575 (11th Cir. 1993) (quoting <u>Endress v. Dugger</u>, 880 F.2d 1244, 1248 (11th Cir. 1989)).  The first question that the court must answer is whether Cokis was advised of his <u>Miranda</u> rights.  <u>See</u> <u>United States v. Barbour</u>, 70 F.3d 580, 585 (11th Cir. 1995) ("The threshold inquiry is whether [defendant] was informed of his Miranda rights.").  In reaching this answer, the Supreme Court stated that it "has never indicated that the 'rigidity' of <u>Miranda</u> extends to the precise formulation of the warnings given a criminal defendant" and that "no talismanic incantation [is] required to satisfy its strictures."  <u>California v. Prysock</u>, 453 U.S. 355, 359, 101 S. Ct. 2806, 2809, 69 L. Ed. 2d 696 (1981).

---

[21]Having found that Loza-Cruz's waiver of rights and post-<u>Miranda</u> statement was tainted by the unconstitutional search and that the subsequent statement should not be admitted into evidence, the court is not addressing the admissibility of the statement further.  However, the court notes that, if the District Court determines that the post-Miranda statement should not otherwise be excluded from evidence, the same analysis applies to Loza-Cruz's post-<u>Miranda</u> statement as set forth *infra* for Cokis.

[22]<u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694 (1966).

At 9:52 a.m., Agent Bowen advised Cokis of his <u>Miranda</u> rights using a DEA 13A card, reading from the Spanish side.  (Tr. at 31-32; Gov't Ex. 5).  Defendant was advised:

> Before we ask you any questions, you must understand:
> -       You have the right to remain silent.
> -       Anything you say can be used against you in court.
> -       You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.
> -       If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> Do you understand?
> Are you willing to answer some questions?

(Gov't Ex. 5).  Cokis was advised of his rights.

Having found that Cokis was advised of his <u>Miranda</u> rights, the court must next determine whether Defendant voluntarily, knowingly and intelligently waived those rights.[23]  <u>See</u> <u>Barbour</u>, 70 F.3d at 585.  This is a two-part inquiry:

> "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal

---

[23]"It is well established that '[t]he government must prove by a preponderance of the evidence that [the defendant] made a knowing, voluntary and intelligent waiver of his <u>Miranda</u> rights.'"  <u>United States v. Chirinos</u>, 112 F.3d 1089, 1102 (11th Cir. 1997) (citation omitted).

> both an uncoerced choice and the requisite level of comprehension may
> a court properly conclude that the <u>Miranda</u> rights have been waived.”

<u>Id.</u> (quoting <u>Moran v. Burbine,</u> 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d

410 (1986) (internal citations and quotations omitted)); <u>see also</u> <u>United States v.</u>

<u>Brenton-Farley,</u> 607 F.3d 1294, 1326 (11th Cir. 2010) (same).  The totality of all the

surrounding circumstances, which a court must evaluate to make these determinations,

includes “both the characteristics of the accused and the details of the interrogation.”

<u>Schneckloth,</u> 412 U.S. at 226, 93 S. Ct. at 2047; <u>see also</u> <u>United States v. Bernal-</u>

<u>Benitez,</u> 594 F.3d 1303, 1319 (11th Cir. 2010) (same).  No single factor is necessarily

determinative of the issue whether a defendant knowingly and intelligently waived his

rights, but the court must engage in a fact-specific inquiry based on all of the

circumstances.  <u>See</u> <u>Moore v. Dugger,</u> 856 F.2d 129, 134 (11th Cir. 1988).

    Agent Bowen testified that as she began to read the <u>Miranda</u> rights, she asked

Cokis to advise her if he did not understand something she said in order for her to

explain and, after each bullet point, that she asked if Cokis understood.  Finally, as she

finished, she asked Cokis if he understood.  (Tr. at 32).  Cokis appeared to understand

the advice of rights.  (Tr. at 32).  She also gave Cokis the opportunity to read the card.

(Tr. at 32).  No agent had his or her firearm drawn on Cokis.  (Tr. at 33).  Agent

50

Bowen did not recall if Cokis was handcuffed when advised of his rights or when he made a statement. (Tr. at 52-53). Cokis did not state that he did not want to make a statement or answer questions, and Cokis did not ask for a lawyer. (Tr. at 34-36). Nothing about the circumstances of Cokis' detention or arrest on April 29, 2009, indicates that he was coerced into waiving his rights or making a statement; therefore, his waiver was voluntary. And the facts establish that he understood his rights and that he knowingly and intelligently waived his rights.

Finally, to the extent that Cokis' Sixth Amendment right to counsel had attached on April 29, 2009, the Supreme Court has held that a defendant can waive his Sixth Amendment right to counsel and that advising a defendant of his <u>Miranda</u> rights provides adequate guarantees of a knowing and intelligent waiver. <u>Patterson v. Illinois</u>, 487 U.S. 285, 296, 108 S. Ct. 2389, 2397, 101 L. Ed. 2d 261 (1988) ("As a general matter, then, an accused who is admonished with the warnings proscribed by the Court in <u>Miranda</u> . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one."); <u>see also</u> <u>United States v. Gonzalez-Lauzan</u>, 437 F.3d 1128, 1140 (11th Cir. 2006) (same).

Accordingly, Cokis' Sixth Amendment right to counsel was not violated by the statement he made on April 29, 2009, without the presence of counsel.

For these reasons, the court **RECOMMENDS** that Defendant Anaya-Medina/Cokis' motion [Doc. 302] to suppress statements be **DENIED** and that Defendant Cruz-Loya/Loza-Cruz's motion [Doc. 297] to suppress statements be **GRANTED IN PART** and **DENIED IN PART**.

### III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant Anaya-Medina/Cokis' motion [Doc. 301] to suppress voice exemplars and statements obtained on April 29, 2009, and motion [Doc. 302] to suppress evidence seized pursuant to a warrantless search on April 29, 2009, at 2265 Ranch Trial, Norcross, Georgia, be **DENIED**; that Defendant Cruz-Plancarte/Valda-Ceja's motion [Doc. 322] to suppress evidence obtained during the same warrantless search be **DENIED**; and that Defendant Cruz-Loya/Loza-Cruz's motion [Doc. 297] to suppress be **GRANTED IN PART** and **DENIED IN PART**, denied as to the voice exemplars taken for purpose of identification on April 29, 2009, and granted as to the post-Miranda statements obtained on April 29, 2009, and as to the evidence seized during the same warrantless search.

52

**Defendant Otha Barnes' Motion to Suppress**

Defendant Otha Barnes filed a motion [Doc. 315] to suppress evidence and statements.  In the motion, Defendant sought to suppress evidence obtained during a warrantless detention and search of the tractor-trailer he was operating on December 10, 2008.  He also sought in the motion to suppress voice exemplars obtained by the Government on the date of his arrest, April 29, 2009, on the federal indictment in this case.  [Id.].  An evidentiary hearing was held on the motion on March 18, 2010.[24] [Doc. 464].  In his post-hearing brief filed in support of the motion to suppress, Defendant only addresses the warrantless detention and search occurring in December 2008.[25]  [Doc. 497].  He seeks suppression of the evidence obtained from the search, cocaine and methamphetamine, on the grounds that the detention and search violated

---

[24]Citations to the transcript are:  (Tr. at ).

[25]At the suppression hearing, counsel for Defendant stated that the motion to suppress only challenged the detention and search on December 10, 2008, and the voice exemplars taken on April 29, 2009.  Defendant is not challenging the admissibility of evidence seized on April 29, 2009, as the result of execution of a federal search warrant (Tr. at 46, Gov't Exs. 6 and 7) at his residence, or the statements that he made following his waiver of Miranda rights on April 29, 2009 (Tr. at 52-54).  Because Defendant did not deal with the issue of the voice exemplars in his post-hearing brief, the Government did not address the admissibility of the exemplars.  [Doc. 571 at 3 n.1].  The Government, however, has advised the court and Defendant that the voice exemplars will only be used for the purpose of identification at trial.

53

not only his federal constitutional rights but state law.[26]  [Id.].  The Government opposes the motion to suppress contending that there was probable cause to stop Defendant's tractor-trailer for the traffic violation, speeding, and subsequently to detain Defendant for the purpose of investigating the officer's reasonable suspicion that Defendant was engaged in criminal activity.  [Doc. 571 at 2-11].  The Government also asserts that, while being lawfully detained, Defendant consented to the search of the tractor-trailer resulting in the seizure of the controlled substances.  [Id. at 12].  After consideration of the totality of the circumstances on December 10, 2008, the court finds that the detention and search were lawful.  The court further finds that the voice exemplars are admissible for the purpose of identification.

I.     **Facts**

---

[26]Defendant's reliance on state law, because the stop was conducted by a state officer, is misplaced.  It is well-settled in this Circuit that federal statutory and constitutional law controls in determining the admissibility of evidence in federal court.  United States v. Bembry, 321 Fed. Appx. 892, 894 (11th Cir. 2009) ("'[T]he admissibility in federal court of the products of state searches and seizures is controlled by federal law.'") (quoting United States v. Clay, 355 F.3d 1281, 1283 (11th Cir. 2004)); United States v. Booker, 131 Fed. Appx. 234, 242 (11th Cir. 2005) (same); United States v. Gilbert, 942 F.2d 1537, 1539-40 (11th Cir. 1991).  The court will, accordingly, only determine whether Defendant's Fourth Amendment rights were violated.

54

A day or two prior to December 10, 2008, Sergeant Black Swicord, Georgia State Patrol ("GSP"), supervisor of the Criminal Interdiction Unit,[27] was contacted by agents with the Federal Bureau of Investigation ("FBI") and advised that, as part of a drug trafficking organization under investigation, a possible of load of narcotics was coming into the Atlanta area in a tractor-trailer. (Tr. at 4-6). The FBI agents advised that they would follow the tractor-trailer into Georgia and point it out to Sgt. Swicord, who was asked to conduct a traffic stop of the vehicle if he had probable cause and, then, to determine if narcotics were in the tractor-trailer.[28] (Tr. at 5-6). As a part of Sgt. Swicord's training and experience, he had attended the Department of Transportation ("DOT") inspection school and was certified to detain and inspect commercial motor vehicles. (Tr. at 9). His training and experience included examining commercial motor vehicle paperwork, such as logbooks. (Tr. at 9-10). Based on the thousands of prior traffic stops and numerous seizures of contraband in commercial motor vehicles, he was knowledgeable of the trucking industry. (Tr. at

---

[27]This Unit's primary focus is road safety with a secondary mission of using indicators and travel patterns to identify individuals committing felonies. (Tr. at 5).

[28]Although the officer had suspicions about the tractor-trailer's load based on the information provided by the FBI, he was not going to stop the motor vehicle without observing a traffic violation. (Tr. at 24).

AO 72A
(Rev.8/82)

10).  Sgt. Swicord is an instructor at the Drug Interdiction Association Program ("DIAP")[29] at which he teaches other law enforcement officers about the paperwork associated with the trucking industry and the significance of the information contained in or missing from that paperwork as it relates to criminal activity.  (Tr. at 10-11).

On December 10, 2008, Sgt. Swicord was on patrol on I-20 West, in Carroll County, in uniform and in a marked vehicle, when the suspect tractor-trailer was pointed out to him by the FBI.  (Tr. at 6).  He followed the tractor-trailer and determined that it was traveling 78 miles per hour although the speed limit was 70 miles per hour.  (Tr. at 6-7, 24-25).  Based on the speeding infraction, Sgt. Swicord activated his blue lights and stopped the tractor-trailer at approximately mile marker 26 westbound, at about 7:30 a.m.  (Tr. at 7, 35).  The burgundy tractor was pulling a box trailer with a cooling system, known as a "reefer," both with Texas license plates.  (Tr. at 7).

The officer exited his police vehicle and walked up to the driver door of the tractor and spoke to the white male driver, identified as Defendant Barnes.  Sgt. Swicord advised Defendant why he was stopped and asked for his identification and

---

[29]DIAP is a multi-agency program involving the Drug Enforcement Administration, EPIC and the Federal Motor Carrier Safety Assistance Program.  (Tr. at 10-11).

driver's license.  (Tr. at 8, 35).  The officer noticed that Defendant's driver's license was issued in Tennessee.  (Tr. at 8).  Due to the fact that it was raining, Sgt. Swicord asked Defendant to drive up to the next over-pass and park.  (Tr. at 8, 35).  Defendant did so, and Sgt. Swicord followed, keeping Defendant's driver's license.  (Tr. at 8, 35). Sgt. Swicord exited his vehicle and again approached Defendant, this time requesting that Defendant produce all the paperwork that he was required to maintain, that is, the logbook, bill of lading, and medical card.  (Tr. at 8, 35-36).

The officer then examined the paperwork, which requires several minutes based on the requirements limiting an operator's time driving and determining whether the tractor-trailer was permitted to operate in Georgia.  (Tr. at 10-12, 36).  In examining the bill of lading,[30] Sgt. Swicord observed several items that were not commonly missing on the numerous bills of lading he observed on a daily basis.  (Tr. at 11-12, 37).  Unlike most such documents, there was not much information on the bill of lading.  The paperwork was vague in regards to contact information for the source of the load or the destination, which is unusual because the commodity has value.  The only information on the source was McAllen, Texas, near the Mexican border, and

---

[30]The bill of lading describes the commodity being transported on the motor vehicle. (Tr. at 10).

AO 72A
(Rev.8/82)

Defendant was able to provide no information about the owner of the tractor-trailer or the load, which was also unusual based on the officer's experience. With small companies and independent operators, such as this load, the drivers usually know the owners. And the only destination for the twenty-four pallets of jumbo cabbage was the Atlanta Farmer's Market, a large place. No contact information was provided for delivery. (Tr. at 11-15, 30).

Sgt. Swicord was also suspicious about why a driver from Tennessee was operating a Texas tractor-trailer. (Tr. at 12). He asked Defendant about how he obtained the load. Defendant advised that he flew from Knoxville, Tennessee, to the Texas border to pick up the load. (Tr. at 12). Based on the officer's experience and knowing that each load must be cost-effective, Sgt. Swicord stated that flying a driver from Tennessee to pick up a load of cabbage, one of the least cost-effective loads, was suspicious. He was aware based on his interaction with drivers transporting loads from that area of Texas that there were numerous drivers available in the area and that there was no need to pay the expense to fly a driver in to pick up a load of cabbage.[31] (Tr.

_____

[31]The situations that Sgt. Swicord was aware of where a driver was flown to a location to pick-up a load involved special reasons, such as hazardous materials which required a driver with specialized license and endorsements. (Tr. at 21-22). On cross-examination, the officer affirmed his opinion, based on his extensive experience with truckers traveling to and from the border area of Texas, that flying someone to that

at 12-14, 21-22).  His suspicions about flying in a driver to transport a low cost load was heightened by the fact that he believed the tractor-trailer was operated by a new company.  This belief was based on the high DOT number, "one million 700-something thousand," which at the time of the stop indicated the company was brand new.  (Tr. at 29).  For this reason, the company needed to make money on a load, not just break even, which was inconsistent with flying in a driver for this low cost-effective load.  (Tr. at 29-31).

Sgt. Swicord had also observed that the trailer doors, although padlocked, were not sealed as is usually true with loads from the border area.  (Tr. at 15, 26-27).  If the trailer is not sealed, then the load can be tampered with; the seal on the trailer confirms that the load matches the bill of lading.  (Tr. at 15).  This fact was of interest to the officer.  (Tr. at 27).  Adding further to the officer's suspicions was Defendant's statement that he did not see the trailer being loaded which, according to the officer, was very inconsistent with most drivers who observe the trailer being loaded, as they

---

area to pick-up a low cost load was simply not cost-effective and not necessary due to the number of drivers available in the area.  (Tr. at 21-23).  Drivers did not need to be flown back from deliveries to Atlanta or other locations because, unlike Defendant, they had made arrangements for back-loads.  This was another reason that he was suspicious of the delivery involving the tractor-trailer driven by Defendant.  (Tr. at 22-23, 32).  The back-loads he usually saw involved returning to the border area with chicken and pork animal parts for delivery to Mexico.  (Tr. at 23).

are responsible for the commodity on the trailer.  The drivers want to be sure the commodity loaded matches the bill of lading.  (Tr. at 14).  And Defendant lacked knowledge about how he was being paid, providing conflicting answers, which is inconsistent with most drivers who know all of the costs of the transportation and the cost-effectiveness of the load.  (Tr. at 31-32).

After Sgt. Swicord examined the paperwork and questioned Defendant about the owner of the tractor-trailer and the commodity, the load's destination, and Defendant's authority to operate the motor vehicle, he wrote out a warning citation and returned to Defendant all of the paperwork and identification documents.  (Tr. at 28, 33-34, 37-38).  He issued Defendant a warning for speeding.  (Tr. at 28, 37).  This was approximately three to four minutes into the stop.  (Tr. at 28).  The officer then discussed with Defendant the reasons he was suspicious about whether the tractor-trailer's load was legitimate and asked Defendant if he would consent to a search of the tractor-trailer.[32]  (Tr. at 16, 38-39).  After Defendant verbally consented to the search, Sgt. Swicord obtained a consent to search form which he filled in and asked Defendant to sign.  (Tr. at 16).  The form stated:

---

[32]Sgt. Swicord stated that Defendant was not free to leave at this time.  However, because he was being cooperative, Sgt. Swicord did not tell Defendant that he was free to leave and also did not tell him that he could not leave.  (Tr. at 33-34).

AO 72A
(Rev.8/82)

GEORGIA STATE PATROL
CONSENT TO SEARCH

I, *Otha Barnes* hereby grant my consent to *Sgt. Swicord, TFC Malone* Troopers of the Georgia State Patrol to search the following described vehicle including luggage, containers, and contents of all. This includes the removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purposes of concealing contraband.

| *Red* | *1999* | *Freight* | *Tractor* | *RB7L20* |
|-------|--------|-----------|-----------|----------|
| Color | Year | Make | Body Style | License Number |

I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

My consent is freely and voluntarily given.

Date        *12-10-08*            Time        *0805*

*Otha Barnes*
Signature

(Tr. at 16; Gov't Ex. 3 (handwritten information in italics)).

After Defendant signed the consent to search form, Sgt. Swicord asked Defendant if he had a key for the padlock on the trailer, and Defendant responded, yes. He then asked Defendant to unlock the padlock, and Defendant complied. (Tr. at 17). Once the trailer doors were opened, Sgt. Swicord stated that he could smell the "stench

61

of rotten fruit." (Tr. at 17).  He climbed onto the top of the pallets which were soft and slimy and not in good condition; the condition of the load added to his suspicions.  (Tr. at 17).  The officer made his way to the front of the trailer and noticed that the pallets had been disturbed.  (Tr. at 17).  After he exited the trailer, he advised Defendant that the cabbage was rotten, and he asked his partner, who was present as back-up, to deploy his K-9 around the trailer.  (Tr. at 17-18).  The second officer advised Sgt. Swicord that the K-9 alerted to the undercarriage of the trailer which is consistent with controlled substances being in the trailer and the odor escaping through drainage holes in the floor of the trailer.  (Tr. at 18).

Due to the weather conditions and being on the side of the interstate, Sgt. Swicord decided to relocate the trailer to a nearby business for off-loading.  (Tr. at 18). He asked Defendant to follow him to the next exit and to back the trailer up to a loading dock, and Defendant complied.  (Tr. at 18).  As the seventh pallet was off-loaded, once the pallet was probed, Sgt. Swicord observed what he believed based on his experience to be cocaine.  (Tr. at 19).  He then showed the contraband to Defendant and placed him under arrest.  Defendant appeared agitated and fearful and, when advised of his <u>Miranda</u> rights, asked to speak with an attorney.  (Tr. at 19).

62

Sgt. Swicord contacted the FBI.  After they arrived, twenty-eight bundles of controlled substances removed from the trailer were turned over to the FBI.  Defendant was then booked into the Carroll County Jail on cocaine and methamphetamine trafficking charges. (Tr. at 19-20).  Defendant was subsequently indicted by a federal grand jury, and a warrant was issued for his arrest, which was served at Defendant's residence in Dandridge, Tennessee, on April 29, 2009, by Special Agents with the FBI. (Tr. at 40-42).

At approximately 6:00 a.m., agents arrived at the residence, also having with them a federal search warrant, and knocked on the door.  (Tr. at 41-42).  When Defendant answered the door, he was placed under arrest and advised that there was an arrest warrant from Georgia.  (Tr. at 42-43, 50).  After the residence was secured, Defendant was advised of his <u>Miranda</u> rights and executed a waiver of rights form agreeing to speak with the agents.  (Tr. at 43, 48-49; Gov't Ex. 4).  The agents did not have their weapons drawn.  They made Defendant no promises and did not threaten him.  Defendant sat on the couch and was uncuffed during the interview.  He was cooperative.  (Tr. at 43-45).

At some point, although the FBI agent does not remember if before or after Defendant was advised of his rights, Defendant was handed a phone and answered

63

questions over the phone about his residence, phone number, employment, date of birth, and similar background type of questions. (Tr. at 45-46, 50-51). The agent did not recall making any statement to Defendant about providing the voice exemplar. (Tr. at 50-51). Once the search warrant was executed and the interview with Defendant was completed, at about 8:51 a.m., Defendant was transported to Greenville, Tennessee, for his initial appearance on the federal arrest warrant. (Tr. at 47-48).

Additional facts will be set forth as necessary during discussion of Defendant's claims.

## II.   Discussion

### a.   Detention and Search

As noted, Defendant contends that the evidence, a quantity of cocaine and methamphetamine, seized from the trailer during the stop on December 10, 2008, should be suppressed because the GSP Trooper lacked probable cause to conduct the traffic stop and lacked a reasonable suspicion to detain him to investigate other criminal activity.[33] [Doc. 497]. Although not clear from Defendant's brief, the court

---

[33]Defendant makes repeated references to the Supreme Court decision in Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d. 667 (1978), and requests an evidentiary hearing based on the alleged misstatements by Sgt. Swicord. [Doc. 497 at 6-8]. Quite frankly, Defendant's request is nonsensical. The decision in Franks applies to alleged material and deliberate false statements contained in an affidavit for

will assume that Defendant is also contesting the consent to search. [Id.]. The Government opposes the motion to suppress arguing that Sgt. Swicord had probable cause to conduct the traffic stop, the duration of which was reasonable, and that the officer had a reasonable suspicion to detain Defendant to investigate whether he was engaged in other criminal activity, and that Defendant's consent to search the trailer was voluntary.

"A traffic stop, which 'is a seizure within the meaning of the Fourth Amendment,' . . . 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[, 392 U.S. 1, 88 S. Ct. 1868].'" United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) (citations omitted). As the Eleventh Circuit Court of Appeals stated in United States v. Cooper, 133 F.3d 1394 (11th Cir. 1998), "law enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'" 133 F.3d at 1398 (quoting United States v. Strickland,

---

a search warrant. (See Report and Recommendation, Defendant Martina Casas Flores' Motion to Suppress Evidence, II. Discussion). The testimony challenged by Defendant concerned the *warrantless* stop and search of Defendant's tractor-trailer. Additionally, the statements were made at an *evidentiary hearing*. Defendant's request for yet another evidentiary hearing is denied.

AO 72A
(Rev.8/82)

902 F.2d 937, 940 (11th Cir. 1990)); see also United States v. Terry, 220 Fed. Appx. 961, 963 (11th Cir. 2007) (same). And "[w]hen determining whether an officer had probable cause to believe that a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.'"[34] Harris, 526 F.3d at 1337 (citation omitted).

---

[34]Defendant argues that the traffic stop was a pretext for conducting a search for contraband because the FBI had provided information that the tractor-trailer may be transporting a controlled substance. [Doc. 497 at 2-3]. That argument does not support a finding that Defendant's Fourth Amendment rights were violated. The law is well established that "'[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" United States v. Jones, 377 F.3d 1313, 1314 (11th Cir. 2004) (quoting Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996)); see also United States v. McGough, 412 F.3d 1232, 1239 (11th Cir. 2005) (indicating that the magistrate judge had improperly discussed the officers' motives for entering the apartment in resolving the case, the appellate court noted that the test "is an objective one"). Applying this rule of law, the Eleventh Circuit Court of Appeals rejected a defendant's contention that her consent to search was invalid and that the case should be evaluated as if there was no consent to search at all because the officer had since the incident testified that he would have conducted the search even without consent. United States v. Hernandez, 418 F.3d 1206, 1209 n.4 (11th Cir. 2005). The court rejected the contention because "[a]n officer's 'subjective intentions' are not relevant for Fourth Amendment analysis." Id.; see also United States v. Gonzalez, 2009 WL 243732, at *3 (M.D. Ala. August 7, 2009) (rejecting the defendant's contention that traffic stop for improper or erratic lane change was a pretext to conduct a search for contraband); United States v. Artiles-Martin, 2008 WL 2600787, at *5 (M.D. Fla. June 30, 2008) (the defendant's contention that traffic stop was pretext to conduct search of tractor-trailer foreclosed by Whren).

As noted, law enforcement officers may also briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity.  See Terry, 392 U.S. 1, 88 S. Ct. 1868; Harris, 526 F.3d at 1337 (same); United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (same).  "[T]he 'reasonableness' standard requires that a police officer 'be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion.'"  United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996) (citing Terry, 392 U.S. at 21, 88 S. Ct. at 1880); see also United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must be judged against an objective standard:  would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate.") (citations and internal quotations omitted)).  Additionally, "[d]uring a lawful traffic stop, officers . . . may take steps that are reasonably necessary to protect their personal safety . . ., including requiring the driver and passengers to exit the vehicle 'as a matter of course.'"  Spoerke, 568 F.3d at 1248 (quoting Maryland v. Wilson, 519 U.S. 408, 410, 117 S. Ct. 882, 884, 137 L.

67

Ed. 2d 41 (1997); <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 110-12, 98 S. Ct. 330, 333-34, 54 L. Ed. 2d 331 (1977)).

Sgt. Swicord had probable cause to stop Defendant's tractor-trailer for the traffic infraction of speeding. The Georgia Code section relevant to the traffic stop provides in pertinent part:

> (a) The limits specified in this Code section or established as authorized in this article shall be the maximum lawful vehicle speeds. . . .
> (b) Consistent with the provision of engineering and traffic investigations regarding maximum speed limit as provided in Code Section 40-6-182, no person shall drive a vehicle at a speed in excess of the following maximum limits: . . .
>> (2) Seventy miles per hour on a highway on the federal interstate system . . . provided that such speed limit is designated by appropriate signs.

O.C.G.A. 40-6-181. The undisputed evidence establishes that on December 10, 2008, Sgt. Swicord was on patrol on I-20 West, in Carroll County, in uniform and in a marked vehicle, when the suspect tractor-trailer was pointed out to him by the FBI. (Tr. at 5-6). He followed the tractor-trailer on the interstate highway and determined that it was traveling 78 miles per hour although the speed limit was 70 miles per hour. (Tr. at 6-7, 24-25). Based on the speeding infraction, Sgt. Swicord activated his blue lights and stopped the tractor-trailer at approximately mile marker 26 westbound, at

68

about 7:30 a.m. (Tr. at 7, 35).  The officer's observations provided probable cause to conduct the traffic stop for speeding.  <u>Disharoon v. State</u>, 263 Ga. App. 787, 789, 589 S.E.2d 339, 342 (2003) ("Because the officer personally observed Disharoon committing a traffic offense, namely speeding, he had probable cause to stop her car."); <u>Jones v. State</u>, 258 Ga. App. 337, 338, 574 S.E.2d 398, 400 (2002) ("[T]o be guilty of speeding, one need only exceed the designated speed limit.").  And the traffic stop, as conducted by Sgt. Swicord, was lawful.

The legality of traffic stops is analyzed under the test set forth in <u>Terry</u>.  "[A] traffic stop 'must last no longer than is necessary to effectuate the purpose of the stop.'"  <u>United States v. Ramirez</u>, 476 F.3d 1231, 1237 (11th Cir. 2007) (quoting <u>United States v. Pruitt</u>, 174 F.2d 1215, 1220 (11th Cir. 1999)).  Absent articulable suspicion of other criminal activity, a traffic stop may last no longer than necessary to process the traffic violation.  <u>Purcell</u>, 236 F.3d at 1277.  Additionally, "'further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter.'"  <u>Ramirez</u>, 476 F.3d at 1237 (quoting <u>Pruitt</u>, 174 F.3d at 1220).

In <u>Hernandez</u>, 418 F.3d 1206, the Eleventh Circuit Court of Appeals, relying on the Supreme Court's decision in <u>Muehler v. Mena</u>, 544 U.S. 93, 125 S. Ct. 1465, 161

69

L. Ed. 2d 299 (2005), stated that the focus in evaluating the reasonableness of a detention during a traffic stop is "on the duration (and not scope of questioning). . . ."[35] 418 F.3d at 1209 n.3.  Accordingly, a court does "not inquire as to the substantive reasonableness of the questions that are asked by a police officer in the context of a traffic stop, but only whether the 'duration' of the detention was prolonged 'for an unreasonable time.'"  Ramirez, 476 F.3d at 1237 n.11 (quoting Hernandez, 418 F.3d at 1209 n.3); see also United States v. Ffriend, 151 Fed. Appx. 778, 779 (11th Cir. 2005) ("Moreover, during a legal stop, an officer may ask questions, including

_____

[35]The facts in Muehler involved the detention of an individual, Mena, in handcuffs during the execution of a search warrant.  While Mena was being detained, officers questioned her about her immigration status.  Muehler, 544 U.S. at 100-01, 125 S. Ct. at 1471.  The Supreme Court rejected the lower court's finding that Mena's Fourth Amendment rights were violated by the questioning, a decision which the lower court apparently based "on the assumption that the officers were required to have independent reasonable suspicion in order to question Mena concerning her immigration status because the questioning constituted a discrete Fourth Amendment event."  Id.  The Supreme Court found that premise faulty because, as summarized by the Eleventh Circuit Court of Appeals in Hernandez, "'[M]ere police questioning does not constitute a seizure,'" – even if such questioning is about a topic unrelated to the initial purpose of the search or seizure – so long as it does not "'prolong[ ] . . . the time reasonably required to complete that [initial] mission.'"  418 F.3d at 1209 n.3 (quoting Muehler, 544 U.S. at 101, 125 S. Ct. at 1471).  The Supreme Court held that because the lower court did not find that questioning Mena about her immigration status extended the duration of her detention, "no additional Fourth Amendment justification for inquiring" about other matters was required.  Muehler, 544 U.S. at 101, 125 S. Ct. at 1471-72  In Hernandez, the Court of Appeals extended the decision in Muehler to apply to lawful traffic stops.  418 F.3d at 1209 n.3.

70

questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license.").

The duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver. United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003)[36]; Purcell, 236 F.3d at 1277-78. Additionally, an officer conducting a routine traffic stop may request consent to search the vehicle. Harris, 526 F.3d at 1339; Purcell, 236 F.3d at 1281; United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999). And courts have determined that during routine traffic stops involving commercial tractor-trailers, as part of a normal field interview, officers may obtain and review the bill of lading and log book and other items related to the operation of the truck. See, e.g., United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1337 (N.D. Ga. 2009) (finding, as part of traffic stop, that officer was authorized to question the defendant "about his operation of the tractor-trailer, including asking to see his bill

---

[36]However, each of these computer checks must be conducted as a routine part of the traffic stop and not undertaken after the conclusion of the traffic stop to further detain a driver absent articulable suspicion of other criminal activity. Boyce, 351 F.3d at 1107 (finding that the criminal history check in that case was not requested until several minutes after the traffic stop had concluded and after the officer had asked for and been refused consent to search the vehicle).

of lading and logbook"); <u>Artiles-Martin</u>, 2008 WL 2600787, at *8 (court found it was "perfectly appropriate to request the Defendant to produce his driver's license, registration, insurance – and because this vehicle was a commercial truck – the driver's medical card and the driver's log book"); <u>United States v. Torres</u>, 2005 WL 3546677, at *5 (S.D. Ohio December 28, 2005) (officer conducting traffic stop of commercial truck properly requested and examined driver's license, log book and other documents concerning the truck and load being carried); <u>United States v. Dakers</u>, 2004 WL 5343936, at *5 (S.D. Ohio August 19, 2004) (officer properly requested driver to produce truck's log book and shipping papers as those documents were related to the defendant's travel plans).

The duration of the traffic stop was reasonable. After the tractor-trailer stopped, the officer exited his police vehicle and walked up to the driver door of the tractor and spoke to the white male driver, identified as Defendant Barnes.[37] Sgt. Swicord advised Defendant why he was stopped and asked for his identification and driver's license. (Tr. at 8, 35). The officer noticed that Defendant's driver's license was issued in Tennessee. (Tr. at 8). Due to the fact that it was raining, Sgt. Swicord asked

---

[37]The burgundy tractor was pulling a box trailer with a cooling system, known as a "reefer," both with Texas license plates. (Tr. at 7).

AO 72A
(Rev.8/82)

Defendant to drive up to the next over-pass and park.  (Tr. at 8, 35).  Defendant did so, and Sgt. Swicord followed, keeping Defendant's driver's license.  (Tr. at 8, 35).  Sgt. Swicord exited his vehicle and again approached Defendant, this time requesting that Defendant produce all the paperwork that he was required to maintain, that is, the logbook, bill of lading, and medical card.  (Tr. at 8, 35-36).

The officer then examined the paperwork, which requires several minutes based on the requirements limiting an operator's time driving and determining whether the tractor-trailer was permitted to operate in Georgia.[38]  (Tr. at 10-12, 36).  During this time, Sgt. Swicord observed the information on the bill of lading, and based on the lack of information, he questioned Defendant about the owner of the tractor-trailer, the source of the load and the load's destination, receiving very little information from Defendant.  (Tr. at 11-15, 30-32, 37).  Given the discrepancy in Defendant's driver's license being issue in Tennessee and the trailer having Texas plates, with a load originating at the Texas-Mexico border, he also asked Defendant about how he came to operate the tractor-trailer.  (Tr. at 12-14, 21-22).  Sgt. Swicord had observed the DOT number on the trailer and the fact that the doors of the trailer were not sealed and,

---

[38]Having attended and completed the DOT inspection school, Sgt. Swicord was authorized to inspect, including paperwork, and detain commercial motor vehicles such as that operated by Defendant.  (Tr. at 9-10).

AO 72A
(Rev.8/82)

due to those observations, questioned Defendant about the commodity on the trailer. (Tr. at 14-15, 26-27, 29-31).

After Sgt. Swicord examined the paperwork and questioned Defendant about the owner of the tractor-trailer and the commodity being transported, the load's destination, and Defendant's authority to operate the motor vehicle, he wrote out a warning citation and returned to Defendant all of the paperwork and identification documents. (Tr. at 28, 33-34, 37-38). He issued Defendant a warning for speeding. (Tr. at 28, 37). This was approximately three to four minutes into the stop. (Tr. at 28).

None of the actions taken by Sgt. Swicord unreasonably lengthened the traffic stop, including questioning Defendant about his travel, his authority to operate the tractor-trailer, and examining the log book and bill of lading. See, e.g., United States v. Geboyan, 367 Fed. Appx. 99, 100-01 (11th Cir. 2010) (traffic stop of approximately twenty minutes, including time officer conducted computer checks on driver and passengers, was reasonable); United States v. Cantu, 227 Fed. Appx. 783, 785 (11th Cir. 2007) (traffic stop lasting approximately twenty-seven minutes, which included examination of the log book, to determine how long driver had been driving, was reasonable); Artiles-Martin, 2008 WL 2600787, at *10 (noting that "'police are not constitutionally required to move at top speed or as fast as possible[,]'" the court

74

determined that the "twenty-five minutes between the stop and the discovery of probable cause to conduct a search, is well within the range of time periods that the Eleventh Circuit has found to be constitutionally permissible") (citation omitted); Dakers, 2004 WL 5343936, at *5 (noting that officer did not devote himself exclusively to task of completing the ticket for the lane violation but also examined the log book and shipping documents, the court held that traffic stop of approximately twenty minutes was reasonable).

Furthermore, any delay in completing the traffic stop as well as the continued detention of Defendant following the traffic stop to explain to him the officer's suspicions and to ask for consent to search was based on a reasonable suspicion that Defendant was engaged in criminal activity and was of a reasonable duration. Because of Sgt. Swicord's training and experience, including attending the DOT inspection school, resulting in his certification to inspect and detain commercial motor vehicles, instructing at the DIAP where he teaches other law enforcement officers about the paperwork associated with the trucking industry and the significance of the information contained in or missing from that paperwork as it relates to criminal activity, and conducting the thousands of prior traffic stops and numerous seizures of contraband in commercial motor vehicles, he was knowledgeable of the trucking

75

industry, the paperwork associated with operating commercial motor vehicles and the patterns and conduct associated with criminal trafficking activities.  (Tr. at 9-11). Based on this background and his observations on December 10, 2008, he developed a reasonable suspicion that Defendant was engaged in criminal activity.  See Lindsey, 482 F.3d at 1290-91 ("We also recognize that the police may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'") (citation omitted); United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000) ("In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention[,]" which includes viewing all of the circumstances "in the light of the officers' special training and experience.").

Sgt. Swicord outlined, based on his training and experience, the particular facts that caused him to be suspicious that the tractor-trailer was not carrying a legitimate load.  First, the FBI had advised him that, as part of an investigation into a drug organization trafficking into Atlanta, they suspected a load of narcotics were coming into the Atlanta area in a tractor-trailer. (Tr. at 5-6).  On December 10, 2008, the FBI pointed out the tractor-trailer being operated by Defendant as the one suspected of

76

transporting the controlled substances. (Tr. at 6). After he stopped the vehicle for the speeding infraction, Sgt. Swicord identified the following additional specific factors as the basis for his independent suspicion that the load was illegitimate. In examining the bill of lading, Sgt. Swicord observed several items that were not commonly missing on the numerous bills of lading he observed on a daily basis. (Tr. at 11-12, 37). The paperwork was vague in regards to contact information for the source of the load, only stating McAllen, Texas, or the destination, the Atlanta Farmer's Market, a large place, which is unusual because the commodity has value. Nor was Defendant able to provide information about the owner of the tractor-trailer or the load, also unusual based on the officer's experience that, with small companies and independent operators, such as this load, the drivers usually know the owners. (Tr. at 11-15, 30).

Sgt. Swicord was also suspicious about why a driver from Tennessee was operating a Texas tractor-trailer. (Tr. at 12). He asked Defendant about how he obtained the load. Defendant advised that he flew from Knoxville, Tennessee, to the Texas border to pick up the load. (Tr. at 12). Based on the officer's experience and knowing that each load must be cost-effective, Sgt. Swicord stated that flying a driver from Tennessee to pick up a load of cabbage, one of the least cost-effective loads, was suspicious. He was aware based on his interaction with drivers transporting loads from

77

that area of Texas that there were numerous drivers available in the area and that there was no need to pay the expense to fly a driver in to pick up a load of cabbage and that this was not a situation where it was necessary to arrange for a driver with a specialized license. (Tr. at 12-14, 21-23). And drivers did not need to be flown back from deliveries to Atlanta or other locations because unlike Defendant, again suspicious, drivers make arrangements for back-loads. His suspicions about flying in a driver to transport a low cost load was heightened by the fact he believed, based on the high DOT number, "one million 700-something thousand," that the tractor-trailer was operated by a new company and, for this reason, needed to make money on a load, not just break even. (Tr. at 29-31).

Sgt. Swicord had also observed that the trailer doors, although padlocked, were not sealed as is usually true with loads from the border area. (Tr. at 15, 26-27). If the trailer is not sealed, then the load can be tampered with; the seal on the trailer confirms that the load matches the bill of lading. (Tr. at 15). Adding further to the officer's suspicions was Defendant's statement that he did not see the trailer being loaded which, according to the officer, was very inconsistent with most drivers who observe the trailer being loaded. Because they are responsible for the commodity on the trailer, the drivers want to be sure the commodity loaded matches the bill of lading. (Tr. at

78

14).   And Defendant lacked knowledge about how he was being paid, providing conflicting answers, which is inconsistent with most drivers who know all of the costs of the transportation and the cost-effectiveness of the load.  (Tr. at 31-32).

All of these factors, beginning with the FBI's alert, in light of Sgt. Swicord's training and experience, established reasonable suspicion to continue the interview to investigate whether Defendant was engaged in other criminal conduct.  Similar factors, in fact less suspicious circumstances, have been determined by other courts to establish reasonable suspicion.  In United States v. Arango-Lopez, 340 Fed. Appx. 154 (4th Cir. 2009), the Fourth Circuit Court of Appeals considering the challenge to a traffic stop of a commercial truck for speeding found that the officer's suspicion of criminal activity, based on examination of the documents relating to the truck's operation and the defendant's actions, was reasonable.  The court, relying on the officer's opinion about why he questioned the legitimacy of the truck's operation, found that the defendant's extreme nervousness, inconsistencies in the log book and bill of lading, the unexplained delay in transporting the load, and the circuitous route taken to deliver the load established a reasonable suspicion of criminal activity.  Id. at 155-56. Likewise, in United States v. Johnson, 285 F.3d 744 (8th Cir. 2002), the Eighth Circuit Court of Appeals found that the officer had a reasonable suspicion to continue the

79

detention of a commercial truck based on the incomplete log book entries, confusion as to final destination, incomplete address on bill of lading, truck's delay in transportation especially in light of the fact it was hauling produce, and the defendant's evasive and strange conduct, as well as the facts that the defendant's criminal history involved drugs and that his trip included a plane flight for the purpose of picking up the tractor-trailer, which in the officer's opinion was a costly expense. Id. at 749.

And, in United States v. Flores, 2009 WL 2170238 (M.D. Ala. July 20, 2009), the District Court found that the officer assembled reasonable suspicion of criminal activity after he stopped a commercial truck for a traffic violation. The log book showed two months of inactivity, which the defendant claimed was due to unavailability of a load, although the officer's information indicated that loads were readily available from Texas. The point of origin for the load was a source area for drugs. The lack of a seal on the trailer allowed for tampering with the load which was inconsistent in the officer's opinion of legitimate operations. Also, the amenities on the truck seemed inconsistent with the defendant's lack of work. The Court concluded that officer's review of the log, "coupled with his knowledge of the drug and trucking industries," provided the basis to extend the stop. Id. at 3-4. Finally, in Dakers, although the District Court found that the duration of the stop was reasonably related

80

to issuance of the traffic citation, alternatively, the Court found that the officer had reasonable suspicion to believe that the defendant was engaged in other criminal activity to extend the duration of the stop.  The facts considered by the Court included the nature of and delay in the defendant's travel, the manner in which the shipping papers were completed, that is, with cross-outs and handwriting, which the officer testified was not the norm, the high number on the trailer, indicating ownership by a new company using letters rather than a name, which the officer testified was common for companies transporting drugs, the lack of a seal on one trailer door allowing for tampering with the load, and the defendant's nervousness and failure to make eye-contact.  2004 WL 5343936, at *4 n.11.

The focus of Defendant's attack on Sgt. Swicord's explanation for his reasonable suspicion is Defendant's contention that the officer's opinions were speculative and unfounded and that he had not been offered or qualified as an expert in the trucking industry.  [Doc. 497 at 6-9].  Defendant misconstrues the testimony, which the court did not accept as an expert opinion, but as a layperson, particularly a law enforcement officer, with extensive training and experience and based on the significance of the facts noted, if any, to the officer in his law enforcement capacity.  As evidenced by the cases cited by the court *supra*, the testimony offered by Sgt.

81

Swicord falls within the scope of the law-enforcement-based opinion evidence relied on by courts to resolve issues of reasonable suspicion in these type of cases.  See, e.g., Johnson, 285 F.3d at 749; Arango-Lopez, 340 Fed. Appx. at 155-56; Flores, 2009 WL 2170238, at *6; Dakers, 2004 WL 5343936, at *4 n.11.[39]  Defendant's objection to the testimony and the basis for the court's reliance on the officer's opinions is unpersuasive.

Based on all of the factors set forth by Sgt. Swicord, the court finds that in the present case the continued detention of Defendant did not violate his Fourth Amendment rights.  That detention was brief.  After issuing the warning, the officer discussed with Defendant the reasons he was suspicious about whether the tractor-trailer's load was legitimate and asked Defendant if he would consent to a search of the tractor-trailer.  (Tr. at 16, 38-39).  After Defendant verbally consented to the search, Sgt. Swicord obtained a consent to search form which he filled in and asked

---

[39]Likewise, in cases determining whether there is probable cause for an arrest or to issue a search warrant, it is well-established that courts may rely on the type of opinion evidence, based on a law enforcement officer's training and experience, as offered at the evidentiary hearing in this case.  See United States v. Whitner, 219 F.3d 289 (3rd Cir. 2000); United States v. Feliz, 182 F.3d 82 (1st Cir. 1999); United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995); United States v. Pitts, 6 F.3d 1366 (9th Cir. 1993); United States v. Thomas, 989 F.2d 1252 (D.C. Cir. 1993); United States v. Williams, 974 F.2d 480 (4th Cir. 1992); Espinosa-Orlando, 704 F.2d at 511.

Defendant to sign. (Tr. at 16). Once Defendant consented to the search, the encounter became consensual and the amount of delay, because Defendant did not object to the length or scope of the search, is not considered by the court. See United States v. Gonzalez, 275 Fed. Appx. 930, 933 (11th Cir. 2008) (once "driver voluntarily consents to a search of his vehicle, 'the remainder of the detention [is] consensual so long as the scope of the search [does] not exceed the consent given[;]'" therefore, "where the driver raises no issue concerning the scope or duration of the search, only the time period between the initial stop and the driver's consent is relevant to the reasonableness of the duration of the traffic stop.") (quoting Purcell, 236 F.3d at 1279).

Defendant, who was not being unlawfully detained, executed a form consenting to the search of the tractor-trailer. The court previously set forth the binding legal authority guiding the court's analysis of the voluntariness of Defendant's consent to search. (See Report and Recommendation, Defendants Anaya-Medina's, et al., Motions to Suppress Evidence and Statements, II. Discussion, a. Search of Residence). Applying that authority to the facts established at the evidentiary hearing establishes that Defendant's consent was voluntary. After Defendant verbally consented to the search, Sgt. Swicord obtained a consent to search form which he filled in and asked Defendant to sign. (Tr. at 16). The form stated:

GEORGIA STATE PATROL
CONSENT TO SEARCH

I, *Otha Barnes* hereby grant my consent to *Sgt. Swicord, TFC Malone* Troopers of the Georgia State Patrol to search the following described vehicle including luggage, containers, and contents of all.  This includes the removal of any suspicious paneling or other vehicle components and the least intrusive access to any constructed compartment used for the purposes of concealing contraband.

| *Red* | *1999* | *Freight* | *Tractor* | *RB7L20* |
|-------|--------|-----------|-----------|----------|
| Color | Year   | Make      | Body Style | License Number |

I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form.  I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

My consent is freely and voluntarily given.

Date          *12-10-08*          Time          *0805*

*Otha Barnes*
Signature

(Tr. at 16; Gov't Ex. 3 (handwritten information in italics)).

Defendant, being advised of his right to refuse consent and acknowledging that no coercion, threats or promises contributed to his consent and continuing to be cooperative with the officer, granted permission for Sgt. Swicord to conduct a

thorough search of the trailer.[40]   <u>Blake</u>, 888 F.2d at 798 (factors in assessing

voluntariness include: "'voluntariness of defendant's custodial status, the presence of

coercive police procedure, the extent and level of the defendant's cooperation with

police, the defendant's awareness of his right to refuse to consent to the search, the

defendant's education and intelligence, and, significantly, the defendant's belief that

---

[40]Although Sgt. Swicord stated that Defendant was not free to leave at this time, because Defendant was being cooperative, Sgt. Swicord did not tell him that he could not leave. (Tr. at 33-34.) So, as far as the objective facts establish, Defendant was not being detained at the time he consented to the search.  Because the Government and Defendant apparently assumed that once the traffic stop was completed, that is, when Defendant was handed the warning and all of his documents were returned, Defendant was further detained by the Trooper, the court did not address the issue.  However, as noted *supra*, "'further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter.'"  <u>Ramirez</u>, 476 F.3d at 1237 (citation omitted).  The evidence presented in this case establishes a basis for finding that Defendant was not being detained during the discussion of the officer's suspicions and while being asked for consent to search.  The traffic stop had ended.  Sgt. Swicord handed Defendant the warning and all of his personal papers and the documents related to operation of the truck.  (Tr. at 28, 33-34, 38).  The entire stop had been conducted in a low-key and cooperative manner.  Nothing objectively prevented Defendant from declining to speak with or cooperate with the officer and getting in the truck and leaving.  <u>Id.</u> at 1240 (noting that while there is no "bright-line 'litmus test'" to determine if a defendant is detained or engaged in a consensual encounter following a traffic stop, several factors were identified by the court to assist in making a decision, "such as whether there is any coerciveness on the part of the police, whether the exchange is cooperative in nature, and whether the defendant had everything he reasonably required to proceed on his journey"); <u>see also</u> <u>Geboyan</u>, 367 Fed. Appx. at 101 (at the time the officer requested consent to search, the traffic stop had ended and the officer had returned to the defendant all of her paperwork, therefore, the exchange was cooperative in nature).

no incriminating evidence will be found.'") (citations omitted) Defendant does not argue, nor does the court find, that the officer exceeded the scope of the search which resulted in the seizure of cocaine and methamphetamine from the pallets of rotten cabbage in the trailer.  (Tr. at 17-20).

For all of these reasons, the court **RECOMMENDS** that Defendant Barnes' motion [Doc. 315] to suppress evidence, quantities of controlled substances seized on December 10, 2008, be **DENIED**.

### b.    Voice Exemplars

Although not discussed in the post-hearing brief, in the motion to suppress, Defendant seeks to suppress the voice exemplars taken on the date of his arrest on the federal indictment, April 29, 2009.  [Doc. 315].  The grounds for making that request are confusing with Defendant again seeking a <u>Franks</u> hearing.  [<u>Id.</u>].  However, based on the Government's representation that the voice exemplars will only be used at trial for the purpose of identification, Defendant cannot establish that introduction of the evidence will violate his Fourth, Fifth, or Sixth Amendment rights.

FBI agents arrived at Defendant's residence in Dandridge, Tennessee, at approximately 6:00 a.m., on April 29, 2009, to execute a federal arrest warrant and a federal search warrant.  Although Defendant was given his <u>Miranda</u> rights and, as not

contested by Defendant, waived his rights and spoke with the agents, the evidence is not clear if Defendant provided the voice exemplars before or after being advised of and waiving his rights.  (Tr. at 41-45, 48-49; Gov't Ex. 4).  In any event, Defendant was handed a phone and answered questions over the phone about his residence, phone number, employment, date of birth, and similar background type of questions.  (Tr. at 45-46, 50-51).  The agent did not recall making any statement to Defendant about providing the voice exemplar.  (Tr. at 50-51).  Use of the exemplars for identification purposes, based on these facts and the case law set forth *supra* (see Report and Recommendation, Defendants Anaya-Medina's, et al., Motions to Suppress Evidence and Statements, II.  Discussion, b.  Voice Exemplars), will not violate Defendant's rights.  See, e.g., Gallo-Moreno, 584 F.3d at 762-63; Askew, 203 Fed. Appx. at 416-17; Lanier, 103 F.3d 121, 1996 WL 721894, at **1-2; Shaw, 555 F.2d at 1300; Suarez, 553 F. Supp. at 347.

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 315] to suppress the voice exemplars be **DENIED**.

## III.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 315] to suppress evidence and the voice exemplars be **DENIED**.

### Defendant Gerald Durrance Motion to Suppress Evidence

Pending before the court are Defendant Durrance's motions [Docs. 304 and 455] to suppress evidence seized as the result of a consent search of his residence located at 45 Fairway Ridge Drive, Alpharetta, Georgia, on April 29, 2009. As fruits of that search, Defendant also seeks to suppress evidence obtained as the result of a federal search warrant executed on several computers and associated hardware seized during the search. [Id.]. An evidentiary hearing was held on the motion to suppress on February 23, 2010.[41] [Doc. 434]. Although Defendant does not contend that the consent to search was involuntary, he does argue that the third party, his step-daughter, providing consent did not have the authority to consent to the search of locked rooms and a closed and locked safe found in the residence. (Tr. at 4). And Defendant does not challenge the federal search warrant for the seized computers and equipment except as fruits of the warrantless search of his residence. (Tr. at 42). The Government opposes the motions to suppress contending that the third party, if not having actual

---

[41]Citations to the transcript are: (Tr. at ).

88

authority to consent to search, had apparent authority to consent to the search of the residence including the locked rooms and the safe found in the residence.  [Doc. 479].

## I.    Facts

On April 29, 2009, FBI agents along with local officers arrived at 45 Fairway Ridge Drive, in Alpharetta, to execute a federal arrest warrant for Defendant Durrance.[42]  (Tr. at 6-7).  A SWAT team made the initial entry into the residence and reported back to the on-scene commander, FBI Special Agent Ronald Campbell, that Defendant was not found inside the residence; however, three females and one male were located inside.  (Tr. at 7-9).  At Agent Campbell's request, the four individuals were escorted outside of the residence where the agent spoke with each person.  (Tr. at 9, 20).

The agent advised the four occupants of the residence that they were not under arrest and were free to leave.  (Tr. at 9).  The male, who was just visiting, left.  (Tr. at 10, 22).  The oldest female, age twenty and identified at the time as Stephanie Espinoza, advised the agent that she was in charge of the house and of her two younger

_____

[42]Based on information gathered during the investigation, the agents believed that the house at this location was the residence of Defendant, and although Defendant was not observed at the residence a few days before or that morning, vehicles known to be operated by Defendant were observed at the residence.  (Tr. at 6, 18-19).

sisters, aged 17 and 14, while her parents were out of town for a few days.  (Tr. at 9-10, 36, 39).  The agent understood that Defendant Durrance was Ms. Espinoza's step-father.  (Tr. at 10).  Agent Campbell asked Ms. Espinoza if the agents could search the residence and showed her a consent to search form on which he filled in the residence address.  (Tr. at 11; Gov't Ex. 1).  The form states:

1.    I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:  *45 Fairway Ridge Dr. Alpharetta, GA*
2.    I have been advised of my right to refuse consent.
3.    I give this permission voluntarily.
4.    I authorize these agents to take any items which they determine may be related to their investigation.

<u>    *4/29/09*    </u>            <u>    *Stephanie Espinoza*    </u>
        Date                                Signature

        Witness                          <u>  *Ronald Campbell SA FBI Atlanta*</u>
                                           *Christie Parker SA FBI Atlanta*

(Gov't Ex. 1 (handwritten information in italics)).  After asking to speak with and speaking with a lawyer over the telephone, Ms. Espinoza signed the consent form.  (Tr. at 11-12).  The agents conducted a search of all the rooms in the residence finding various items, including documents, computers and electronic equipment, a safe, and ammunition.  (Tr. at 12).

90

Specifically, in an office in the basement (designated on the evidence list as Room H), the agents found SunTrust bank documents, a SimpleTeck Hard Drive, a HP Pavilion Desktop, a Generic Desktop, a Royal Sovereign cash counter, and miscellaneous business and financial documents.  (Tr. at 13, 23-24, 43; Gov't Ex. 2).  Agent Campbell stated that when the SWAT team made entry into the residence to search for Defendant Durrance, they found the door to the office locked and that they breached the door to look in the office for Defendant.  (Tr. at 13).  According to Agent Campbell, Ms. Espinoza advised that Defendant had a computer in the office "but that she and her sisters often used that computer."  (Tr. at 13).

In the master bedroom (designated on the evidence list as Room P) and the master bath/closet (designated on the evidence list as Room Q), the agents found a Sentry Safe, several cellular telephones, an Apple MacBook (laptop), a digital recorder and various business and financial documents.  (Tr. at 14, 23, 43-44; Gov't Ex. 2).  Agent Campbell did not know whether the door to the master bedroom was locked and breached by the SWAT while searching for Defendant but no one reported to him breaching that door.  (Tr. at 16-17, 22).  According to Agent Campbell, when Ms. Espinoza saw the laptop, which had been found under the bed in the master bedroom, she stated that the computer was hers.  (Tr. at 14).

The safe found in the master bedroom was picked up by searching agents who, using a flash light, could look through what appeared to be bolt holes in the bottom of the safe. They observed a weapon, some men's jewelry and currency. (Tr. at 14, 24). The safe, which was locked, required a key and a code to open and was seized locked at the residence. (Tr. at 24-25, 29-30, 33; Def. Ex. 4). At the FBI office, agents obtained a code for the safe from the manufacturer and opened the safe retrieving the handgun, jewelry and currency. (Tr. at 25).

The agents also found in the kitchen (designated on the evidence list as Room E) more miscellaneous business and financial documents, in the garage (designated on the evidence list as Room G) a box containing an assault rifle magazine, and in one of the daughter's bedrooms (designated on the evidence list as Room C) miscellaneous documents and a MetroPCS cellular telephone. (Tr. at 26, 43; Gov't Ex. 2). [Doc. 455 at 2 n.1].

Ms. Espinoza testified at the hearing. Her testimony, as was that of Agent Campbell, was credible. Neither witness's testimony about the events of April 29, 2009, materially differs. Ms. Espinoza stated that Defendant was her step-father. (Tr. at 28). She resides at 45 Fairway Ridge Drive with her mother, step-father and two younger sisters. (Tr. at 28). She did not pay rent or the mortgage for the residence,

92

which was being rented by her parents. (Tr. at 28-29). With respect to the rooms in the residence, Ms. Espinoza stated that her parents shared a bedroom and that the door to the room was locked whenever they were not at home. Although the door was not locked when they were present, she stated, "But whenever they would leave to work or, you know, any place, they would lock the room." (Tr. at 29). She did not have a key for the master bedroom which was locked on the morning of April 29, 2009, when the agents arrived, because her parents were not at home. (Tr. at 29, 34, 36, 39). She also identified photographs of the door and door frame to the master bedroom which she described as showing a hole punched in the door and the door frame ripped. (Tr. at 30-33; Def's Exs. 1, 2, and 3). The agents did not specifically ask her about searching the master bedroom. (Tr. at 30). On cross-examination, Ms. Espinoza stated that when her parents are home, she is not restricted from any part of the house and that she has been in the master bedroom. (Tr. at 36-37). Ms. Espinoza stated that her laptop was in the master bedroom because she gave it to her mother to be repaired. (Tr. at 34, 40).

With respect to the safe, Ms. Espinoza identified the safe as belonging to her mother. (Tr. at 29). She did not have either the code or key to open the safe and did

93

not know how to open the safe.  (Tr. at 29-30, 34-35).  No one asked her about opening the safe.  (Tr. at 30).  None of the items in the safe belonged to her.  (Tr. at 34).

Ms. Espinoza testified that the door to the office in the basement was locked on April 29, 2009, and stated that the office was Defendant's.  (Tr. at 35, 39).  The office normally remains locked, and she does not have a key or any possessions in the office. (Tr. at 35).  She is allowed in the office to use the computer when Defendant is home and with his permission.  (Tr. at 35, 37).

Ms. Espinoza gave consent for the agents to search the entire house.  (Tr. at 36). And she did not tell the agents that they could not go into any of the rooms.  (Tr. at 40).  She apparently had very little conversation with the agents about the various rooms in the residence or the items that they found in the residence.  (Tr. at 24, 30, 40-41).

Additional facts will be set forth as necessary during the discussion of Defendant's claims.

## II.   Discussion

Defendant only challenges the scope of the authority Ms. Espinoza had to consent to a search of the residence on April 29, 2009, in Defendant's and her mother's absence.  Defendant contends that Ms. Espinoza had neither actual nor apparent

94

authority to consent to the search of the master bedroom, the safe found therein or the office.  [Doc. 455].  The search of the office and master bedroom resulted in the seizure of the laptop and desktop computers and related equipment.  Defendant contends that the results of the search of those items pursuant to the federal search warrant constitute fruits of the unlawful consent search and should also be suppressed. [Id.].  The Government contends that Ms. Espinoza had actual authority to consent to the search and, if not, that the agents reasonably relied on her apparent authority to search the entire residence.  [Doc. 479].  Therefore, the Government also asserts that the results of the federal search warrant should not be suppressed.  [Id.].

 a. **Consent Search**

 The court *supra* (see Report & Recommendation, Anaya-Medina's, et al., Motions to Suppress Evidence and Statements, II. Discussion, a. Search of Residence) set out the framework for resolving the issue before the court.  As stated by the Seventh Circuit Court of Appeals in Aghedo, "A third party with common authority over the premises [or effects] sought to be searched may provide such consent. . . . Common authority is based upon mutual use of property by persons generally having joint access or control."  159 F.3d at 310 (citations omitted).  In Matlock, the Supreme Court elaborated on the concept of common authority noting that it "is, of course, not

95

to be implied from the mere property interest a third party has in the property . . . but rests rather on the mutual use of the property by persons generally having joint access or control for most purposes. . . ."  415 U.S. at 171-72 n.7, 94 S. Ct. at 993 n.7. Furthermore, as recently affirmed by the Eleventh Circuit Court of Appeals in United States v. Garcia-Jaimes, 484 F.3d 1311 (11th Cir. 2007), vacated and remanded on other grounds, Nunez-Virraizabal v. United States, 553 U.S. 1091, 128 S. Ct. 2901, 171 L. Ed. 2d 839 (2008), "even if the consenting party does not in fact have the requisite relationship to the premises, if the officer has an objectively reasonable, though mistaken, good-faith belief that the consent was a valid consent, there is no Fourth Amendment violation."  Id. at 1323; see also Rodriguez, 497 U.S. at 188, 110 S. Ct. at 2801 ("As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?") (citation and internal quotation marks omitted).  The Government bears the burden of establishing that Ms. Espinoza had actual authority or apparent authority to consent to the search of the locked rooms and safe within the residence.  See Rodriguez, 497 U.S. at 181, 110 S. Ct. at 2797.

96

Based on the evidence presented at the evidentiary hearing, the court finds that Ms. Espinoza did not have actual authority to consent to the search of the master bedroom, the safe found therein, or the office.  "The government presented no evidence of joint access or control at the suppression hearing."  United States v. Jaras, 86 F.3d 383, 389 (5ᵗʰ Cir. 1996) (the court stated that a "finding of actual authority requires proof that the consenting party and the party challenging the search 'mutually used the property [or space within the property] searched and had joint access to and control of it for most purposes, so that it is reasonable to recognize that either user had the right to permit inspection of the property and that the complaining co-user had assumed the risk that the consenting co-user might permit the search'") (citation omitted).  Although Ms. Espinoza had actual authority to allow the agents into the residence to conduct a search of the common and unlocked areas of the residence, the facts demonstrate that her authority stopped at the locked doors of the master bedroom and office, as well as the locked safe, secured by Defendant and her mother.  As stated by the Eighth Circuit Court of Appeals:

> Where a third party appears to have authority over the entire premises, the police may rely on that person's consent to search throughout the house, so long as the consent appeared to extend so far. . . . On the other hand, if part of a dwelling is appropriated for the exclusive use of one occupant, other inmates of the house have no right to consent to police

97

> entry of the space from which they themselves are excluded.  "To the extent a person wants to ensure that his possessions will be subject to a consent search due to his *own* consent, he is free to place these items in an area over which others do *not* share access and control, be it a private room or a locked suitcase under his bed."

United States v. Almeida-Perez, 549 F.3d 1162, 1172 (8th Cir. 2008) (quoting

Randolph, 547 U.S. at 135, 126 S. Ct. at 1535) (Roberts, C.J., dissenting) (emphasis

in original)).

Ms. Espinoza was a resident of the home, living there as an adult-child, rent-

free, with her step-father, Defendant Durrance, and her mother.  (Tr. at 9-10, 28-29).

On April 29, 2009, she was in charge of the residence and her two younger sisters.  (Tr.

at 9-10, 36).  Based on these facts, she had authority to allow a consent search of the

residence, and she did not limit the scope of the search that she granted.  (Tr. at 11, 36;

Gov't Ex. 1).  However, two rooms in that residence, the master bedroom shared by

her parents and the office used by Defendant, were locked and were only entered by

the agents using force.  (Tr. at 13, 29-33; Def's Exs. 1, 2, and 3).  Ms. Espinoza did not

have a key to either room, did not have access to either room unless her parents were

home, and as to the office, in fact, had to ask permission to enter and use the computers

located therein.  (Tr. at 29, 34-35, 37).  Accordingly, Ms. Espinoza did not have "joint

access or control for most purposes," Matlock, 415 U.S. at 171-72 n.7, 94 S. Ct. at 993

n.7, over either room; therefore, it would *not* be "'reasonable to recognize that *either* [Defendant or Ms. Espinoza] had the right to permit inspection of the [locked rooms] and that [Defendant] had assumed the risk that [Ms. Espinoza] might permit the search.'" Jaras, 86 F.3d at 389 (citation omitted) (emphasis added).

In Moore v. Andreno, 505 F.3d 203 (2nd Cir. 2007), the court found that a co-resident, the defendant's girlfriend, did not have actual authority to consent to a search of the locked study used by the defendant, who owned the residence. In Moore, in the defendant's absence, his girlfriend, who lived with him but who did not have any ownership interest in the residence, gained entry by force into the locked study for which she did not have a key and over which the defendant had denied her entry without his permission. Id. at 210-11 (noting that the court had found joint access "to be satisfied when the party who consented to the search had a key to the searched area" or "was the owner of the searched [area] and could 'get into [the area] whenever he wanted' despite not having a key") (citation omitted). And, in United States v. Jimenez, 419 F.3d 34 (1st Cir. 2005), the court found that the lessee, Ms. Rodriguez, of the residence did not have actual authority to consent to the search of the defendant's locked bedroom. Id. at 40. The court found that Ms. Rodriguez did not have common authority over that space based on the facts that she identified the

99

bedroom as "his space," stated that she did not enter the room as a regular matter, that she did not have a key for the bedroom but had to enter using a knife to pry the door open, and that she advised she was not supposed to enter the room. Id.  See also United States v. Heltsley, 33 Fed. Appx. 270, 272 (9th Cir. 2002) (finding that the defendant's wife did not have actual authority to consent to a search of a closet locked by the defendant to which she did not have a key and into which she gained access by removing the hinges to the door).

A recent decision of the Eleventh Circuit Court of Appeals does not support a finding to the contrary. In United States v. Camp, 157 Fed. Appx. 121 (11th Cir. 2005), the court found that the defendant's companion, Compton, despite not having a key to the lock placed on the door by the defendant, had actual authority to consent to a search of the locked storage unit. The court found both mutual use and joint access over the storage unit because "Compton and Camp both stored property in the unit (mutual use) and Compton retained joint access to the unit since she was the *only* name on the unit's lease. The fact that Camp wrongfully locked her out of the unit did not divest her of her actual *or* apparent authority to consent to a search." Id. at 123 (emphasis in original). In the instant case, Ms. Espinoza neither had mutual use nor joint access to the locked rooms for most purposes. She was only allowed in the rooms

when her parents were present in the residence, and her parents' act of locking the doors to the rooms, as the lessors of the property, was their right and not wrongful.

Even if Ms. Espinoza had authority to allow a search of the master bedroom, that authority did not extend to the locked safe found in the bedroom. A consent to search a place of residence does not generally extend to personal belongings of other occupants, especially locked containers, located in the residence. See United States v. Salinas-Cano, 959 F.2d 861 (10th Cir. 1992); United States v. Gilley, 608 F. Supp. 1065, 1068-70 (S.D. Ga. 1985). As the court stated in Salinas-Cano, "'A privacy interest in a home itself need not be co-extensive with a privacy interest in the contents or movements of everything situated inside the home. . . . *A homeowner's consent to a search of the home may not be effective consent to a search of closed objects inside the home. . . .*'" 959 F.2d at 863 (quoting United States v. Karo, 468 U.S. 705, 725-26, 104 S. Ct. 3296, 3308-09, 82 L. Ed. 2d 530 (1984)) (emphasis in original).

In United States v. Waller, 426 F.3d 838 (6th Cir. 2005), the court found that the lessee did not have actual authority to consent to the search of luggage belonging to the defendant who had left the luggage, along with other personal items, in the apartment with the consent of the lessee. The evidence established that the lessee and the defendant "held a mutual understanding that the luggage contained Waller's private

101

personal effects" and that "Waller never gave [the lessee] permission to open the luggage bag and [the lessee] never did so." Id. at 845.  Noting that "[a] valid consent to search the closed container must come from one who has common authority over the effects sought to be inspected, one who has mutual use of the property, and one who generally has joint access or control for most purposes[,]" the court held that the lessee "did not have *mutual use* of the luggage, nor did he have joint access and control *for most purposes*.  Thus, he did not have common authority to grant permission to search Waller's luggage." Id. at 845-46 (emphasis in original).  Likewise, the evidence in this case indicates that Ms. Espinoza had neither mutual use of nor joint access and control over the locked safe.  She identified the safe as belonging to her mother.  (Tr. at 29).  She did not have either the code or key to open the safe and did not know how to open the safe.  (Tr. at 29-30, 34-35).  No one asked her about opening the safe which the agents had to take back to their office locked and could only open after contacting the manufacturer for the combination to the lock.  (Tr. at 25, 30).  None of the items in the safe belonged to Ms. Espinoza.  (Tr. at 34).

For these reasons, the court finds that Ms. Espinoza did not have actual authority to consent to a search of either locked room or the locked safe.  As noted, the Government also relies on apparent authority to justify the search of these areas.

102

Apparent authority to consent depends on a "'reasonable mistake of fact, as distinguished from a mistake of law.'" Salinas-Cano, 959 F.2d at 865 (quoting United States v. Whitfield, 939 F.2d 1071, 1073-74 (D.C. Cir. 1991)). "In other words, 'Rodriguez . . . applies to situations in which an officer would have had valid consent to search *if the facts were as he reasonably believed them to be*.' . . . Here, to the contrary, the officer was not mistaken as to the facts; his error consisted of concluding that the facts authorized [defendant's girlfriend's] consent. His mistake was a mistake of *law* rather than a mistake of fact, and Rodriguez therefore does not resolve the issue." Id. at 865-66 (citation omitted and emphasis in original).

In Waller, the Sixth Circuit Court of Appeals summarized the law this court finds applicable to analysis of the issue of Ms. Espinoza's apparent authority to consent in this case:

> Whether the facts presented at the time of the search could "warrant a man of reasonable caution" to believe the third party has common authority over the property depends upon all of the circumstances. . . . The government cannot establish that its agents reasonably relied upon a third party's apparent authority "if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful without further inquiry.'" . . . Where the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use

103

> of the property, "warrantless entry without further inquiry is unlawful[.]" Rodriguez, 497 U.S. at 188-89, 110 S. Ct. [at 2801] (noting that "the surrounding circumstances could conceivably be such that a reasonable person would doubt [the apparent consent] and not act upon it without further inquiry[ ]").

426 F.3d at 846 (remaining citations omitted); accord United States v. Purcell, 526 F.3d 953, 963-64 (6th Cir. 2008).[43]   The court finds that in this case the agents were presented with ambiguous circumstances – that is, the locked doors to the master bedroom and office and locked safe, which they appeared to have ignored –  which undermine any claim that the agents had an objectively reasonable belief that Ms. Espinosa had authority to consent to search the locked rooms and safe.  See Almeida-Perez, 549 F.3d at 1172 ("if the police encounter circumstances that would put them on notice of limited authority, they may not ignore such signals").

The agents, when confronted with the locked bedroom and office, as well as the locked safe, did very little to determine whether Ms. Espinoza's authority extended to a valid consent to search those areas.  Although the agents knew that the office was

---

[43]The court cited a number of cases from other circuits recognizing "an officer's duty to inquire in ambiguous situations."  Id. at 847 (citing, e.g., Kimoana, 383 F.3d at 1222; United States v. Rosario, 962 F.2d 733, 738 (7th Cir. 1992); Whitfield, 939 F.2d at 1075).  Additionally, the same "ambiguity" test is applied in the Eighth Circuit. See Almeida-Perez, 549 F.3d at 1172.  The court did not find a decision of the Eleventh Circuit Court of Appeals applying - or rejecting - this test.

AO 72A
(Rev.8/82)

locked, the room having been forcibly entered during the search for Defendant, the only piece of information that the agents obtained, at some point during the search but not clear if before the room was searched or after, was Ms. Espinoza's statement that she and her sisters used one of the computers in the office. (Tr. at 13). However, the agents apparently did not ask Ms. Espinoza a few simple questions to clarify her right to access that locked room, such as, whether she had a key to the locked door, did she have permission to enter the room in her parent's absence, or did she have belongings in the room. And, if those questions would have been asked, Ms. Espinoza's answers that she did not have a key, did not have authority to enter the office or use the computer without Defendant's permission and unless he was present, and did not have belongings in the room (Tr. at 35, 37) would have demonstrated her lack of legal authority to validly consent to a search of that space. The same is true of the locked master bedroom and the safe found in that room. The only information that the agents obtained about Ms. Espinoza's relationship to that room was obtained after the search of the room and the seizure of the laptop found therein. Ms. Espinoza offered, not in response to being asked, that the laptop was hers. (Tr. at 14). However, if questioned further, she would have explained that her mother had the laptop for the purpose of having it repaired. (Tr. at 34, 37, 40). And Ms. Espinosa would have also advised that

105

her parents locked the bedroom when they were not present, that she did not have a key to the room, and that she did not have other belongings in the room. (Tr. at 29, 30, 34, 36). With respect to the safe, Agent Campbell acknowledged that he did not recall any conversation with Ms. Espinoza about the safe. (Tr. at 24). If asked, Ms. Espinoza would have advised the agents that she did not have a key for or know the code for the safe, that it was not hers nor did she have anything in the safe, and in fact, that she did not even know how to open the safe. (Tr. at 29-30, 34-35). As noted *supra*, "if part of a dwelling is appropriated for the exclusive use of one occupant, other inmates of the house have no right to consent to police entry of the space from which they themselves are excluded." Almeida-Perez, 549 F.3d at 1172.

And Ms. Espinoza's relationship with Defendant and her mother and to the residence did not, in this case, "give rise to the presumption that [she] has authority to consent to search of the other's property." Id. Although, "[t]ypically, all family members have common authority over all of the rooms in the family residence[,]" Pratt v. United States, 214 Fed. Appx. 532, 535 (6th Cir. 2007), the facts in this case gave the agents reason to conclude that Ms. Espinoza did not have co-extensive authority with her parents over the locked rooms in the residence. In Pratt, the Sixth Circuit Court of Appeals found that the defendant's mother, the sole leaseholder of the residence,

106

normally had a key to her son's locked bedroom and that the fact she "temporarily lacked a key to the bedroom would not have made the officers' reliance on the appearance of her authority unreasonable." <u>Id.</u> at 536. Here, Ms. Espinoza was not the leaseholder; she did not pay any rent for the residence; and she never had a key to either locked room or the safe. In <u>United States v. Rith</u>, 164 F.3d 1323 (10th Cir. 1999), the Tenth Circuit Court of Appeals discussed the actual and apparent authority of parents to consent to the search of the bedroom of the defendant, their eighteen year old son who was living rent-free in the family home. <u>Id.</u> at 1330-31. Acknowledging that relationships, such as husband-wife and parent-child, may give rise to a presumption of control over property, the court stated, "that presumption may be rebutted by facts showing an agreement or understanding between the defendant and the third party that the latter must have permission to enter the defendant's room." <u>Id.</u> Examples of such facts noted by the court included a lock on the bedroom door. <u>Id.</u> at 1331. The court in <u>Rith</u> found that the defendant's parents had apparent authority to consent to a search of their son's bedroom. Besides the fact he was eighteen, the facts established "no lock on Rith's bedroom door; no agreement with Rith's parents that they not enter his room without his consent; no payment of rent." <u>Id.</u> Contrary to those facts, in this case, Ms. Espinoza was the child living rent-free in her parent's

home, and there were not only locks on the doors, for which she did not have a key, but an agreement that she did not access either room in her parent's absence. See Purcell, 526 F.3d at 964 ("Being in an intimate relationship, however, does not endow a would-be-consenter with an additional sheen of apparent authority that would survive the discovery of evidence that contradicts the consenter's asserted authority.").

For these reasons, the court finds that Ms. Espinoza did not have actual or apparent authority to consent to a search of the locked office and the locked master bedroom or the locked safe found in the master bedroom. The court **RECOMMENDS** that Defendant's motions [Docs. 304 and 455] to suppress evidence obtained from those rooms and the safe be **GRANTED**.

### b.    Search Warrant for Computer and Related Equipment

Out of those rooms, the agents seized computers and related electronic equipment as identified on the report of inventory of items seized. In the locked office in the basement (designated on the evidence list as Room H), the agents found, along with other items, a SimpleTeck Hard Drive, a HP Pavilion Desktop, and a Generic Desktop. (Tr. at 13, 23-24, 43; Gov't Ex. 2). And, in the master bedroom (designated on the evidence list as Room P), along with other items, the agents found an Apple MacBook (laptop). (Tr. at 14, 23, 43-44; Gov't Ex. 2). On July 13, 2009, agents

108

obtained a federal search warrant to search the computers and related electronic equipment.  (Gov't Ex. 3).  Defendant challenges the search of these items pursuant to the warrant on the grounds that the results of the search constitute fruits of the unlawful seizure on April 29, 2009.  [Docs. 304 and 455 at 10].  Having found that these items were unlawfully seized from the residence, the court agrees with Defendant.  The evidence obtained from execution of the search warrant constitute fruits of the unlawful seizure.  The Government did not have lawful access to the items searched and does not offer any alternative basis for introduction of that evidence. [Doc. 479].

For these reasons, the court **RECOMMENDS** that Defendant's motions [Docs. 304 and 455] to suppress the information and other results of the execution of the warrant for the computers and electronic equipment seized from the master bedroom and office be **GRANTED**.

## III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motions [Doc. 304 and 455] to suppress evidence be **GRANTED**.

### Defendant Martina Casas Flores' Motion to Suppress Evidence

109

Pending before the court is Defendant Flores' motion [Doc. 349] to suppress evidence seized pursuant to the execution of two federal search warrants on April 29, 2009, one for 604 Sandyhills Avenue, McAllen, Texas [Doc. 456, Ex. 1] and one for 608 Sandyhills Avenue, McAllen, Texas [Id., Ex. 2; Doc. 578].[44]  In the brief filed in support of the motion to suppress, Defendant contends that the affidavit for the search warrants fails to establish probable cause to believe that Defendant was involved in drug trafficking activity, that evidence of those crimes would be found at either residence, and that the residences were linked to Defendant.  [Doc. 456 at 8-13]. Defendant further contends that, if the affidavits for the warrants do not establish probable cause, the Leon exception to the exclusionary rule is not applicable in this case because, as to both warrants, the affidavit in support contained false information, because the affidavits were facially deficient in establishing probable cause, and because the magistrate judge abandoned his detached and neutral role.  [Id. at 21-27]. And, as to the warrant for 604 Sandyhills Avenue, Defendant also argues that the good faith exception does not apply because the affidavit relied on information obtained in violation of Defendant's Sixth Amendment right to counsel.  [Id. at 16-20].  The

---

[44]The Government also provided to the court a certified copy of the warrant, affidavit and attachments which have been filed with the court.  [Doc. 578].

110

Government opposes the motion to suppress the search warrants arguing that the affidavit for the search warrants establishes probable cause to search each residence and that, nonetheless, the good faith exception to the exclusionary rule is applicable to each search warrant; therefore, evidence seized pursuant to the warrants is admissible in evidence.  [Doc. 473].  Since filing their response to the motion to suppress, the Government has advised the court and counsel for Defendant that the Government does not intend to use in its case-in-chief any evidence obtained from the search warrant executed at 604 Sandyhills Avenue.  Accordingly, the court will only address Defendant's motion to suppress with respect to the warrant for 608 Sandyhills Avenue.

## I.    Background

On April 29, 2009, the Government presented a search warrant to a federal magistrate judge seeking authorization to search the residence at 608 Sandyhills Avenue, McAllen, Texas, for evidence related to violations of 18 U.S.C. § 1956, money laundering, and 21 U.S.C. §§ 841 and 846, a drug trafficking conspiracy.  [Doc. 578].  In the affidavit in support of the warrant, the affiant, Serena Peterson, a Special Agent with the FBI, assigned to the McAllen Resident Agency, San Antonio Division, first provided information concerning her training and experience as a federal agent

111

for approximately five years, including a substantial background in working on drug trafficking and money laundering organizations. [Doc. 578, Affidavit ¶ 1]. She further described the sources of the information for the affidavit, including (1) her personal involvement in the investigation and review of the transcripts and summaries of the court-authorized wire intercepts, specifically the intercepts of a telephone utilized by Defendant, and discussions with Spanish speaking agents and/or monitors regarding the wire interceptions; (2) her review of reports of seizures of drugs and drug proceeds; and (3) discussions with other agents concerning the investigation.  [Id., ¶ 3].  The affiant then stated that based on her training and experience, in addition to the training and experience of other agents with whom she communicated, she knew "that individuals that commit these types of offenses[, i.e., drug trafficking and money laundering organizations,] keep and maintain the . . . type of records and related evidence and contraband [set forth in the search warrant and affidavit] in order to carry on their illegal activities, particularly" as relates to the crimes of drug trafficking and money laundering.  [Id., ¶ 4].  Based on her training and experience, her knowledge of the instant investigation and her discussions with other agents, the affiant specifically outlined the type of documents, contraband and related materials and equipment, assets, and records that are commonly retained by and commonly stored and

112

maintained in secure, easily accessible locations, such as residences, businesses, offices and the like, by individuals involved in illegal drug trafficking and money laundering activity. [Id., ¶¶ 4-8].

The affidavit provided a detailed physical description and a statement regarding Defendant Flores' association with the location to be searched. For the 608 Sandyhills Avenue residence, the affidavit specified: "Agents confirmed through surveillance on April 29, 2009[,] that [t]his residence is utilized by Martina Casas Flores, and has listed this as her address on her Texas driver's license; and her son Marcos Antonio Flores II resides at this location." [Id., ¶ 2.B.].

The affiant then provided a general background of the investigation which began in Atlanta in February 2008 and which had as a result of the investigation identified "Ojos" as a member of the Gulf Cartel which operates in Mexico and the Rio Grande Valley. That drug cartel is responsible for distribution of multi-kilogram quantities of controlled substances and for the laundering of the resulting proceeds of the distribution of the controlled substances. The affiant stated, "Through debriefings of various reliable cooperating witnesses, review of documents seized in relation to seizures, physical surveillance, and/or electronic surveillance, agents have learned that [Defendant Flores] . . . is a high-level member of the OJOS DTO, responsible for

113

coordinating the transportation of large loads of narcotics and resulting monetary proceeds.  Electronic surveillance has corroborated information previously provided by credible and reliable cooperating individuals regarding Flores' role in the organization."  [Id., ¶ 9].  The affiant then outlines generally seizures of drugs and monetary proceeds during the investigation.  [Id.].

With respect to specific information about Defendant, the affiant discussed Defendant having previously stored evidence of drug trafficking activities in a residence associated with her.  The affiant describes a August 2006 seizure (which was based on an anonymous tip) of $1,500,000 from a safe located in the former residence of Defendant.  The affidavit states that Defendant made a voluntary statement to officers that the currency was given to her by a narcotics trafficker on behalf of her late husband.  [Id., ¶ 10].

The affidavit then outlines evidence of Defendant's involvement in the organization under investigation.[45]  That information, as stated in the affidavit, is obtained from the court-authorized wire intercepts commencing in February 2008 on

---

[45]Although not stated in the affidavit for the search warrant, the arrest of Defendant at the second residence, 604 Sandyhills Avenue, referenced in the affidavit was based on a warrant for her arrest issued following the return of a federal indictment in the Northern District of Georgia for her alleged involvement in the drug trafficking and money laundering organization.  [Docs. 1 and 25].

114

twenty-four telephones, one of which was "subscribed to Grupo De Asecsoria en Reynosa en Comercilizacion, Nuevo Leon 441 Co. Rodriguez, CP 88630, and used by Martina Casas FLORES, aka MOM." [Id., ¶ 11]. Those intercepts relate to drug and monetary seizures by law enforcement officers. The affiant summarized calls in November 2008 involving Defendant and another co-conspirator, Belisario Mendoza-Gil, which occurred following the law enforcement seizure of over $2,000,000 from a tractor-trailer which had just departed a warehouse in Atlanta. That seizure was the result of interception of conversations about the load between Mendoza-Gil and other co-conspirators. Defendant and Mendoza-Gil discussed the monetary seizure, and she instructed Mendoza-Gil to obtain police reports regarding the seizure. [Id., ¶¶ 12, 13].

Also, the affiant outlined another series of wire intercepts between Defendant and co-conspirators later in November 2008 discussing the transportation of kilogram quantities of cocaine to Chicago with Defendant "acting as a conduit between Mendoza[-Gil] and OJOS to facilitate the shipment, as she obtained details of the shipment from Mendoza[-Gil] for relay to OJOS and requested Mendoza[-Gil] to maintain contact with OJOS." [Id., ¶ 14]. The affidavit set out summaries of wire intercepts in December 2008 and February 2009 involving Defendant and other co-conspirators, again following the seizures of loads of controlled substances resulting

115

from the wire interceptions, which were being transported as part of the drug trafficking organization. Defendant and other co-conspirators discussed the seizures and the amounts of drugs seized. [Id., ¶¶ 15-17].

The search warrant signed on April 29, 2009, was filed in the United States District Court, Southern District of Texas on April 29, 2009. [Doc. 578]. The return executed on May 18, 2009, providing a list of items seized, was also filed on May 18, 2009. [Id.]. The affidavit, and attachments thereto, for the warrant signed on April 29, 2009, by the Federal Magistrate Judge were filed that day, April 29, in the United States District Court, Southern District of Texas. [Id.].

Additional facts will be set forth as necessary during discussion of Defendant's claims.

## II.    Discussion

Defendant's attack on the search warrant focuses on the alleged lack of probable cause in the affidavit for the warrant, specifically contending that the affidavit does not establish probable cause to believe Defendant was involved in the drug trafficking and money laundering organization and that the affidavit does not establish a nexus between Defendant's alleged illegal conduct and the residence to be searched and the items to be seized. [Doc. 456 at 8-13].

116

In deciding whether to sign a search warrant, the issuing judge is "'simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983)).  In this regard, "'probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'" United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 462 U.S. at 232, 103 S. Ct. at 2329).  For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determination." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 462 U.S. at 236-37, 103 S. Ct. at 2331-32; United States v. Ventresca, 380 U.S. 102, 109, 85 S. Ct. 741, 746, 13 L. Ed. 2d 684 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same).  In reviewing the issuance of the search warrant, the

117

undersigned must determine only that the Magistrate Judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant.  See Gates, 462 U.S. at 238, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 466 U.S. 727, 728, 104 S. Ct. 2085, 2085, 80 L. Ed. 2d 721 (1984) (per curiam).  The validity of the warrant is considered based on the totality of the circumstances.  See Brundidge, 170 F.3d at 1352.

Specifically, when the challenge raised is a lack of nexus between the place searched and the items being sought and involves the residence of a defendant, the Eleventh Circuit Court of Appeals recently stated that "the affidavit must supply the authorizing magistrate with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, i.e., a 'safe yet accessible place.'"  United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting Feliz, 182 F.3d at 87-88).  The court in Kapordelis further stated in connection with searching a suspect's home:

> "The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained.  In normal situations, few places are more convenient than one's residence for use in planning and hiding fruits of a crime."

118

Id. (quoting United States v. Green, 634 F.2d 222, 226 (5th Cir. Unit B 1981)).

Therefore, while the affidavit must establish a link between the defendant and the

residence to be searched as well as between the residence and criminal activity,

"[t]here need not be an allegation that the illegal activity occurred at the location to be

searched. . . ." Id. (citing, e.g., United States v. Anton, 546 F.3d 1355, 1358 (11th Cir.

2008) (holding that evidence establishing that a defendant possesses contraband of the

type that would normally be expected to be hidden in a residence will support the

search); United States v. Jenkins, 901 F.3d 1075, 1080-81 (11th Cir. 1990) (finding that

nexus between the items to be seized and a defendant's residence can be established

circumstantially if the contraband is capable of being hidden therein)).[46]

---

[46]In Anton, the affidavit for a search warrant for the defendant's residence
provided that agents had observed the defendant, along with his trailer, at gun shows
and had observed the defendant in possession of firearms at the gun shows, that an
informant had advised that the defendant possessed over 300 guns, and that, based on
the agent's experience, convicted felons and firearms dealers typically store contraband
items on their property.  Based on this information, the court found that the search
warrant was supported by probable cause. 546 F.3d at 1358. And, in Jenkins, a case
involving a bank larceny, the Eleventh Circuit Court of Appeals held that a warrant
established probable cause to search the residence of the individual who probably
committed the theft because the items sought were capable of being hidden in a
residence and because, based on the agent's opinion, stolen items are likely to be
hidden in the residence of the thief. 901 F.2d at 1081.

119

In <u>United States v. Meryl</u>, 322 Fed. Appx. 871 (11th Cir. 2009) (per curiam), the Eleventh Circuit Court of Appeals applied this reasoning to a search warrant for the residence of a suspected drug dealer.    In that case, contrary to the defendant's argument that the affidavit failed to provide a link between the evidence being sought and his residence, the court found that the affidavit "established a fair probability that evidence of drug activity or drugs would be found at Meryl's residence."  <u>Id.</u> at 874. Although the court based this decision in part on the references in the affidavit to the fact that before and after the drug deals Meryl was at his residence, while recognizing that his residence changed between drug deals, and that evidence indicated that Meryl was in possession of drugs, indicating that he was involved in ongoing drug dealing, the court also relied on the reasonable inferences from the evidence.  Because Meryl did not have any other base of operations except his residence, when "[c]ombined with the district court's common-sense finding that 'drug dealers are likely to keep evidence of their drug business at home,'" the Eleventh Circuit Court of Appeals found the affidavit supported the district court's probable cause findings.[47]  <u>Id.</u> (citing <u>United States v. Butler</u>, 102 F.3d 1191, 1198 (11th Cir. 1997); <u>Jenkins</u>, 901 F.2d at 1080-81).

---

[47]Alternatively, the Court of Appeals found that the good faith exception applied, as had the district court, because "there was no indication that the police acted recklessly or lacked a reasonable belief in the existence of probable cause. . . ."  <u>Id.</u>

In fact, those circuit courts that have evaluated warrants which *primarily* relied on an agent's opinions based on his training and experience to establish a nexus between illegal drug activity and the items to be seized and/or which are based on the issuing judge's common-sense finding as to the probable location where such evidence will be stored have found that the affidavits for the warrants establish probable cause.[48] See, e.g., United States v. Biglow, 562 F.3d 1272, 1280 (10th Cir. 2009) ("'Additional evidence' connecting a defendant's suspected activity to his residence may also take the form of inferences a magistrate judge reasonably draws from the Government's evidence."); United States v. Sanchez, 555 F.3d 910, 914 (10th Cir. 2009) (court stated that evidence defendant was a drug dealer results in common-sense finding that he will keep evidence of his crimes at his home); United States v. Spencer, 530 F.3d 1003, 1007-08 (D.C. Cir. 2008) (Relying on prior decisions which found that observations

---

[48]Defendant relies on the District Court decision in United States v. Parker, 600 F. Supp. 2d 1251 (M.D. Fla. 2009), to essentially argue that the court should not draw such an inference in this case. The court declines to follow the non-binding reasoning of the District Court. The District Court apparently declined to draw any inference of a nexus between the defendant's established drug dealing activities and his residence. Id. at 1261-62. In doing so, the court did not consider the decisions of the Eleventh Circuit Court of Appeals, cited *supra*, nor the recent decisions of numerous courts of appeals, cited *infra*, finding to the contrary. However, this court nevertheless notes that the District Court in Parker found that the good faith exception to the exclusionary rule applied and denied the motion to suppress evidence seized from the defendant's residence. Id. at 1262-63.

AO 72A
(Rev.8/82)

of drug dealing away from a suspect's home can support finding of probable cause to search the home, the court stated, "Common experience suggests that drug dealers must mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade - such as drugs, drug paraphernalia, weapons, written records, and cash - in secure locations.  For the vast majority of drug dealers, the most convenient location to secure items is the home.  After all, drug dealers don't tend to work out of office buildings.  And no training is required to reach this commonsense conclusion."); United States v. Grossman, 400 F.3d 212, 216-17 (4th Cir. 2005) (finding sufficient nexus between the defendant's drug activity and the three locations where he resided based on common-sense determination that "a drug dealer stores drugs in a home to which he owns a key"); United States v. Walker, 145 Fed. Appx. 552, 555-56 (7th Cir. 2005) (finding that agent's general knowledge about drug dealers' habits combined with evidence of the defendant's drug trafficking established probable cause to search the defendant's residence and citing prior decision finding that, even without direct evidence that drug-related activity occurred in residence, facts establishing drug dealing provided link "because 'evidence is likely to be found where the dealers live'") (citation omitted); United States v. Miggins, 302 F.3d 384, 393-94 (6th Cir. 2002) (citing cases from other circuits indicating that for drug dealers evidence

122

is likely to be found where they live, the court found that evidence of drug dealing along with ties to specific residence supported inference of a nexus between the defendant's activity and his residence); United States v. Hodge, 246 F.3d 301, 306-07 (3rd Cir. 2001) (affidavit provided sufficient nexus between the defendant, who affiant established was an experienced drug dealer operating a drug business, and his home because "[i]t is reasonable to infer that a person involved in drug dealing on such a scale would store evidence of that dealing at his home[,]" and because court gives "'considerable weight to the conclusions'" set forth in the affidavit of the trained and experienced law enforcement officer regarding where such evidence was likely to be found) (citation omitted); Feliz, 182 F.3d at 87-88 (Although no direct evidence linked the defendant's drug dealing activities with his residence, the court found that the affidavit established a sufficient nexus for the warrant, stating, "We do not find it unreasonable for the issuing judge in this case to have relied upon her common sense, buttressed by affiant's opinion as a law enforcement officer, that Feliz would be likely to keep proceeds from his drug trafficking and records relating to drug transactions at his apartment."); Pitts, 6 F.3d at 1369 (acknowledging that direct evidence of a link between items being searched for and the place being searched is not required and that a magistrate judge "may 'draw reasonable inferences about where evidence is likely

123

to be kept, based on the nature of the evidence and the type of offense[,]'" and recognizing that in cases involving drug dealers evidence is likely to be found where they live, the court found that the affidavit set forth probable cause for the search) (citation omitted).

Likewise, in this case, the affidavit in support of the search warrant for the residence associated with Defendant Flores provides sufficient information to allow the issuing Magistrate Judge to make a common-sense determination that the evidence being sought in connection with Defendant's involvement with the drug trafficking and money laundering organization will be found in the residence. This conclusion is supported by the affiant's opinion, based on her training and experience, that Defendant is probably in possession of the items sought and has stored those items in the residence. First, the affiant provided evidence that Defendant was associated with and an active participant in the organization under investigation. The investigation, which included a number of authorized wire intercepts of the various co-conspirators, including a telephone stated to have been used by Defendant, relied on intercepted conversations between Defendant and other co-conspirators and established her role and involvement in the illegal activities. [Doc. 578, Affidavit ¶¶ 11-17]. Contrary to Defendant's arguments [Doc. 456 at 9-10], the lack of details about identifying

Defendant as a participant on the wire intercepts, which the Magistrate Judge could reasonably infer had been determined by the District Judges issuing the court-authorized wire intercepts based on sworn affidavits of investigating agents,[49] and the failure to quote verbatim from the wire intercepts do not negate the probable cause finding by the Magistrate Judge.

The Eleventh Circuit Court of Appeals rejected a similar challenge to a search warrant affidavit in Jiminez, 224 F.3d at 1248.  The defendant, in that case, contended that the affidavit contained only the affiant's "*conclusions* as to the evidence derived from the wiretap[.]"  Id. at 1247-48 (internal quotation marks omitted; emphasis in original).  The court concluded that:

> This affidavit, at worst, summarizes the evidence gained through the wiretap.  While it would perhaps have been preferable for the affidavit to have detailed some particular phone conversations, the affidavit states that those phone conversations "indicate that" various drug activities were taking place; this is an objective presentation of the information gained by the investigating officers.  Nor does the affidavit fail to specify

---

[49]See United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009) ("'Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant. . . .'") (citation omitted); Biglow, 562 F.3d at 1281 ("We recognize that magistrate judges are vested with substantial discretion to draw all 'reasonable inferences' from the Government's evidence."); United States v. Santarsiero, 566 F. Supp. 536, 542 (S.D. N.Y. 1983) ("'[J]udges are not required to exhibit a naivete from which ordinary citizens are free.'") (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2nd Cir. 1977)).

the source of the information, as in the <u>Aguilar</u>[50] example:  the affidavit clearly states that the wiretap was the source of the information, and this circuit has recently noted that "[t]he fact that a wiretap was the basis for gaining confidential information" lends reassurance as to the veracity of the information.

<u>Id.</u> at 1248-49 (citation omitted).

Second, the affiant established in the affidavit that the residence was closely associated with Defendant.  She was observed at and her driver's license listed as her residence the house at 608 Sandyhills Avenue.  [Doc. 578, Affidavit ¶ 2].  Defendant argues that the information handwritten on the affidavit, that is, that she was observed at 608 Sandyhills Avenue, should be not considered by the court because the Magistrate Judge did not initial those additions to the affidavit.  For this reason, Defendant in effect argues, based on pure speculation, that the Government committed a fraud on the Magistrate Judge by adding that information after he signed the warrant and affidavit.  [Doc. 456 at 10-11].  This spurious claim deserves little attention, but the court notes that the affidavit was signed by the Magistrate Judge on April 29, 2009, and that the affidavit was filed that same date in the Clerk's Office.  [Doc. 578].  Absent a factual showing to the contrary by Defendant, this court simply will not assume that the affidavit filed with the Clerk is not the affidavit relied on and signed

---

[50]<u>Aquilar v. Texas</u>, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964).

by the Magistrate Judge.[51]  That information was properly before the Magistrate Judge and considered by him in determining that the residence was sufficiently associated with Defendant to support a probable cause finding.

Thirdly, in addition to the common-sense inferences to be drawn from the evidence, the affidavit sets forth in detail the training and experience of the affiant upon which she based her opinion that evidence of Defendant Flores' association and participation in the drug trafficking and money laundering organization would be found in the residence.  With respect to the affiant's training and experience, including almost five years with the FBI, the affidavit stated that she participated in investigations involving various controlled substances and involving money laundering.  The affidavit further stated that the affiant had participated in numerous prosecutions of individuals and the execution of search warrants, physical surveillance, wire intercepts, debriefings and review of documents.  Based on her and other agents'

_____

[51]The court further notes that the practice and procedure regarding search warrants and affidavits in support thereof provides that the Magistrate Judge retains the original signed affidavit for filing with the Clerk while the affiant retains the original search warrant until the return is made to the Magistrate Judge for filing.  See United States v. Valenzuela-Espinoza, 2009 WL 2761918, at *5 (D. Ariz. August 28, 2009) (taking judicial notice of practice and procedure of the court).  This practice negates the opportunity for the Government to substitute another affidavit for the one signed by the Magistrate Judge.

127

involvement in investigations and executing warrants on locations associated with these illegal enterprises, she knew that individuals involved in these illegal activities maintained in secure and easily accessible locations controlled substances, drug paraphernalia, records reflecting transactions involving controlled substances, names, addresses and telephone numbers of associates, contraband and equipment used to further the illegal conduct, and expenditures of monies, currency, banking records, and valuable assets. [Doc. 578, Affidavit ¶¶ 1, 3, 5-8]. In addition, the affiant provided an instance in which this Defendant's conduct fit this pattern and practice, that is, the August 2006 seizure of drug proceeds from the then residence of Defendant. [Id., ¶ 10].

Defendant's attempt to undermine the probable cause determination by asking questions about information not provided in the warrant, such as, did she make the intercepted calls from the residence, how long had she lived at the residence, or did illegal activities take place at the residence, misses the point. [Doc. 456 at 11-12]. The question in this case is not whether further investigation or additional information would have corroborated the facts set forth in the affidavit but whether the affidavit's factual statements, based on facts known to the affiant at that time, establish a "fair probability" that evidence of the drug trafficking and money laundering organization

would be found in the residence.  See, e.g., United States v. Shields, 458 F.3d 269, 280 (3rd Cir. 2006) (rejecting the defendant's contention that affidavit lacked probable because FBI could have conducted more investigation, the court stated that "[w]hether the FBI could have provided more information is not the benchmark," the question is whether "the valid information it supplies satisfies the 'fair probability' standard"); United States v. Gourde, 440 F.3d 1065, 1072-73 (9th Cir. 2006) (en banc) (finding that the defendant's argument converted the "fair probability" standard to "a test of near certainty[,]" the court held that "Gates, however, does not compel the government to provide more facts than necessary to show a 'fair probability' that Gourde had committed a crime"); United States v. Dale, 991 F.2d 819, 844 (D.C. Cir. 1993) (rejecting the defendant's argument that probable cause "'require[s] an officer to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence'") (citation omitted).

All of the information in the affidavit results in a finding by this court that the Magistrate Judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant.  See Gates, 462 U.S. at 238, 103 S. Ct. at 2331.  And Defendant has not established that the affiant provided information in the affidavit that she knew

129

or should have known was false except for her reckless disregard for the truth.[52]  [Doc. 456 at 21-24].  And Defendant is not entitled to a hearing pursuant to <u>Franks</u>.  [<u>Id.</u> at 21 n.3].  Defendant contends that this statement was false and made knowing that it was false:  "Through debriefings of various reliable cooperating witnesses, review of documents seized in relation to seizures, physical surveillance, and/or electronic surveillance, agents have learned that [Defendant Flores] . . . is a high-level member of the OJOS DTO, responsible for coordinating the transportation of large loads of narcotics and resulting monetary proceeds.  Electronic surveillance has corroborated information previously provided by credible and reliable cooperating individuals regarding Flores' role in the organization."  [Doc. 456 at 21, quoting Doc. 578, Affidavit ¶ 9].  This statement is false, according to Defendant, because the affiant for the two wiretap affidavits on the telephones associated with Defendant, who was located in the FBI office in Atlanta, stated that there was only one confidential informant in the investigation who had no dealings with Defendant.  [Doc. 456, Exs. 3 and 4].  The court finds that Defendant has not made a sufficient preliminary

---

[52]Although Defendant does not raise the issue of <u>Franks</u> until his discussion of the applicability of the good faith exception, this matter is properly addressed initially in determining whether the affidavit established probable cause.

showing that this reference to various cooperating witnesses or individuals constituted a Franks violation.  See Franks, 438 U.S. 154, 98 S. Ct. 2674.

In Franks, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search.  Franks, 438 U.S. at 171-72, 98 S. Ct. at 2684-85; see also United States v. Sarras, 575 F.3d 1191, 1218 (11th Cir. 2009).

To mandate a Franks evidentiary hearing,

> the [defendant's] attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant.  Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.  On the other hand,

131

> if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.  Whether he will prevail at that hearing is, of course, another issue.

Franks, 438 U.S. at 171-72, 98 S. Ct. at 2684-85; O'Ferrell v. United States, 253 F.3d 1257, 1267 (11th Cir. 2001) ("[T]o prevail in a Franks challenge one must establish (1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant.") (citation omitted).

First, the court does not find the two statements to be obviously mutually exclusive as required to support a finding of knowing or deliberate disregard for the truth.  The affidavits for the wiretaps distinguished between witnesses and confidential informants.  The affiant therein did not address whether or not there were specific witnesses available to provide information about any of the targets but merely provided an example why such witnesses will not provide the necessary investigative information.  [Doc. 456, Ex. 3 at 85-86 and Ex. 4 at 69-70].  The affiant then discussed the potential for use of confidential informants and indicated that to date only one such individual had been used in the investigation.  [Doc. 456, Ex. 3 at 86-88 and Ex. 4 at 70-72].  The affiant for the search warrant made reference to cooperating *witnesses* and

132

*individuals* - which the court also notes was prepared some two months after the last affidavit submitted by the affiant in Atlanta - not to *confidential informants*. The statements by the two affiants, if even charged with equal knowledge, are not in conflict.

Second, the court finds that Defendant has failed to show that "inclusion of the untrue information[, if any,] was either deliberate or in 'reckless disregard for the truth.'" O'Ferrell, 253 F.3d at 1267 (citation omitted).  Defendant has offered no evidence that the affiant completing the affidavit for the search warrant acted with a reckless disregard for the truth - nor frankly what that truth may be.  Defendant speculates that the two agents, one in Atlanta and one in Texas, must each know exactly the same information, so one of the affiants is providing false information, but the court will not infer such knowledge based on the record before the court.

Thirdly, and most importantly, the test in Franks requires Defendant to establish that "the untrue information was an *essential element* of the probable cause showing relied upon by the judicial officer in issuing the search warrant." O'Ferrell, 253 F.3d at 1267 (emphasis added).  The challenged statement is immaterial as can be noted from the court's discussion of the facts considered in support of a finding of probable cause - the court placed no reliance on the statement about various witnesses.  Striking

133

any reference to various cooperating witnesses or individuals does not impact the finding of probable cause.  There is no <u>Franks</u> violation.

Finally, even if the court found that the affidavit for the search warrants failed to establish probable cause, the court agrees with the Government that the good faith exception to the exclusionary rule should be applied to this case.  In <u>United States v. Leon</u>, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), and <u>Massachusetts v. Sheppard</u>, 468 U.S. 981, 104 S. Ct. 3424, 82 L. Ed. 2d 737 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective.  In <u>United States v. Accardo</u>, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court.  With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies.  <u>Id.</u> at 1480 & n.4 (citations omitted).  The good faith exception "require[s] suppression 'only if the officers were

dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" Id. at 1480 (quoting Leon, 468 U.S. at 926, 104 S. Ct. at 3422). In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered. Id. at 1481.

Defendant, however, contends that the exception does not apply in this case because the warrant is based on an affidavit "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" and because "the issuing magistrate wholly abandoned his judicial role." [Doc. 456 at 24-27 (citations omitted)]. Defendant's arguments attacking the warrant focus on the alleged lack of probable cause.[53]

Defendant's attack lacks merit. First, the court notes that the affidavit supporting the search warrant was not a "'bare-bone' statement of nothing more than conclusory allegations" which the Supreme Court in Leon found indicative of warrants falling within the third exception to the good faith doctrine. See United States v.

---

[53]Defendant also contends that the good faith exception does not apply because of the alleged Franks violation. [Doc. 456 at 21-24]. However, the court has found that Defendant failed to establish a basis for finding a Franks violation, and this ground for denying applicability of the good faith exception need not be further addressed by the court.

135

Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998). The court has outlined the detailed information provided by the affiant in support of the search warrant, including her opinion based on her training and experience, Defendant Flores' association and participation in the drug trafficking and money laundering organization, and Defendant's ties to the location to be searched. [Doc. 578, Affidavit]. This affidavit presented much more than conclusory, "bare-bone" assertions for consideration by the Magistrate Judge. The affidavit provided factual details for the Magistrate Judge to consider and evaluate. And other courts that have considered similar affidavits offered in support of search warrants for residences closely associated with individuals engaged in drug trafficking and money laundering activities have applied the good faith exception. See, e.g., Meryl, 322 Fed. Appx. at 874; United States v. Williams, 548 F.3d 311, 317-322 (4th Cir. 2008); Spencer, 530 F.3d at 1008; United States v. Ross, 487 F.3d 1120, 1122-24 (8th Cir. 2007); Walker, 145 Fed. Appx. at 556; Hodge, 246 F.3d at 308-09. The agents were, therefore, entitled to rely upon the Magistrate Judge's evaluation and determination that "given all the circumstances set forth in the affidavit before him, there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." Gates, 462 U.S. at 238, 103 S. Ct. at 2332. The same analysis of the affidavit forecloses Defendant's contention that the

136

Magistrate Judge "wholly abandoned his judicial role."  Accardo, 749 F.2d at 1480 &

n.4.  And there is simply no evidence in the record that the Magistrate Judge acted as

a prosecutor, an investigating agent, or otherwise exceeded his role as a neutral and

detached judicial officer.  See United States v. Cruse, 343 Fed. Appx. 462, 465 (11th

Cir. 2009); United States v. Young, 229 F. Supp. 2d 1325, 1329 (M.D. Ala. 2002).

Accordingly, even if the affidavit for the search warrant did not establish probable

cause, the good faith exception applies and the motion to suppress should be denied.

## III.    Conclusion

For these reasons, the court **RECOMMENDS** that Defendant Flores' motion

[Doc. 349] to suppress evidence seized on April 29, 2009, be **DENIED** as to the

warrant for the residence located at 608 Sandyhills Avenue, McAllen, Texas, but

**GRANTED** as unopposed by the Government for the residence located at 604

Sandyhills Avenue, McAllen, Texas.

### Defendant Noe Aguilar-Camudio's Motions to Suppress
### Statements and Evidence

Pending before the court is Defendant Aguilar-Camudio's motion [Doc. 334] to

suppress evidence seized from 2386 Cruse Road, Lawrenceville, Georgia, on April 29,

2009, pursuant to execution of a federal search warrant for that location.  Defendant

137

contends that the affidavit for the warrant is based on stale information and in the residence.[54]  [Docs. 334 and 354].  The Government opposes the motion to suppress contending that the affidavit for the warrant establishes probable does not establish probable cause to believe evidence of criminal activity will be found cause and that, in any event, the good faith exception to the exclusionary rule applies to the facts of this case.  [Doc. 596].  Also pending before the court is Defendant's motions [Docs. 331 and 332] to suppress evidence obtained from his person[55] during execution of the search warrant and statements obtained on the same date contending that the evidence and statements were the fruits of his warrantless, unlawful arrest [Doc. 472].[56]  An evidentiary hearing was held on the motion on March 11, 2010.[57]  [Doc. 451].  The Government opposes the motion to suppress contending that Defendant was not under

---

[54]Defendant has withdrawn his <u>Franks</u> violation claims.  [Doc. 385].

[55]The other items of evidence found in the residence were seized as a result of the execution of the federal search warrant and are not subject to suppression based on Defendant's allegedly unlawful arrest.

[56]In his post-hearing brief, except for contending that his statements were fruits of his unlawful arrest, Defendant does not otherwise attack the sufficiency of the <u>Miranda</u> warnings or his waiver of his rights.  [<u>Id.</u>].

[57]Citations to transcript are: (Tr. at ).

138

arrest until advised of his <u>Miranda</u> rights at which time the facts known to the agents established probable cause.[58] [Doc. 498].

## I.   Federal Search Warrant

As noted, Defendant contends that the affidavit for the federal search warrant for 2386 Cruse Road is based upon stale information that does not establish probable cause for the search.  Defendant focuses his challenge on an alleged lack of nexus between any illegal activity and the residence.  [Doc. 354].  The Government opposes the motion to suppress asserting that the affidavit for the warrant establishes probable cause for the search of the residence and that, if not, the good faith exception to the exclusionary rule applies.  [Doc. 596].

### a.   Facts

On April 27, 2009, this Magistrate Judge signed a search warrant for 2386 Cruse Road, Lawrenceville, Georgia 30044, authorizing a search of the residence for cocaine, methamphetamine, marijuana and other controlled substances and cutting agents; for

---

[58]Although the Government initially placed Defendant on notice that he had to establish a legitimate expectation of privacy in the residence located at 2386 Cruse Road and the court noted at the end of the evidentiary hearing that Defendant's evidence on this issue appeared weak (Tr. at 50-53), neither Defendant nor the Government addressed Defendant's "standing" to challenge the search conducted in the residence in any of the briefs filed with the court.  Accordingly, the court finds that the Government abandoned any challenge on this issue.

U.S. currency; for telephones, pagers and other electronic devices and their contents; firearms and ammunition; money counting machines, rubber bands, plastic bags and heat sealers; indicia of occupancy of the residence; drug ledgers and other documents reflecting drug transactions, identification of associates and information for those associates, and photographs of associates; and other contraband, all of which are evidence of the violations of 18 U.S.C. § 1956 and 21 U.S.C. §§ 841 and 846. [Doc. 596-1, Warrant].

In support of the warrant, the Government presented the affidavit of Brian Jacobs, FBI Special Agent, which began by outlining the affiant's training and experience, especially with investigating drug trafficking and money laundering organizations. [Id., Affidavit, ¶¶ 1-4]. Based on that training and experience, the affiant stated that he had reason to believe that various items, evidence and contraband would be found in locations, such as, residences or "places of business," that is, "stash houses," associated with the members of the organization under investigation, those items including large amounts of U.S. currency and assets necessary to maintain and finance operations or obtained from the illegal activities; records, ledgers, and related paperwork, including travel documents and receipts, documenting distribution of controlled substances and collection of proceeds from the sale of controlled substances

140

and identifying associates and contact information for those associates, including photographs, for concealment from law enforcement and for ready access to use in conducting business or to destroy if the illegal activities are discovered; and various types of firearms, both in their residences, places of business, and on their persons, for use in protecting and securing the premises.  [Id., ¶ 5].

The affiant then set out the background facts regarding the investigation of the drug trafficking and money laundering organization, which resulted in the return of an indictment naming a number of individuals, including Belisario Gil Mendoza a/k/a Cachoritto ("Cachoritto") and Juan Manuel Mendoza a/k/a Ramon Aguilar Torres a/k/a Jose ("Jose"), for violations of 18 U.S.C. § 1956 and 21 U.S.C. §§ 841 and 846.  [Id., ¶¶ 10-19].   Based on court-authorized wire intercepts, the affiant stated that the organization under investigation was "a large scale cocaine, methamphetamine, and marijuana trafficking network operating in Atlanta, Georgia[,]" with participants coordinating the shipments of drugs into the Atlanta area and then collecting proceeds from the sale of the drugs.  [Id., ¶¶ 10-11].  Cachoritto was identified as a transport manager for the organization.  [Id., ¶ 11].  Following intercepted conversations between members of the organization, specifically Cachoritto, law enforcement authorities conducted a series of enforcement activities outlined in the affidavit.  In

141

November 2008, a search of a residence associated with the organization resulted in the seizure of over a million dollars in U.S. currency, a money counter, heat sealer, drug ledgers, a semi-automatic handgun, and cellular telephone, and a search of a tractor-trailer associated with the organization, which had left a warehouse in Atlanta traveling to Texas, resulted in the seizure of over two-million dollars in U.S. currency. [Id., ¶¶ 13-14].   In December 2008, another tractor-trailer associated with the organization and destined for Atlanta was searched resulting in the seizure of over 300 kilograms of cocaine and over 150 pounds of methamphetamine.  [Id., ¶ 15].   In January 2009 and in February 2009, in Texas, two more tractor-trailers associated with the organization were searched resulting in the seizure of over 70 pounds of methamphetamine and over 150 kilograms of cocaine.  [Id., ¶¶ 16-17].

Noting that despite these seizures and others, the organization was still in operation and utilizing a number of locations, including the residence at 2386 Cruse Road, all of which the affiant believed, based on his training, experience and participation in the investigation, contained evidence of the drug trafficking and money laundering crimes charged in the indictment.  [Id., ¶¶ 19, 21-25].  Specifically with respect to the residence at 2386 Cruse Road, Lawrenceville, Georgia, the affiant described the residence, known as the "blue house," which was a light blue, wooden

142

single-family home and which, based on physical surveillance, the affiant believed was the residence for Jose.  [Id., ¶¶ 21-22].  The affiant then summarized a series of intercepted conversations involving Cachoritto and/or Jose beginning in November 2008 and continuing to mid-February 2009.  During a conversation on November 14, 2008, Cachoritto and Jose discussed collection of drug proceeds and preparations for delivery of the proceeds to a warehouse associated with the organization.  Jose indicated that he was in "la azul," which is Spanish for "the blue," and that he had just received some of the drug proceeds from another participant at that location and that he had collected 25% of the funds owed for the drugs.  The men discussed that it was taking longer than the usual one-day turn-around time to collect proceeds from the sale of the drugs.  [Id., ¶ 22].  The men also discussed tallying up the drug ledgers and determining what amount should be sent to the suppliers in Mexico and what amount should remain in Atlanta as profits.  [Id., ¶ 23].

Another conversation on November 15, 2008, indicates that, after dropping off drug proceeds at the warehouse, Jose returned to 2386 Cruse Road, "home."  [Id., ¶ 24].  And on February 19, 2009, conversations between Cachoritto and other conspirators indicated that a cocaine transaction was planned and that the drugs were at the residence at 2386 Cruse Road.  [Id., ¶ 25].  The affiant concluded, "Overall,

these calls suggest that Cruse Road is used as a stash location for drugs prior to their delivery to customers" at another location.  [Id.].

Among other items seized during execution of the warrant, fifteen firearms were found throughout the residence, including pistols, rifles and a shotgun.  [Doc. 596 at 11-12].  According the information provided by the entry team, FBI SWAT, one of those firearms, a .22 caliber Beretta pistol, was found under the mattress of the bed on which Defendant apparently had been sleeping.  [Doc. 596 at 11, citing Tr. at 42-43].

Additional facts will be set forth as necessary during discussion of Defendant's claims.

### b.    Discussion

In the preceding discussion addressing Defendant Flores' motion to suppress evidence obtained as a the result of the execution of a federal search warrant, the court fully set forth the guiding principles and case law governing challenges to a finding of probable cause.  See Defendant Flores' Motion to Suppress Evidence, II. Discussion. Specifically, with respect to Defendant Aguilar-Camudio's challenge to probable cause due to a lack of nexus between the crimes under investigation and the residence being searched, the court noted:

144

> "The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained.  In normal situations, few places are more convenient than one's residence for use in planning and hiding fruits of a crime."

Kapordelis, 569 F.3d at 1310 (quoting Green, 634 F.2d at 226).   The affidavit presented to this Magistrate Judge established that the house located at 2386 Cruse Road was the residence of one of the indicted co-conspirators, Juan Manuel Mendoza. [Doc. 596-1, Affidavit, ¶¶ 18, 22, 24].  Additionally, the affiant, based on his training, experience, and participation in the investigation, all of which was outlined in the affidavit, stated his opinion that the items sought in the warrant would likely be kept at the residence or place of business, that is, stash house, of a participant in the drug trafficking and money laundering organization.  [Id., ¶¶ 1-5].  As the court concluded *supra* when discussing Defendant Flores' motion, a magistrate judge issuing a search warrant may rely upon such an opinion, as well as the court's own common-sense evaluation of the facts in the affidavit, in determining that there is probable cause to search a residence or other location associated with a participant in a drug trafficking organization.  See, e.g., Biglow, 562 F.3d at 1280; Sanchez, 555 F.3d at 914; Spencer, 530 F.3d at 1007-08; Grossman, 400 F.3d at 216-17; Walker, 145 Fed. Appx. at 555-

AO 72A
(Rev.8/82)

56; Miggins, 302 F.3d at 393-94; Hodge, 246 F.3d at 306-07; Feliz, 182 F.3d at 87-88;

Pitts, 6 F.3d at 1369.

However, the court need not rely solely on common-sense deductions from the facts or the affiant's opinion in this case to establish a nexus between the drug trafficking and money laundering activities of the organization and the residence located at 2386 Cruse Road because the facts presented in the affidavit demonstrate that the residence was a "stash house" used by the organization to collect and store drug proceeds and to hold drugs prior to distribution. [Doc. 596-1, Affidavit, ¶¶ 21-25]. During conversations in November 2008, Jose states that he is in "la azul" (the blue), which is the "blue house," or the residence at 2386 Cruse Road, and that he has received proceeds at that location from another member of the organization. Jose also advises that he has collected 25% of the proceeds for the drugs, apparently currently being sold on behalf of the organization. [Id., ¶¶ 22, 24]. The location is a stash house for drug proceeds. And, in February 2009, intercepted conversations indicate, as stated by the affiant, that the location is being used to hold cocaine intended for distribution. [Id., ¶ 25].

Defendant's argument that this information is stale and does not support a finding that there is probable cause to believe drugs, proceeds or other evidence of the

146

organization is in the residence in April 2009 is unpersuasive.  The "staleness doctrine in the context of probable cause . . . requires that the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues."  United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000); see also United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994) ("To satisfy the probable cause standard, the government 'must reveal facts that make it likely that the items being sought are in that place when the warrant issues.'") (quoting United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985)).  "Warrant applications based upon stale information fail to create a probable cause that similar or other improper conduct is continuing."  Harris, 20 F.3d at 450.  In deciding whether information in a warrant is stale, each case is decided "based on the unique facts presented[,]" id., and "[t]here is no particular rule or time limit for when information becomes stale[,]" Bervaldi, 226 F.3d at 1265.  "In this case by case determination[, a court] may consider the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched."  Harris, 20 F.3d at 450 (citations omitted).

147

Specifically, in Bastida v. Henderson, 487 F.2d 860 (5th Cir. 1974), the former Fifth Circuit Court of Appeals stated that "[i]n general, the basic criterion as to the duration of probable cause is the inherent nature of the crime.  The Circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time.  On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance[.]"  Id. at 864.  The instant drug trafficking and money laundering organization, as outlined in the affidavit, evidences criminal conduct of a protracted and continuous nature involving the collection of millions of dollars of drug proceeds and the distribution of substantial quantities of controlled substances making the two months between activity recounted in the affidavit and the warrant being issued insignificant.  See also United States v. Johnson, 290 Fed. Appx. 214, 223 (11th Cir. 2008) (rejecting the defendant's claim of staleness, therein fifteen days, to search a residence associated with an ongoing, drug trafficking operation, and citing cases finding much older information, such as, six months, Bervaldi, 226 F.3d at 1264-67, eleven months, United States v. Hooshmand, 931 F.2d 725, 735-36 (11th Cir. 1991), and nine months, Domme, 753 F.2d at 953-55, due to nature of offenses, was not stale); United States v. LaMorie, 100 F.3d 547, 554 (8th Cir. 1996) ("Where continuing

148

criminal activity is suspected, the passage of time is less significant.").  In Harris, the court found that the information contained in an affidavit supporting the warrant application was not fatally stale, even though "most of the information contained in the affidavit referred to events which took place over two years before [the officer] applied for the warrant. . . ." 20 F.3d at 450-51.  Significant to the court's determination was the affidavit's allegations of a "longstanding and protracted criminal conspiracy" involving money laundering and the distribution of drugs.  Id. at 451.

And, in Johnson, the court found that the district court's reliance on the nature of the offense, "an ongoing drug operation," and on the "semi-permanent" location, an apartment, to be searched to determine that the operation would not relocate in the time between the events set forth in the affidavit and the date the warrant was issued was proper.  290 Fed. Appx. at 223.  Likewise, this court's reliance, at the time the warrant was signed and now on review, on the ongoing nature of the drug trafficking and money laundering organization, on the organization's use of various locations to conduct business, and on the type of location, that is, a residence, being searched, which by its nature indicates a permanency in items kept and stored there, was appropriate and overcomes any alleged staleness in the information in the affidavit. See Bervaldi, 226 F.3d at 1265 ("Residency in a house, like protracted and continuous

149

criminal activity . . ., generally is not transitory or ephemeral, but instead endures for some length of time.").

For these reasons, the court finds that the affidavit for the search warrant established probable cause to believe that the items listed in the warrant would be found in the place to be searched. However, even if the court determined that probable cause was not established, the evidence obtained during execution of the warrant should not be suppressed. The good faith exception applies to the facts of this case. See Defendant Flores' Motion to Suppress Evidence, II. Discussion. Defendant has not presented any reasons for finding that the exception does not apply in this case. [Docs. 334 and 354]. The only potential basis for denying applicability of the exception, given Defendant's challenge to probable cause, would be a finding that the warrant was "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]'" Leon, 468 U.S. at 923, 104 S. Ct. at 3421 (citation omitted). However, the affidavit supporting the search warrant was not a "'bare-bone' statement of nothing more than conclusory allegations" which the Supreme Court in Leon found indicative of warrants falling within the this exception to the good faith doctrine. See Glinton, 154 F.3d at 1257. The doctrine applies in this case.

150

### c.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 334] to suppress evidence obtained during execution of the search warrant at 2386 Cruse Road on April 29, 2009, be **DENIED**.

## II.    Motion to Suppress Search of Defendant's Person and Statements

Defendant also contends that any evidence found on his person on April 29, 2009, and any statements made by him on that date should be suppressed as fruits of his unlawful arrest.  [Docs. 331, 332 and 472].  The Government opposes the motions to suppress contending that at the time Defendant was placed in custody there was probable cause for his arrest.  [Doc. 498].

### a.    Background Facts

On April 29, 2009, in the early morning, FBI agents assisted by other federal agents and local officers arrived in the area of 2386 Cruse Road, Lawrenceville, Georgia, to execute a federal search warrant and two federal arrest warrants.[59]  (Tr. at 4-5, 27-29; Doc. 498-2).  The location "was where a majority of the . . . drugs that

---

[59]The arrest warrants were for Ramon Torres (indicted as Juan Manuel Mendoza a/k/a Ramon Aguilar Torres a/k/a Jose) and Angel (witnesses were unable to recall a last name, but a defendant in the original indictment is identified as Angel Luis Ayala). (Tr. at 29; Doc. 1).

were being delivered would come to that residence as well as we knew that subjects . . . under investigation would frequent this location. . . ." (Tr. at 28).   The initial entry into the residence was made by members of the FBI SWAT who were tasked with securing the occupants and making the residence safe for the remaining agents and officers to enter to execute the arrest warrants and the search warrant.   This process took approximately fifteen to twenty minutes.   (Tr. at 5-6, 29-30, 38-39).   The on-scene commander, FBI Special Agent Delancy Alexander, instructed the SWAT members to keep each person found in the residence in the room in which they were found at the time of entry.   (Tr. at 7, 22, 30).

Once advised that the residence was secure, Agent Alexander along with Task Force Officer ("TFO") Julio Echevarria, who was present to act as the Spanish interpreter, entered the residence to conduct an initial walk-through and to observe where each occupant was located.   Any weapons found in the residence, which had been secured, were also pointed out by the SWAT commander to Agent Alexander. (Tr. at 6-7, 30-31, 40-42).   Due to the weapons found throughout the residence, each

152

occupant was handcuffed, and two SWAT members remained with each person.[60]  (Tr. at 7, 17).

In the second bedroom on the left, Agent Alexander observed Defendant Aguilar-Camudio, who was lying face-down on the floor and handcuffed behind his back.  (Tr. at 20, 35, 40-41; Gov't Ex. 3, Room I).  Defendant was then placed seated on the floor with his back against the wall, remaining handcuffed.  (Tr. at 20, 35, 41).  The SWAT commander advised that Defendant had been found on the bed in the room, and he pointed out to Agent Alexander the handgun which had been found under the mattress of that bed.  (Tr. at 34, 42-44).  In other rooms in the residence, three other individuals were found and detained in handcuffs.  (Tr. at 18-19, 36).

While each occupant remained where initially found, TFO Echevarria, in Spanish, asked each person for his name, date of birth and identification, and whether he was in the United States legally.  [Tr. at 15, 19-20].  When Defendant was asked these questions, he stated that he did not have any identification and that he was in the country illegally.  (Tr. at 15, 19-20).  A wallet, which was either on his person or nearby, had various items inside but apparently no identification.  (Tr. at 47-49).

---

[60]The list of the fifteen firearms found in the residence is set forth in the Government's response [Doc. 596 at 11-12] to Defendant's motion to suppress evidence seized executing the federal search warrant.

Agent Alexander decided to move the four men to the kitchen area of the residence "because [there were] just entirely too many weapons around."  (Tr. at 7, 21, 31). Defendant and the other three men remained handcuffed.  (Tr. at 21, 45).

TFO Echevarria then read in Spanish to all four men their <u>Miranda</u> rights.  (Tr. at 10).  He advised:

> Before we ask you any questions you must understand your rights.  You have the right to remain silent.  Anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during questioning.  If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.  If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Tr. at 11-12).  He asked each man individually if he understood the rights.  And each man, including Defendant, stated that he did understand.  (Tr. at 10, 12).  Each man was next asked to provide a voice exemplar which was conducted over the telephone in Spanish, with each man answering questions about his name, date of birth and country of birth.[61]   (Tr. at 10).   TFO Echevarria questioned Defendant for approximately five minutes, and Defendant, who claimed to have just arrived, basically

---

[61]The Government advised that the voice exemplars will not be used against Defendant in any manner.  (Tr. at 50).

154

denied knowledge about anything, including the firearm found under the mattress in his bedroom.[62]  (Tr. at 13-15, 25).

The four men were then transported from the residence.  The agents remained to finish executing the search warrant.  (Tr. at 11, 37, 46).

Additional facts will be set forth as necessary during discussion of Defendant's claims.

### b.   Discussion

Defendant and the Government, in addressing the issue of Defendant's detention and whether that detention constituted an arrest requiring probable cause, fail to discuss the Supreme Court's decisions in <u>Michigan v. Summers</u>, 452 U.S. 692, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981), and in <u>Muehler</u>, 544 U.S. 93, 125 S. Ct. 1465, which are controlling and determinative of the issue before the court.  Defendant was lawfully detained during the execution of the federal search warrant at 2386 Cruse Road as an occupant of the residence, and the issue of whether there was probable cause for his "arrest" is immaterial to resolution of the issue before the court; in

---

[62]Marijuana was found in a blue bag in the bedroom where Defendant was initially located; however, those drugs were discovered after Defendant left the residence, and he was not asked about the drugs.  (Tr. at 15, 46-47).

155

addition, following the initial questioning of Defendant, agents did have probable cause to arrest Defendant.

In Michigan v. Summers, the Supreme Court stated that "for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705, 101 S. Ct. at 2595. In Summers, officers possessing a search warrant for a residence, stopped the occupant of the residence as he left the premises and ordered the occupant back into the house, detaining him until the search results provided probable cause for his arrest. A search of his person disclosed a small quantity of heroin. Id. at 693, 101 S. Ct. at 2589-90. The Court concluded, "Because it was lawful to require respondent to re-enter and remain in the house until evidence establishing probable cause to arrest him was found, his arrest and the search incident thereto were constitutionally permissible." Id. at 705, 101 S. Ct. at 2596.

In Muehler v. Mena, the Supreme Court, relying on the decision in Summers, found that a three hour detention, in handcuffs, under guard, of the occupants of a residence, which was being searched pursuant to a warrant seeking firearms and gang paraphernalia, did not violate the occupants' Fourth Amendment rights. Members of

156

a SWAT team initially entered the house, thought to be the home of a violent gang member, searching for and taking into custody, at gunpoint, the occupants. The subsequent execution of the search warrant resulted in the seizure of several firearms along with other items. 544 U.S. at 95-96, 125 S. Ct. at 1468-69. The Court noted that pursuant to <u>Summers</u>, the detention for the duration of the execution of the warrant was permissible, stating, "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" <u>Id.</u> at 98, 125 S. Ct. at 1470 (citation omitted). Nor was the use of force, including the use of handcuffs, to secure the occupants unreasonable given the facts that "this was no ordinary search." <u>Id.</u> at 100, 125 at 1470. The Court noted that the search of a residence suspected of housing a violent gang member and for firearms is inherently dangerous posing a threat to both the occupants and officers. The Court also noted that the officers had to detain multiple occupants making "the use of handcuffs all the more reasonable." <u>Id.</u> at 100, 125 S. Ct. at 1470-71. Finally, the Court found that the duration of the detention, two to three hours, was not unreasonable. <u>Id.</u> at 100, 125 S. Ct. at 1471. The facts before this court raise the same concerns for the safety of the agents, officers and occupants as those addressed by the Supreme Court in <u>Summers</u>.

157

The location of the search, 2386 Cruse Road, was believed to be a stash house for a large, multi-state drug trafficking and money laundering organization, and the warrant authorized the seizure of drugs, currency, weapons and related items.  (Tr. at 28-29; Doc. 498-2).  At least two members of that organization were believed to be inside the residence.  (Tr. at 29).  Even prior to entry into the residence, these circumstances posed a threat to law enforcement.  See Summers, 452 U.S. at 702-03, 101 S. Ct. at 2594 ("Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.  The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.").  And, upon entry, the circumstances encountered greatly enhanced the potential of danger to both the agents and officers and the occupants.  SWAT members encountered four men and found numerous firearms throughout the residence.  (Tr. at 7-8, 17-18, 31).  One of those weapons was under the mattress of the bed on which Defendant was found at the time of entry.  (Tr. at 42-43).  As instructed, SWAT secured each person in the room where he was detained until further direction from the on-scene commander, Agent Alexander.  (Tr. at 7, 22, 30).  The decision to secure each occupant with handcuffs

was entirely reasonable under the circumstances, and due to the number of weapons in the residence, the decision to keep each man handcuffed was likewise reasonable.

Under these circumstances, the issue of whether there was probable cause to initially detain Defendant is irrelevant.  See United States v. Sears, 139 Fed. Appx. 162, 165-66 (11th Cir. 2005) (The court rejected the defendant's argument that the officers lacked probable cause to stop him, stating that "[t]his argument misses the mark[, b]ecause the officers had a valid warrant to search Sear's home, they had a basis to detain him during the search.").  And the initial questioning of Defendant, while he remained in his bedroom, seeking his name, date of birth and identification, as well as his status in the United States, also did not violate his constitutional rights.  In United States v. Horne, 198 Fed. Appx. 865 (11th Cir. 2006), the court addressed the same claim raised by Defendant Aguilar-Camudio.  In that case, the defendant was detained during a search of his residence.  The defendant contended that, because the agents lacked probable cause to arrest him, his statement that he had illegal drugs in his vehicle was illegally obtained.  The statement was used to arrest the defendant.  Id. at 871.  The court rejected the defendant's claim:

> Horne argues that that the statement was unlawfully obtained because he
> was unlawfully detained, but a person may be detained during a search
> of a residence conducted pursuant to a warrant based on probable cause.

159

> . . . Because the search warrant was valid, Horne was lawfully detained
> during the search and his statement provided probable cause to arrest him.

Id. Likewise, Defendant was lawfully detained in this case, and his statement that he

was in the United States illegally provided probable cause to arrest him, even without

consideration of the other circumstances in which he was found on the morning of

April 29, 2009.[63] See Lindsey, 482 F.3d at 1291 ("Probable cause to arrest exists when

the totality of the facts and circumstances support 'a reasonable belief that the suspect

had committed or was committing a crime.'") (citation omitted).

The conclusion that his statements are admissible is supported by the Supreme

Court's reasoning in Muehler, which was discussed *supra*. See also Defendant Otha

Barnes' Motion to Suppress, II. Discussion, a. Detention and Search, footnote 35.

While Mena, one of the residence occupants in that case, was being detained during

execution of the warrant, officers questioned her about her immigration status.

---

[63]Those circumstances, which would independently establish probable cause,
include Defendant's presence in a known drug stash house for a large-scale drug
trafficking organization in which known members of the organization are located and
the fact he was found sleeping on a bed with a firearm under the mattress and in a
room with a quantity of controlled substances. (Tr. at 7-8, 17-18, 28, 31, 41-44, 46).
Given the nature of the organization under investigation, the agents would have been
entirely reasonable in concluding only individuals involved and trusted by the
members of the organization would be living in the residence, and Defendant claimed
the location to be his residence [see Doc. 332, ¶ 1].

160

Muehler, 544 U.S. at 100-01, 125 S. Ct. at 1471. The Supreme Court rejected the lower court's finding that Mena's Fourth Amendment rights were violated by the questioning. Id. The Supreme Court found that "'mere police questioning does not constitute a seizure[,]'" so long as it does not "'prolong[ ] . . . the time reasonably required to complete that [initial] mission[.]'" Id. at 101, 125 S. Ct. at 1471) (citations omitted). The Supreme Court held that because the lower court did not find that questioning Mena about her immigration status extended the duration of her detention, "no additional Fourth Amendment justification for inquiring" about other matters was required. Muehler, 544 U.S. at 101, 125 S. Ct. at 1471-72. Similarly, in this case, the questioning of Defendant about his immigration status did not prolong his detention, as execution of the search warrant was just beginning, and no additional justification is necessary for the questioning.

The initial questioning of Defendant, therefore, was lawful, and Defendant's statements are admissible. Once Defendant admitted being in the United States illegally, as noted, the agents had probable cause to place him under arrest. The search of his person and the seizure of any items on his person, such as his wallet and the

contents of the wallet,[64] are admissible as a search incident to arrest.  See United States

v. Robinson, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973); Chimel v.

California, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969).  Alternatively, given

the circumstances in which Defendant was found and the presence of firearms

throughout the residence, including under the mattress of his bed, the agents

reasonably believed that Defendant posed a threat to their safety.  Once lawfully

detained, agents "can frisk the individual so long as 'a reasonably prudent man in the

circumstances would be warranted in the belief that his safety or that of others was in

danger.'"  United States v. Hunter, 291 F.3d 1302, 1306 (11th Cir. 2002) (citation

---

[64]On what basis the court is not quite sure, but Defendant includes within the scope of the items seized from his person the firearm found under the mattress and the drugs found in the blue bag in his bedroom.  [Doc. 472 at 7].  Defendant appears to forget that the agents were in possession of a search warrant for the premises which entitled them to search all areas of Defendant's bedroom and to seize drugs and firearms found therein.  [Doc. 498-2].  Seizure of those items was pursuant to the warrant regardless of the lawfulness of Defendant's detention.  Moreover, the search of Defendant's person and personal belongings in his possession falls within the scope of the warrant.  Although arguably in dicta, in United States v. Young, 909 F.2d 442 (11th Cir. 1990), the Eleventh Circuit Court of Appeals adopted the reasoning of the First Circuit Court of Appeals finding "that the usual occupant of a building being searched [by a warrant] would lose a privacy interest in his belongings located there. . . ." Id. at 445 (citing United States v. Micheli, 487 F.2d 429, 431-32 (1st Cir. 1973)); see also United States v. Rouse, 2009 WL 3483301, at **3-4 (S.D. Ga. October 28, 2009) (discussing Young and applying the decision to uphold a search of personal belongings of the occupant of the residence being searched pursuant to a warrant).

omitted); see also United States v. Bonds, 829 F.2d 1072, 1074 (11th Cir. 1987) (a frisk is justified, whether or not the person frisked is the focus of an investigation, if an officer reasonably believes himself or others to be in danger).

Any items taken off of Defendant's person or in his possession are, thus, admissible in evidence. And, finally, Defendant's statements after he was advised of his Miranda rights are admissible. As pointed out, Defendant only seeks to suppress those statements as fruits of his allegedly unlawful arrest. [Doc. 472]. Defendant was not unlawfully detained or arrested. And, based on the facts presented at the evidentiary hearing, the court finds that Defendant was advised of his rights and voluntarily, intelligently and knowingly waived those rights. See Barbour, 70 F.3d at 585.

After all of the men were relocated into the kitchen area of the residence, TFO Echevarria advised the men, including Defendant, in Spanish of their rights. He stated:

> Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

163

(Tr. at 11-12). He then asked each man individually if he understood the rights. And each man, including Defendant, stated that he did understand. (Tr. at 10, 12). Nothing in the record before the court indicates that Defendant was threatened, made promises, or otherwise coerced to waive his rights. Defendant appeared to understand the TFO. (Tr. at 9). Defendant only spoke to the TFO for approximately five minutes denying knowledge of any illegal activity. (Tr. at 13, 25). Defendant's statements after waiving his <u>Miranda</u> rights are admissible.

### c.    Conclusion

For these reasons, the court **RECOMMENDS** that Defendant's motions [Docs. 331 and 332] to suppress be denied.

## III.   Conclusion

Based on the foregoing legal authority and for the stated reasons, the court **RECOMMENDS** that Defendant's motions [Docs. 331, 332, and 334] to suppress be **DENIED**.

### Motions to Suppress Title III Intercepts

Pending before the court are Defendants Martina Casas Flores' motion [Doc. 351], Jorge Alejandro Anaya-Medina's motion [Doc. 328], and Defendant Luis Manuel Haces-Delgado's motion [Doc. 342] to suppress evidence obtained during

164

various court-authorized wire intercepts.  The Government opposes [Docs. 585 and 587] the motions to suppress.

The Government [Doc. 366] initially contested each Defendant's standing to challenge the various wire intercept orders.  Finding that Defendants had not met their burden under 18 U.S.C. § 2510(11), the court issued several orders directing Defendants to supplement their motions.  [Docs. 353, 383, and 395].  In the last of those orders, the court found [Doc. 395] that Defendants Flores and Anaya-Medina had satisfied § 2510(11) by their submissions [Docs. 392 and 388] to the court. Accordingly, Defendant Flores is an "aggrieved person" pursuant to § 2510(11) as to the wire intercepts on Target Telephones ("TT") 14, 18, 21, 22, 23 and 25, a finding apparently no longer contested by the Government [Doc. 585]. And Defendant Anaya-Medina is an "aggrieved person" pursuant to § 2510(11) as to the wire intercepts on TT 13, 14, 16, 17, 18, and 19, although the Government appears to challenge that conclusion [Doc. 585 at 7].[65]  The court found that Defendant Haces-Delgado's

---

[65]Ignoring Defendant Anaya-Medina's affidavit [Doc. 388] in which he stated under oath that his voice was intercepted on at least one telephone call on each of the identified target telephones and the court's finding [Doc. 395] that Defendant Anaya-Medina had established that he was an "aggrieved person" under the Act, see United States v. Faulker, 439 F.3d 1221, 1223 (10th Cir. 2006) (to establish that he is an "aggrieved person," a defendant must show that ". . . he was a party to the communication . . ."), the Government continues to contest Defendant's standing to

AO 72A
(Rev.8/82)

submissions did not satisfy § 2510(11) or establish grounds for granting a hearing but allowed Defendant another opportunity to make the required showing.  [Doc. 395]. Defendant submitted additional facts seeking a hearing to establish his right to challenge the wire intercepts [Doc. 421], and the court found that Defendant made a sufficient showing and granted Defendant a hearing [Doc. 431].  At the hearing, the Government and Defendant entered a stipulation [Doc. 492 (Transcript at 95-96); Gov't Ex. 17] regarding identification of Defendant's voice on TT 13, 17, and 20. Although the Government now contends that Defendant Haces-Delgado is only relying on the Government's allegations to support his claim that he is an "aggrieved person" under the Act [Doc. 587 at 7], the Government fails to consider the stipulation entered at the evidentiary hearing which states that Defendant's voice was identified as being intercepted on TT 13, 17 and 20 by one of the wire intercept monitors.  [Doc. 492; Gov't Ex. 17].  This evidence is sufficient to show that Defendant Haces-Delgado is also an "aggrieved person" under the Act.  See Faulker, 439 F.3d at 1223.

On March 24, 2010, the court issued an order directing Defendants Flores, Anaya-Medina, and Haces-Delgado to supplement their motions to suppress the wire intercepts.  The motions were based on vague and conclusory claims that: (1) the

_____

challenge the wire intercepts.  [Doc. 587 at 7].

166

affidavits did not establish probable cause for each intercept order; (2) the affidavits did not establish necessity for each wire intercept; (3) there was insufficient authorization for each intercept request; (4) the intercepts were not properly sealed; and (5) the Act is unconstitutional.[66] [Doc. 449]. And the court specifically found that none of the motions to suppress the wire intercepts established grounds for suppression. The court allowed Defendants until April 30, 2010, to file particularized

---

[66]Although afforded the opportunity to either challenge the court's requirement to show a reasonable expectation of privacy or to supplement their motions to establish same, no Defendant supplemented their motions as directed in order to challenge minimization. [Doc. 353 at 3-4; Doc. 449]. And, in light of Defendants' responses, or lack thereof, supplementing the remaining issues before the court, it is doubtful that Defendants would have met their burden to demonstrate that the wire intercepts were improperly minimized to the extent requiring suppression. Absent a flagrant violation of the minimization requirements, total suppression of all monitored calls is highly unlikely and, quite probably, inappropriate. See United States v. Ozar, 50 F.3d 1440, 1448 (8th Cir. 1995) ("'Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations. The nonincriminating evidence could be suppressed pursuant to 18 U.S.C. § 2518(10)(a), but the conversations the warrant contemplated overhearing would be admitted.'") (citation omitted); United States v. Suggs, 531 F. Supp. 2d 13, 24 (D. D.C. 2008) ("[t]otal suppression 'is not appropriate unless the moving party shows that there was a taint upon the investigation as a whole sufficient to warrant sweeping relief' . . . and is reserved for the 'particularly horrendous case' . . . 'where the government has made effectively no effort towards minimization whatsoever'") (citations omitted); United States v. Batiste, 2007 WL 2412837, at *16 (S.D. Fla. August 21, 2007) (errors in minimizing particular calls do not automatically warrant suppression of all intercepts "unless a defendant demonstrates that the entire surveillance was tainted").

briefs in support of each ground raised in the motions to suppress, as to each wiretap challenged.  [Id. at 3-6].  Defendants were specifically admonished that failure to supplement the motions as directed by the court would be deemed an abandonment of those grounds challenging the wire intercepts.  [Id. at 5].

Defendant Flores, after being granted additional time through June 23, 2010, filed a supplemental brief [Doc. 575] on the issue of necessity for the wire intercept orders on TT 22 and 23, but she did not otherwise supplement her motion [Doc. 351]. The court finds that Defendant therefore abandoned her motion to suppress on all grounds as to TT 14, 18, 21, 22, 23 and 25 with the exception of necessity for the interception of TT 22 and 23.  And Defendant's motion [Doc. 351] to suppress should be denied as abandoned, except for that issue on those two wire intercepts which will be addressed *infra*.

Defendant Anaya-Medina filed a document titled a second brief in support of motion to suppress [Doc. 487] which failed to offer any particularized grounds, discussion, or legal authority in support of any of the claims raised in the motion to suppress stating that he could not particularize the motion at this time and seeking a hearing on his motion.  The court first notes that Defendant initially filed the motion to suppress on October 1, 2009, after three months of discovery in this case.  [Doc.

168

328].  Since that filing, Defendant had another seven months to review the discovery materials, including the wire intercept orders, applications, affidavits and related documents as well as the wire intercepts, but still was unable to particularize the motion to suppress on April 30, 2010.

Defendant Anaya-Medina is not entitled to a hearing on his motion to suppress. It is well settled that "'[a] motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. . . .  A court need not act upon general or conclusory assertions. . . .'"  United States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 1985) (quoting United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985)); see also United States v. Corriette, 171 Fed. Appx. 319, 322-23 (11th Cir. 2006) (upholding denial of hearing for defendant seeking to suppress wire intercepts due to conclusory and unsupported claims in motion).  Thus, if a motion to suppress fails to allege facts that, if proved, would entitle a defendant to relief, a court is not required to hold an evidentiary hearing to reach a determination with respect to the motion.  See Horne, 198 Fed. Appx. at 869-70  ("A district court 'may refuse a defendant's request for a suppression hearing and motion to suppress if the defendant fails to allege facts that, if proved, would require the grant of relief.'") (citations omitted); Cooper, 203 F.3d at

169

1285 (citing <u>United States v. Sneed</u>, 732 F.2d 886, 888 (11th Cir. 1984) (per curium)).

The court also notes that a wiretap order is presumed to be valid and that a defendant

has the burden of overcoming this presumption and of proving that the wiretap order

was unlawfully obtained.  <u>See</u> <u>United States v. Mitchell, III</u>, 274 F.3d 1307, 1310 (10th

Cir. 2001) ("a wiretap authorization order is presumed proper, and a defendant carries

the burden of overcoming this presumption") (citations and internal quotation marks

omitted).   Defendant Anaya-Medina's conclusory allegations, which he failed to

supplement as directed by the court, do not entitle him to a hearing nor come close to

overcoming the presumption of validity attached to each wire intercept.   Defendant

Anaya-Medina's request for a hearing [Doc. 487]  is denied.  The court also finds that

he has abandoned his motion to suppress the wire intercepts on TT 13, 14, 16, 17, 18

and 19 on all grounds raised therein.  Defendant Anaya-Medina's motion [Doc. 328]

to suppress should therefore be denied.

Defendant Haces-Delgado did not file any supplement to his motion to suppress

as ordered by the court.  Accordingly, the court finds that he abandoned his challenge

to the wire intercepts on TT 13, 17, and 20 on all grounds raised in the motion to

suppress.  The motion [Doc. 342] should therefore be denied.

170

The court has reviewed each wire intercept application, affidavit, and order for

TT 13, 14, 16, 17, 18, 19, 20, 21, 22, 23 and 25, as well as all extensions of those wire

intercepts, and the sealing orders in order to determine (1) if each application was

properly authorized by the Department of Justice ("DOJ"), (2) if each affidavit

established probable cause and necessity for the intercept, and (3) if each wire intercept

was sealed in accordance with the statute.   The wire intercepts were properly

authorized by the appropriate designated official in the DOJ and further inquiry is not

warranted.  See Corriette, 171 Fed. Appx. at 321-22; United States v. O'Connell, 841

F.2d 1408, 1416 (8th Cir. 1988); United States v. O'Malley, 764 F.2d 38, 41 (1st Cir.

1985).  The wire intercepts were properly sealed pursuant to 18 U.S.C. § 2518(8)(a),

and Defendants' claim that failure to seal the hard drive of the computer as well as the

optical disks on which each intercepted call was recorded violated the statute is not

supported by particularized facts or legal authority.  See United States v. Ojeda Rios,

495 U.S. 257, 263, 110 S. Ct. 1845, 1849, 109 L. Ed. 2d 224 (1990) ("[t]he primary

thrust of § 2518(8)(a) . . . is to ensure the reliability and integrity of evidence obtained

by means of electronic surveillance"); United States v. McLee, 436 F.3d 751, 763-65

(7th Cir. 2006) (rejecting defendants' claims that failure to seal hard drive of computer

violated the statute).  Each affidavit established probable cause and necessity (as will

171

be discussed in more detail *infra* as to Defendant Flores' challenge to TT 22 and 23) for the wire intercepts, especially when considered in light of the great deference accorded to the findings of the District Judges issuing the wire intercept orders.  See United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990) ("We have also said that the practical nature of the [district judge's] decision justifies 'great deference' upon review and calls for upholding the [district judge's] findings even in marginal or doubtful cases."); United States v. Moody, 762 F. Supp. 1491, 1495 (N.D. Ga. 1991) ("In passing upon the validity of the authorization, the court accords 'great deference' to the issuing judge's probable cause [and necessity] determination.").  Finally, there is no doubt as to the constitutional validity of the Act.  See United States v. Harvey, 560 F. Supp. 1040, 1047-48 (S.D. Fla. 1982) (rejecting challenge to constitutionality of Title III and citing cases so holding therein).

## I.  Defendant Flores' Challenge to TT 22 and 23

Defendant Flores, as allowed by the court, supplemented her motion to suppress the wire intercepts on TT 22 and 23 contending that the affidavit presented in support of each wire intercept order failed to comply with 18 U.S.C. § 2518(1)(c).  [Doc. 575].  Defendant challenges these two intercept orders contending that the affidavits failed to provide a full and complete statement of the investigative procedures that have been

172

tried, focusing on her alleged cooperation which was not set forth in the affidavits and on the failure to fully identify her in the affidavit for TT 23, and arguing that necessity was not established because no independent investigation of her, separate from her co-conspirators, was attempted prior to obtaining either wire intercept order.  [Id. at 5-24].  Defendant also contends that the Government knowingly and intentionally omitted information from the affidavit regarding her identity and the cooperating witnesses or informants such that the court should grant her a Franks hearing.  [Id. at 27-30].  Finally, Defendant asserts that the good faith exception to the exclusionary rule does not apply to orders issued under the Act.  [Id. at 25-26].  The Government opposes Defendant's claims asserting that each affidavit establishes necessity for the wire intercept orders, that Defendant has not demonstrated that a Franks hearing is required, and that the good faith exception is applicable.  [Doc. 585].

### a.    Procedural History

On January 14, 2009, District Judge William S. Duffey, Jr., entered an order authorizing a wire intercept of FNU LNU a/k/a "Mom" the suspected user of a cellular telephone, UFMI 62*65501*40, subscribed to by Crupo De Asesoria en Reynosa en Comercilizacion, Nuevo Leon 441 Col. Rodriquez, CP 88630.  [Doc. 585, Ex. B, TT 22].  And on February 18, 2009, District Judge Richard W. Story entered an order

173

authorizing a wire intercept of FNU LNU a/k/a "Mom" a/k/a "Tina" the suspected user of a cellular telephone, Mexican UFMI 72*704181*4, subscribed to by Alberto Valenzuela Moreno, Ejercito Nacional #523 Poinete, Colonia Oscar Russo Voguel, Ciudad Obrgon, Sonora, Mexico C.P. 85197.  [Doc. 585, Ex. C, TT 23].  In the order, application and affidavit, the individual "Mom" a/k/a "Tina" is fully identified as Martina Flores a/k/a "Tina Flores" a/k/a "Mom."  [Id., Order, ¶¶ A and C; Application, ¶¶ 2 and 4b; Affidavit, ¶¶ 6 and 7].

### b.    Discussion

#### 1.    Necessity

An application for interception must contain a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.  18 U.S.C. § 2518(1)(c); United States v. Carrazana, 921 F.2d 1557, 1564-65 (11th Cir. 1991); United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986).  "Full and complete" means a description with specificity as to why in this particular investigation ordinary means of investigation would fail or are too dangerous.  United States v. Weber, 808 F.2d 1422 (11th Cir. 1987); see also United States v. Cartagena, 593 F.3d 104, 110 (1st Cir. 2010) (the statute's "'full and complete statement' requirement does not mandate

174

that officers include every single detail of an investigation, even if relevant to the need for a wiretap[,]" that is, "[p]rovided that sufficient facts are included supporting the need for a wiretap over other investigative procedures, the officer need not set forth the minutiae of an investigation").  The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed.  United States v. Giordano, 416 U.S. 505, 515, 94 S. Ct. 1820, 1826-27, 40 L. Ed. 2d 341 (1974); United States v. Kahn, 415 U.S. 143, 153 n.12, 94 S. Ct. 977, 983 n.12, 39 L. Ed. 2d 225 (1974).

The affidavit need not, however, show a comprehensive exhaustion of all possible techniques but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.  Nixon, 918 F.2d at 901; Van Horn, 789 F.2d at 1496; United States v. Alonso, 740 F.2d 862, 868 (11th Cir. 1984); United States v. Hyde, 574 F.2d 856, 867 (5th Cir. 1978).  As the Eleventh Circuit Court of Appeals recently reaffirmed, "[A] comprehensive exhaustion of all possible investigative techniques is not necessary before applying for a wiretap." United States v. De La Cruz Suarez, 601 F.3d 1202, 1214 (11th Cir. 2010); see also Cartagena, 593 F.3d at 110-11 ("We have never required the government to 'run outlandish risks or to exhaust every conceivable alternative before seeking a

175

wiretap[.]'") (citation omitted).  The court continued stating, "The statute was not intended 'to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'"  De La Cruz Suarez, 601 F.3d at 1214 (quoting Alonso, 740 F.2d at 868).  Thus, "[t]he burden of establishing necessity is 'not great,' and [a reviewing court] must review the government's compliance with the necessity requirement in a 'practical and common-sense fashion.'"  United States v. Gray, 410 F.3d 338, 343 (7th Cir. 2005) (citation omitted); see also United States v. Oriakhi, 57 F.3d 1290, 1298 (4th Cir. 1995) (the burden imposed upon the government "is not great" and "the adequacy of such a showing is to be tested in a practical and common-sense fashion") (citations and internal quotation marks omitted); United States v. De La Fuente, 548 F.2d 528, 538 (5th Cir. 1977) ("The [necessity] provisions contemplate that 'the showing be tested in a practical and commonsense fashion.'") (citation omitted).

    As noted, Defendant Flores has the burden of overcoming the presumption of validity that attaches to the District Judges' findings that the necessity provisions have been satisfied.  Mitchell, III, 274 F.3d at 1310.  And, in reviewing whether each affidavit satisfies this statutory requirement, great deference is accorded the District

Judges' determinations.  United States v. McGuire, 307 F.3d 1192, 1197 (9th Cir. 2002); Oriakhi, 57 F.3d at 1298; Moody, 762 F. Supp. at 1495.

Accordingly, the effectiveness of traditional investigative techniques must be judged in light of the goals of the investigation and not based on whether one or more of the conspiracy participants can be successfully prosecuted.  See United States v. Reed, 575 F.3d 900, 909-10 (9th Cir. 2009) ("This court has 'consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators.'") (citation omitted); United States v. Wilson, 484 F.3d 267, 281 (4th Cir. 2007) ("wiretaps 'are necessary tools of law enforcement, . . . particularly where crimes are committed by large and sophisticated organizations[,]'" accordingly, "[c]ourts must be careful not to read the statute in 'an overly restrictive manner' . . . which could result in helping insulate more complex and sophisticated conspiracies") (citation omitted); United States v. Sobamowo, 892 F.2d 90, 93 (D.C. Cir. 1989) ("Circuit precedent clarifies that a court may authorize the wiretap of the phone of a member of an operation if traditional investigative techniques have proved inadequate to reveal the operation's full nature and scope.") (citations and internal quotation marks omitted).  In light of this legal authority, the court finds that

177

Defendant has failed to overcome the presumption of validity that attaches to the District Judges Duffey's and Story's findings that the necessity provision of the Act has been satisfied in each of the wiretap affidavits presented to them.[67]  Mitchell, III, 274 F.3d at 1310.

The affidavit for TT 22, the cellular telephone believed to be used by Defendant Flores, although not subscribed to by her and apparently a cellular telephone issued in Mexico not the United States, first identified the numerous known, partially identified and unknown participants in the multi-district, international drug trafficking and money laundering organization, with strong ties to Mexico, and set forth the objectives of the investigation.  At this time, Defendant Flores was partially identified as "Mom." [Doc. 351, Ex. B, Affidavit, ¶¶ 6, 14 and 16-18].

The affidavit then outlined the information obtained from the wire intercepts authorized on target subjects of the investigation which identified the connections to sources of supply in Mexico and the distribution of the controlled substances in various cities in the United States and which assisted in identifying some of the members of the drug trafficking organization and locations associated with the organization.  [Id.,

---

[67]Likewise, the Act is satisfied for the orders issued extending intercepts on TT 23 on March 26, 2009, authorized by District Judge Charles A. Pannell, Jr., and on April 28, 2009, by District Judge Beverly B. Martin.

178

¶¶ 19-44]. Defendant Flores, although as noted identified at the time only as "Mom," evidently was first intercepted on a wire intercept of cellular telephones used by a co-conspirator identified as Cachorrito (TT 14 and TT 18) in late September 2008. The intercepts over TT 14 and TT 18 indicated that Defendant Flores was "a representative and facilitator for OJOS[, a high-echelon member of the organization located in Mexico,] that operates on the Texas/Mexican border." [Id., ¶¶ 29-30]. The intercepted conversations indicated that Defendant Flores acts as a conduit for information between the organization's participants in the United States and sources of supply in Mexico and coordinates the delivery of controlled substances into the United States and proceeds back to the suppliers in Mexico. [Id., ¶¶ 40-44]. After summarizing the information obtained from the prior intercepts and the enforcement activities generated as a result of the intercepts, such as controlled substance and monetary seizures, the affiant stated:

> It is my belief that the interception of wire communications over Target Telephones 21 and 22 will assist law enforcement in determining not only the scope of ROMERO, CACHORRITO, COKIS, MOM and OJOS' illicit drug operations, but will further aid in identifying significant members of this drug organization. We further anticipate that TARGET TELEPHONES 21 and 22, as [they are] being utilized by members of this organization, will give law enforcement more significant information pertaining to the member's whereabouts, their activities as well as direct

179

information about the drug trafficking operations.  Thus, aiding the FBI
in more fully achieving the goals and objectives of this investigation.

[Id., ¶ 45].

The affiant next detailed some of the TT 22 conversations intercepted over other

court-authorized intercepts during the investigation of the organization.  Those

intercepts indicated that the cellular telephone is utilized in both the United States and

Mexico.  [Id., ¶ 56-60].  In a conversation with Cachorrito in November 2008,

Defendant Flores discussed with him a body (found by Mexican authorities) of an

individual who had been involved in the drug trafficking organization and whom

Defendant, Cachorrito, and Ojos all knew but who apparently had been killed as a

result of his involvement in illegal activity.  Defendant and Cachorrito also discussed

how to prevent an individual wanted by Mexican and American authorities from being

apprehended, which the affiant concluded indicated that Defendant Flores was

"harboring a family member in Mexico, a member of the drug trafficking organization,

from law enforcement in Mexico and the U.S."  [Id., ¶ 57].  In December 2008,

Defendant and Cachorrito engaged in additional conversations about transporting a

quantity of drugs from Mexico, including the price of the drugs, which Defendant

agreed to negotiate for Cachorrito with Ojos, about another delivery to Atlanta that was

180

encountering transportation problems, and also about the seizure of drugs by law enforcement on December 10, 2008, in Georgia.[68]  The conversations about the drug seizure included discussions about how to verify that the drug shipment was intercepted and not stolen by one or more participants.  [Id., ¶¶ 58-60].

The affiant then outlined the toll record analysis of TT 22 over the period of December 24, 2008, through January 12, 2009, which indicated that Defendant Flores utilized TT 22 to contact at least eight cellular telephones that are based in Mexico, including the cellular telephone associated with Ojos, the "boss and main source of supply in Mexico."  [Id., ¶¶ 62-63].  The numerous contacts with Mexican "direct connects" indicated that Defendant Flores was maintaining regular contact with Mexican participants in the organization.  The affiant stated:

> Past training and experience with members of these types of drug organizations has shown that when there is contact (direct connect radio contact especially) with Mexican direct connect numbers that the individuals are significant members of the narcotics organization, usually within the transportation cell or within the leadership of the drug organization. These contacts indicate that [Defendant Flores] holds direct ties to OJOS and other Mexican counterparts of this organization and thus to sources of supply.

---

[68]This is the seizure that was the subject of Defendant Barnes' motion to suppress.  See Defendant Otha Barnes' Motion to Suppress, *supra*.

[Id., ¶ 65]. The toll analysis also established links with another unidentified drug associate who is involved in coordinating the transportation and delivery of drugs and the movement of drug proceeds. [Id., ¶ 64].

With this background on the drug trafficking and money laundering organization, on Defendant Flores' role in the organization, and on the means by which TT 22 was utilized to further the criminal activity being investigated, the affiant set forth the reasons that the wire intercept order on TT 22 was necessary. The affiant identified the goals of the investigation as:

> (a) discovering the identities of all of the individuals involved in this narcotics trafficking organization, including identifying all of the significant sources of supply; (b) identifying the exact roles of the various individuals involved in the conspiracy; (c) revealing the methods of operation of the persons who provide narcotics to this organization; (d) identifying the locations where members of the organization store their narcotics; (e) discovering the methods by which the members of the organization transport and distribute their narcotics, and (f) determining the methods by which the organization's members launder, distribute or conceal the assets acquired as a result of their narcotics trafficking activities.

[Id., ¶ 67]. The affiant then outlined the normal investigative procedures which had been utilized in the course of the investigation of the drug trafficking and money laundering organization and/or the reasons why such techniques were unlikely to

182

succeed or were too dangerous as of the time this wire intercept order was being sought.[69]

With respect to prior electronic surveillance, the affiant indicated that no pagers or electronic communication devices had been identified as associated with members of the conspiracy. The affiant also noted that the use of source information and consensual telephone conversations, as well as toll analysis and the prior court-authorized intercepts, had provided useful information but not the details about the organization or identification of high-echelon members of the organization or Mexican sources of supply. The affiant also set forth the difficulties encountered during the investigation with the arrest of one member, Beto, in March 2008, the shooting deaths of other members also in March 2008, and the loss of interception opportunities due

---

[69]In United States v. Gurrola-Rodriguez, 268 Fed. Appx. 732 (10th Cir. 2008), the Tenth Circuit Court of Appeals identified the "normal investigative procedures" which include: "'(1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. In addition, if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous.' . . . '[T]he government may obtain a wiretapping warrant without trying *any* other methods of investigation, if it demonstrates that normal investigatory techniques reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try.'" Id. at 734-35 (citations omitted; emphasis in original).

AO 72A
(Rev.8/82)

in part to a nationwide and international "take down" targeting Mexican drug trafficking organizations in September 2008. According to the affiant, interception of TT 22, along with other target telephones, would assist in identifying the methods of importing controlled substances and sending proceeds back to Mexico, in identifying other associates, and in "enabling law enforcement to more completely dismantle this drug organization and achieve the ultimate goals of this investigation, as opposed to targeting a single narcotics trafficker. Other investigative techniques, without the aid of wire communications over [TT 22], will not enable law enforcement to obtain this information." [Id., ¶¶ 69-73].

And, finally, the affiant noted that, because it is common for leaders to never directly touch narcotics, instead directing others to do the work "so that they are insulated from detection and prosecution[,]" interception over TT 22 will assist in linking the leadership of the organization to the drug trafficking conduct. [Id., ¶ 74]. The court notes that this problem with linking leadership to the drugs without the assistance of wire interception appears to fit Defendant's role in the organization, as the facilitator of the movement of drugs into the United States and the return of proceeds to Mexico and as a conduit for information among various members of the organization. Based on the intercepted conversations recounted, Defendant Flores

184

conducts a lot of business over her cellular telephone by giving direction and coordinating activities apparently involving little personal contact with other participants or the contraband. This conclusion also negatively impacts the potential that surveillance of Defendant Flores would assist in the investigation.

And as she points out, there was no separate physical surveillance of Defendant Flores prior to the wire intercept order being issued set forth in the affidavit. However, the affiant outlined in detail the attempts at surveillance during the course of the investigation of a number of Defendant's co-conspirators and the reasons why surveillance of conspirators in positions such as that held by Defendant would not be likely to succeed in achieving the goals of the investigation. The attempts to conduct surveillance of Beto's meetings with a cooperating witness as well as of stash houses believed to be operated by Beto were unsuccessful, were detected thus jeopardizing the safety of the cooperating witness and agents, and caused Beto to "drop" the cellular telephone he was using. [Id., ¶¶ 75-76]. Other attempts at surveillance of co-conspirator Romero were described, including Romero's counter-surveillance and "heat runs" to detect law enforcement. [Id., ¶¶ 77-78]. Another un-identified co-conspirator also used counter-surveillance measures when physical surveillance was attempted. [Id., ¶ 80]. The affiant then outlined surveillance conducted in Georgia

185

from October 2008 through December 2008 of various co-conspirators based on conversations intercepted due to previous wire intercept orders, which demonstrated the difficulty in conducting surveillance even with the wire intercepts providing information about meetings, deliveries, and transportation of drugs and proceeds which, due to the wire intercepts, did allow the seizure – under circumstances not alerting the organization to the source of the information – of quantities of drugs and proceeds, as well as providing the identities of some participants. [ [Id., ¶¶ 81-90]. As the affiant states, "It would be nearly impossible to determine the locations where drug loads are being received, distributed, and transported or where drug transactions are taking place without a wiretap over phones that this narcotics cell is using. Further, without knowing what this organization's associates are discussing, law enforcement agents will not be able to know either the fact that a meeting is happening or the purpose of such a meeting." [Id., ¶ 90].

Additionally, as this court has already alluded to, the affiant stated that supervisors of the organization, such as Defendant Flores, "would not often touch or transport narcotics themselves[,]" therefore, surveillance of these individuals, including Defendant, "would not necessarily identify instances when they are actually distributing drugs. In short, physical surveillance, even if possible, would not be

186

particularly valuable without further wire surveillance." [Id.].  The affiant described how, as evidenced by the conduct of other members of the organization, narcotic traffickers at the level of the target subjects are "extremely surveillance-conscious" and that increased surveillance would potentially alert them to the investigation.  [Id., ¶¶ 91-93].  Finally, and significant to the wire intercept of TT 22, with the significant number of contacts to Mexican-based participants, surveillance simply cannot be performed by agents without the assistance of foreign authorities; therefore, "[w]ire interception is the only feasible means of learning about the illegal activities of these Mexican-based targets, and about the Mexican operations of the TARGET SUBJECTS." [Id., ¶ 94].  The affiant sufficiently explained the prior surveillance and why, without the wire intercept sought in this case, further attempts at surveillance would not be successful in dismantling the organization.

The affidavit then described the limited usefulness of obtaining telephone toll records, of a grand jury investigation (which was especially limited by the substantial connections of the targets to Mexico), and of search warrants and arrests (referencing experiences during the investigation when stash houses were identified and then moved and when Beto and other participants were arrested which hampered instead of assisting the investigation), and of trash collection.  [Id., ¶¶ 95, 96, 101-103].  The

affiant also provided information about the use of witness interviews, including the attempt to interview Beto after his arrest, and reasons why this technique would not be successful, and about the use of a confidential informant, who had contact with Beto but none of the high-echelon targets, such as Defendant Flores, currently under investigation.  [Id., ¶¶ 97-98].  Referencing the use of the confidential informant against Beto, the affiant noted that he could not infiltrate the organization despite being introduced by Beto's father as a case specific reason why use of informants would be of doubtful success.  [Id., ¶¶ 98-99].  The affidavit also set forth the reasons why undercover officers would not be a successful technique in this investigation.  [Id., ¶ 100].

Defendant, however, contends that the affidavit did not provide a "full and complete statement" of the other potential investigative techniques because the affiant failed to include information about Defendant Flores' extensive cooperation with authorities in Texas, the disclosure of which allegedly would have negated the need for the wire intercept of TT 22 and TT 23. [Doc. 575 at 13-19, Exs. 1-7].  The court agrees with the Government's assessment of this contention, that is, that Defendant's "convoluted logic is staggering." [Doc. 585 at 23].  The court initially notes that as of the time that the wire intercept order on TT 22 was being obtained, Defendant offers

188

no evidence that the Government, in Atlanta or Texas, had any reason to link the "Mom" on the wire intercepts with the Texas source of information referenced in the exhibits attached to her brief, even if the Texas authorities had by that time identified the source as Martina Flores. And the court finds no such evidence in the record before the court. Even if this "source of information" was linked to Defendant Flores, as could be the case by the time the affidavit for TT 23 was being prepared in February 2009, when Defendant had been more fully identified, and if the affiant was charged with knowledge of the information, inclusion of Defendant's "cooperation" in the affidavit would have made no difference to the finding of necessity. And excluding the information, even if known, did not fail to satisfy the Act's requirement of a "full and complete statement."

As the Government notes, Defendant approached law enforcement in October 2006 using a false name claiming to be seeking payback for the death of her estranged husband in the late 1990's. Defendant primarily provided historical information about incidents already within the Government's knowledge until apparently April 2007. In her discussions with authorities, Defendant must have just forgotten to mention that in August 2006 she had over one-million dollars in United States currency stashed in a safe, along with several firearms, in her then residence which had been seized by local

189

law enforcement authorities.   [Doc. 351, Exs. 1-6].   And by 2008, based on the intercepts of her conversations, Defendant obviously had gotten over her anger and ill-will directed at the members of the organization, as she appeared to be involved with Ojos and was a high-echelon member of the organization.  [Doc. 585, Ex. B, Affidavit, ¶¶ 41-44, 56-60; Ex. C, Affidavit, ¶¶ 23, 32-35].  This conclusion is confirmed by Defendant's overwhelming silence during the fall of 2008 and winter of 2009 when she was engaged in significant illegal activity, including discussing harboring a fugitive, the discovery of bodies of organization members and the identities of potential informants, as evidenced over two telephones used by but not subscribed to by her. She did not provide any of this information to law enforcement authorities.  [Id.].  And, as the Government notes, Defendant failed to mention that she has been indicted by the federal authorities in Texas for illegal activities occurring during the time of her alleged substantial cooperation.  [Doc. 585, Ex. G].  Full disclosure of this information in the proper context, and given the Texas' authorities conclusion that Defendant was not truthful [Doc. 585, Ex. F], may have taken up several pages in the affidavit but would not have altered the ultimate necessity determination.

Besides contending that her "cooperation" negated the need for the wire intercept orders on TT 22 and 23, Defendant also argues that the affidavit did not

190

establish necessity to intercept Defendant's cellular telephones, because, as noted, the Government did not first attempt other investigative techniques, such as physical surveillance, pings, and checks on Defendant personally.  [Doc. 351 at 5-13, 19-24]. In support for her position, Defendant relies on decisions from the Ninth Circuit Court of Appeals, United States v. Carneiro, 861 F.2d 1171 (9th Cir. 1988), United States v. Santora, 600 F.2d 1317 (9th Cir. 1979), and United States v. Landeros-Lopez, 718 F. Supp. 2d 1058 (D. Ariz. 2010).  [Id.].  Although the court believes two of these cases can be distinguished because the underlying problem with each affidavit found not to establish necessity was the inclusion or omission of material information impacting the necessity finding,[70] see Carnerio, 861 F.2d at 1180-82; Landeros-Lopez, 718 F. Supp 2d at 1062-63, the court also declines to adopt the very narrow focus espoused in these cases, in effect, that for each and every wire intercept order for a member of a complex conspiracy a separate and detailed recitation of the attempt to use traditional investigative techniques aimed at that target must be included, see Carnerio, 861 F.2d at 1180-81; Santora, 600 F.2d at 1321-22; Landeros-Lopez,718 F. Supp 2d at 1063-69. This narrow focus ignores the prevailing view, including in the Ninth Circuit, that "the

---

[70]As has already been discussed with respect to Defendant's alleged cooperation and as will be further discussed *infra*, such is not an issue with the affidavits herein.

191

government is entitled to more leeway in its investigative methods when it pursues a conspiracy[,]" McGuire, 307 F.3d at 1198, and that "wiretaps 'are necessary tools of law enforcement, . . . particularly where crimes are committed by large and sophisticated organizations[,]'" Wilson, 484 F.3d at 281 (citation omitted).

In fact, the court seriously doubts that the Ninth Circuit, at least in complex, multi-national drug trafficking conspiracies, in which the investigation seeks to dismantle the entire organization, adheres to the narrow approach urged by Defendant to establish necessity. In United States v. Garcia-Villalba, 585 F.3d 1223 (9th Cir. 2009), the court took the opportunity to clarify the law on what constitutes a "cascading theory of necessity." While requiring each wiretap application to separately satisfy the necessity requirement, the court stated:

> This does not mean . . . that a district court must view a wiretap application in a vacuum. Although the government may not rely on the conclusion that a previous application was necessary to justify the current application, historical facts from previous applications, particularly those within the same investigation, will almost always be relevant. So will previous investigatory tactics, so long as they bear on whether the government has adequately shown necessity within the current application. . . . For example, the government may rely on past failed attempts to infiltrate an organization, detailed in past affidavits, as evidence that future attempts would be fruitless. . . . The key question will always be whether the wiretap application separately satisfies the necessity requirement.

192

Id. at 1231-32.

There is no evidence in this case that either Judge Duffey or Judge Story failed to make the necessity finding based solely on the wiretap affidavit before them and independent of any previous finding of necessity.  The fact that the affidavits relied on the difficulties and futility of pursuing most traditional methods of investigation based on the detailed course of the instant investigation does not undermine the necessity findings to which great deference is owed on review.  The affidavits outlined why those same difficulties and lack of success with these traditional investigative techniques would fair no better against the user of TT 22 and 23.  See Reed, 575 F.3d at 911-12 ("Second, the necessity requirement is directed at the objective of the investigation as a whole, and *not to any particular person*.  If the Government can demonstrate that ordinary investigative techniques would not disclose information covering the scope of the drug trafficking enterprise under investigation, then it has established necessity for the wiretap. . . .  As with probable cause, 'the government ha[s] *no duty* to establish [necessity] *as to each possible interceptee*.  It is sufficient that there was [necessity] to tap the phone.'") (citation omitted; emphasis added); United States v. Rivera, 527 F.3d 891, 903 n.2 (9th Cir. 2008) ("Because the purpose of the wiretap was to obtain evidence against the entire Rivera organization, we

193

consider in our necessity analysis all the DEA's pre-wiretap investigative efforts directed at the Rivera organization--not only those efforts directed at the users of the two telephones for which the wiretap was sought."); United States v. Bautista, 2009 WL 1174492, at *3 (W.D. Wash. April 29, 2009) (rejecting the defendants' contentions that necessity was not established because the agents "failed to use customary investigative techniques to obtain evidence against" other participants before obtaining wire intercepts, the court stated that "[t]he agents reasonably focused on the center of this network of criminal activity in order to build its case against the upstream and downstream participants" and that "[t]he government need not engage in an inefficient, piecemeal approach when attempting to determine the full scope of a large-scale organization"); see also United States v. Cabrera, 699 F. Supp. 2d 35, 47 (D. D.C. 2010) (citing circuit precedent, the court rejected "defendants' contentions that it was improper for the government to rely on material about the investigation derived from affidavits supporting the wiretaps of other targets of a narcotics operation and to fail to investigate the defendants by first using non-wiretap investigative methods" and noted that, given the complex, international cocaine-trafficking conspiracy being investigated, "[c]ommon sense dictates that many, if not most, traditional investigative techniques were foreclosed by these circumstances and the

194

DEA affidavit sufficiently justified the impracticality of attempting traditional techniques").[71]   The court declines to adopt Defendant's narrow view of the requirements for establishing necessity and finds that the affidavits, given the circumstances of this investigation in this case, adequately explained why the wire intercepts were necessary.

Having thoroughly discussed the affidavit for TT 22, the court will not spend as much time addressing the necessity showing in TT 23 which Defendant attacks on the same grounds.  [Doc. 575 at 21-24].  The affidavit sets forth the identified targets of the investigation, including Martina Flores a/k/a "Tina Flores" a/k/a "Mom."  [Doc. 585, Ex. C, Affidavit ¶¶ 6-7].  And identifies the suspected user of TT 23 as FNU LNU a/k/a "Mom" a/k/a "Tina."  [Id., ¶ 5].  The affiant then recounts the investigation into

---

[71]And although not explicitly stated by the Eleventh Circuit Court of Appeals, in United States v. Collins, 300 Fed. Appx. 663 (11th Cir. 2008), the court arguably rejected the argument being made by Defendant Flores.  In that case, the defendants contended that necessity for a wiretap on one of their phones could not be established by the failure of traditional investigative techniques which was used to obtain a wiretap on a co-defendant's phone and that the affidavit was misleading in reciting those prior investigative efforts without stating they were the same.  Id. at 667.  The court stated, "In applying for the Wilson wiretap, the Government was entitled to consider the lessons learned from its earlier investigation. . . .  [T]he application for the Wilson wiretap was not misleading because the failure of traditional investigative techniques prior to the application for the Ross wiretap was relevant to the application for the Wilson wiretap."  Id.

the multi-state, international drug trafficking and money laundering organization. [Id., ¶¶ 16-26]. Updating the information provided in the prior affidavit with intercepts during January 2009, the affiant demonstrated that TT 23 appeared to be a replacement cellular telephone being used by Defendant Flores due to concerns raised after a January 16, 2009, seizure of 106 kilograms of cocaine and 92 pounds of methamphetamine from a trucking operation associated with Defendant. [Id., ¶ 23]. The affidavit then detailed conversations intercepted during the wire intercept on Cachorrito's cellular telephone with Defendant on TT 23 discussing the January 16 seizure and attempts to figure out what had happened as well as subsequent calls discussing the operations of the drug organization. [Id., ¶¶ 31-35]. And toll analysis of TT 23 conducted in late January 2009 demonstrated that this telephone was contacting the same Mexican-based participants that had been contacted through TT 22. [Id., ¶¶ 39].

With this background, the affidavit then set out the reasons that traditional investigative methods, when tried, had been unsuccessful or were too dangerous to be attempted at this time based on the stated objectives of the investigation and given Defendant's role in the organization. [Id., ¶¶ 40-69]. The affidavit presented District Judge Story with a "full and complete statement" of the attempted use of traditional

196

methods of investigation and the reasons why those methods, as well as others not tried, including against Defendant Flores, would not be successful.  In addition to the claim that the affidavit did not apprise the District Judge of Defendant's "cooperation," Defendant also contends that the Government intentionally omitted the new information developed concerning her identity as evidenced by the identification of the user of TT 23 as FNU LNU a/k/a "Mom" a/k/a "Tina" and not as Martina Flores a/k/a "Tina Flores" a/k/a "Mom."  [Doc. 575 at 22].  This argument is specious.  If the Government intended to hide the fact that the investigation had identified Defendant Flores, the AUSA and affiant did a very poor job in as much as Defendant's full name, Martina Flores, linked to "Mom" and "Tina Flores," was stated in the wiretap order, wiretap application, and elsewhere in the wiretap affidavit.  [Doc. 585, Ex. C, Order ¶¶ A, C; Application ¶¶ 2, 4b; Affidavit ¶¶ 6, 7].  Substituting the name Martina Flores for FNU LNU or, if known, adding her address, would not have detracted from the necessity for the wire intercept any more than having identified some of the other participants and their residences removed the necessity for prior wire intercept orders. This appears to be no more that an scrivener's error.

AO 72A
(Rev.8/82)

The wiretap affidavits for TT 22 and TT 23 establish necessity, and there are no grounds for finding that the District Judges abused their discretion by issuing the wiretap orders.

### 2. **Franks**

The court finds that Defendant has not established entitlement to a Franks hearing. [Doc. 585 at 28-30]. A challenge to a wiretap authorization on the grounds of material and intentionally false or reckless statements in the supporting affidavit is handled the same as a similar challenge to an ordinary search warrant, pursuant to Franks. See United States v. Wilson, 314 Fed. Appx. 239, 243-44 (11th Cir. 2009); United States v. Bascaro, 742 F.2d 1335, 1344 (11th Cir. 1984), abrogated on other grounds by United States v. Lewis, 492 F.3d 1219 (2007). Likewise, Franks also applies when the "misinformation" involves omissions from the affidavit "'made intentionally or with a reckless disregard for the accuracy of the affidavit.'" Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997) (quoting United States v. Martin, 615 F.2d 318, 329 (5th Cir. 1980)). However, "[o]missions that are not reckless, but are instead negligent . . . or insignificant and immaterial, will not invalidate a warrant. . . . Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Id.

AO 72A
(Rev.8/82)

at 1327 (citations omitted); accord United States v. Brown, 370 Fed. Appx. 18, 21 (11th Cir. 2010) (same).

The court previously set forth the burden on a defendant seeking to obtain a Franks hearing. See Defendant Martina Casas Flores' Motion to Suppress Evidence, II. Discussion. Defendant contends that the affiant's failure to inform the court of the true number of confidential informants or witnesses available, specifically with information about her cooperation, and the failure to fully identify her as the user of the target telephones starting with the application for TT 23 and including the extensions of other intercept orders was material to the necessity determination. [Doc. 575 at 28-30].

The court fully addressed the issue of an alleged conflict between the affidavits presented to obtain warrants to search residences associated with Defendant Flores in McAllen, Texas, and the affidavits for the wire intercepts on TT 22 and 23. See Defendant Martina Casas Flores' Motion to Suppress Evidence, II. Discussion. The statements regarding the use of confidential informants and/or witnesses by the two affiants, even if charged with equal knowledge, are not in conflict. And, again, Defendant has failed to show that the omission of any information or the "inclusion of the untrue information[, if any,] was either deliberate or in 'reckless disregard for the

199

AO 72A
(Rev.8/82)

truth.'"  O'Ferrell, 253 F.3d at 1267.  Finally, Defendant failed to establish that "the untrue information was an *essential element* of the [necessity] showing relied upon by the judicial officer in issuing the [wiretap] warrant[,]" O'Ferrell, 253 F.3d at 1267 (emphasis added), or that the omissions, when added, would have negated the finding of necessity, see United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001); United States v. Bankston, 182 F.3d 296, 305 (5th Cir. 1999), rev'd on other grounds Cleveland v. United States, 531 U.S. 12, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000). Based on the fact that successful use of informants does not foreclose use of wiretaps, inclusion of information about witnesses with some information about Defendant would not have negated necessity to obtain wire intercepts seeking to dismantle the entire international organization.  See United States v. Canales Gomez, 358 F.3d 1221 (9th Cir. 2004); Bankston, 182 F.3d at 306.  And the failure to fully identify Defendant as the user of the target telephones has also been addressed by the court.  Under these circumstances, Defendant can neither show that the omission was deliberate or in reckless disregard for the truth or that including that information would have impacted the necessity determinations.

Defendant's request for a Franks hearing is denied.

**3.    Good Faith**

200

Finally, as the Government correctly notes [Doc. 585 at 27-28], the good faith exception to the exclusionary rule applies to wiretap applications and orders.  United States v. Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988); see also United States v. Brewer, 204 Fed. Appx. 205, 208 (4th Cir. 2006); United States v. Moore, 41 F.3d 370, 376 (8th Cir. 1994); United States v. Solomonyan, 451 F. Supp. 2d 626 (S.D. N.Y. 2006); United States v. Mullen, 451 F. Supp. 2d 509, 530-31 (W.D. N.Y. 2006).  Accordingly, even if the affidavits are lacking in establishing necessity, the exclusionary rule should not be applied in this case.  Defendant understandably does not like that result and argues that Malekzadeh does not so hold, but in any event, she believes that the Sixth Circuit's rejection of the good faith exception in United States v. Rice, 478 F.3d 704 (6th Cir. 2007), is the better reasoned approach.  [Doc. 575 at 25-27].  Unfortunately for Defendant, the Eleventh Circuit Court of Appeals establishes binding precedent not Defendant's opinion.

Due to Defendant's assertion that Malekzadeh really did not apply the good faith exception to the wiretap order being considered in that case, the court carefully reviewed the opinion.  The court disagrees with Defendant and finds that the decision does hold that the good faith exception applies to wiretap orders, as do many of the court's colleagues in this circuit.  See United States v. Russell, 2008 WL 4649051, at

201

*5 (M.D. Ala. October 20, 2008) (citing <u>Malekzadeh</u> and finding that the good faith exception applies to wiretap applications and orders); <u>United States v. Royster</u>, 2007 WL 4336321, at *10 & n.5 (M.D. Ga. December 7, 2007) (acknowledging decision in <u>Rice</u> but finding that <u>Malekzadeh</u> "serves as binding precedent directly on point, however, so this Court follows its holding"); <u>United States v. Flores</u>, 2007 WL 2904109, at *7 (N.D. Ga. September 27, 2007); <u>Batiste</u>, 2007 WL 2412837, at *24. Pursuant to <u>Leon</u>, the Eleventh Circuit Court of Appeals in <u>Malekzadeh</u> declined to exclude evidence obtained pursuant to the wiretap orders finding that the affiant acted reasonably in relying on information in the public record from an earlier search warrant even if that search warrant was invalid and finding no material misstatements in or omissions from the wiretap affidavit.  The court stated, "Suppression of the 1986 wiretaps for alleged illegality in the 1980 search of Webb's home would afford none of the deterrence served by the exclusionary rule." <u>Malekzadeh</u>, 855 F.2d at 1497.

Defendant sets forth no grounds supporting a finding that <u>Leon</u>'s good faith exception does not apply to this case. <u>See</u> <u>Accardo</u>, 749 F.2d at 1480-81. Accordingly, even if the wiretap orders (including the orders challenged by Defendants Anaya-Medina and Haces-Delgado) failed to meet the requirements of the Act, suppression of evidence obtained from the orders is not warranted.

202

## II.      Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendants Anaya-Medina's motion [Doc. 328], Defendant Haces-Delgado's motion [Doc. 342] and Defendant Flores' motion [Doc. 351] to suppress the evidence obtained from the wiretap orders be **DENIED** and **ORDERS** that Defendant Anaya-Medina's request [Doc. 487] for a hearing on his motion and Defendant Flores' request [Doc. 575] for a <u>Franks</u> hearing be **DENIED**.

### Defendant Luis Manuel Haces-Delgado's Motions to Suppress

Defendant Haces-Delgado filed a motion [Doc. 340] to suppress evidence seized on April 29, 2009, from 3538 Buford Highway, Apartment 7, Atlanta, Georgia, contending the warrantless entry to effect an arrest warrant for "FNU LNU #3 a/k/a 'Sancudin', a/k/a 'UM1820'" violated his Fourth Amendment rights and that all evidence seized as a result of the search of that apartment should be suppressed.  [Doc. 340].  Defendant also contests the warrantless search of a red Mustang and of his cellular telephone on the same date.  [<u>Id.</u>].  And Defendant filed a motion [Doc. 341] to suppress statements, including voice exemplars, he made that day in part as fruits of an allegedly warrantless arrest and the warrantless entry into the apartment and on the ground that the statements were taken in violation of his Fourth, Fifth and Sixth

203

Amendment rights.  [Doc. 341].  A hearing on the motions to suppress was initially held on March 19, 2010 [Doc. 492][72] and continued and completed on April 21, 2010 [Doc. 493].[73]

In the post-hearing brief, Defendant asserted that the warrantless entry to effect the arrest warrant did not satisfy the test set forth in <u>Payton v. New York</u>, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), because the facts presented at the evidentiary hearing did not establish either that the apartment was Defendant's residence or that he would be present at the time of entry.  [Doc. 569 at 7-12]. Defendant also asserted that the evidence presented at the hearing did not establish probable cause to believe that he was "Sancudin" for whom the arrest warrant had been issued.  [<u>Id.</u> at 12].  Therefore, Defendant sought to suppress all evidence seized as a result of the entry and search of the apartment and his arrest.  [<u>Id.</u> at 13].  Defendant also sought to suppress evidence seized from the search of the red Mustang because that search violated "Mr. Mora's privacy".[74]  [<u>Id.</u>].  Defendant did not present any

---

[72]Citations to that transcript are:  (3/19/10 Tr. at ).

[73]Citations to that transcript are:  (4/21/10 Tr. at ).

[74]Estavan Flores Mora is the registered owner of the vehicle. (3/19/10 Tr. at 22-23, 60).

204

additional argument in support of suppression of any of the statements, including the voice exemplars, taken on April 29, 2009.  [Doc. 569].

The Government opposed the motions to suppress contending that the evidence presented at the hearing satisfied <u>Payton</u> by citing to the testimony of Special Agent Scott Stephan, therefore allowing the entry into the residence to arrest "Sancudin." [Doc. 577 at 7-10].  The Government also argued that the search of the apartment, of a cell phone belonging to Defendant, and of the red Mustang were based on valid consents to search and that Defendant does not have a legitimate expectation of privacy in the vehicle to challenge that search.  [<u>Id.</u> at 10-13].  Defendant having failed to address the admissibility of the statements and voice exemplars, the Government did not address those statements.[75]  [Doc. 577].

After consideration of the evidence presented at the March and April 2010 evidentiary hearings, the court concluded that the conclusory, non-fact specific testimony by Special Agent Stephan probably did not satisfy the Government's burden pursuant to <u>Payton</u>.  Agent Stephan's testimony provided no facts to be objectively assessed by the court as to why the agents believed "Sancudin" resided in the

_____

[75]However, the Government subsequently advised the court and counsel for Defendant that the Government only intends to use the voice exemplars taken on April 29, 2009, for the purpose of identification.

apartment or why the red Mustang parked near the apartment was associated with "Sancudin" or why he would be in the residence at the time of entry.[76]  (3/19/10 Tr. at 49, 60).  When the court questioned Agent Stephan to determine what facts he had been told about why the agents believed the location was "Sancudin's" residence, he responded, "I believe I was told that was where he had been residing and maybe not residing, at least been seen there on one or more occasion."  (3/19/10 Tr. at 88).  And no additional facts were provided when the court asked Agent Stephan if he had any other basis to believe "Sancudin" was in the residence.  He responded, "No. I had been told prior in the briefing."  (3/19/10 Tr. at 89).  When the court advised counsel for Defendant and the Government of the court's preliminary findings, the Government requested an opportunity to supplement the record.  Defendant objected.  The court granted the Government's request, and the supplemental evidentiary hearing was held on September 28, 2010.  [Doc. 619 at 3-4].[77]  Special Agent Thomas Smith testified at that hearing.

---

[76]And the testimony of Special Agent Joseph Ladd was just as conclusory. (3/19/10 Tr. at 7, 40).

[77]Citations to this transcript are:  (9/28/10 Tr. at ).

206

In the Government's supplemental brief following the September hearing, the Government again argued that the evidence presented satisfied the <u>Payton</u> test for entry into the apartment and that, even if the evidence was insufficient, none of the evidence seized or statements made should be suppressed as fruits of the unlawful entry. [Doc. 624]. The Defendant's argument focused on whether the agents had probable cause to arrest Defendant on the "Sancudin" warrant.[78] [<u>Id.</u> at 2-7]. And Defendant contends that all of the evidence seized should be suppressed as fruits. [<u>Id.</u> at 7-9].

After consideration of the totality of the circumstances surrounding the entry into the apartment on the "Sancudin" arrest warrant, the decision to arrest Defendant on the warrant, and the basis for the search of the apartment, Defendant's cell phone and the red Mustang, the court finds that the Defendant's motion to suppress evidence should be denied. And, although not argued by Defendant, the court likewise finds that the motion to suppress statements should be denied.

## I.    Facts

---

[78]Quite frankly, the court is not sure what Defendant is arguing with respect to the <u>Payton</u> test given his statement in the "Conclusion regarding arrest warrant re: Payton." Defendant states, "There was no probable cause for the arrest warrant of FNU/LNU, 'Sancudin' because there is no reasonable belief that the residence was that of 'Sancudin.' The two vehicles were registered to Estevan Flores Mora. The probable cause, if any, to issue an arrest warrant it would be for Estevan Flores Mora, not FNU/LNU, 'Sancudin', and certainly not Luis Haces Delgado." [Doc. 631 at 7].

FBI Special Agent Thomas Smith, who was assigned to the Strike Force investigating the drug trafficking organization resulting in the indictment in this case, testified that in September 2008 an individual by the name of "Sancudin" came to the agents' attention based on the wire intercepts being conducted. (9/28/10 Tr. at 6-8, 25). Specifically, on September 23, 2008, based on the interception of conversations between Martin Romero and "Sancudin," agents established surveillance of a meeting involving a drug transaction at the Santa Fe Mall, located on the South side of Pleasant Hill Road, just off of I-85.[79]  (9/28/10 Tr. at 8-9). Pursuant to the wire intercepts, the agents expected "Sancudin" to arrive in a red Mustang, and the agents observed a red Mustang arrive with two individuals occupying the vehicle. Romero arrived in a separate vehicle. (9/28/10 Tr. at 9). The men exited the vehicles and met and then reentered their respective vehicles and left the area. (9/28/10 Tr. at 9-10). None of the surveillance agents were able to positively identify the individual believed to be "Sancudin" based on this meeting. (9/28/10 Tr. at 10). The agents obtained the tag on the red Mustang which, when checked, indicated that the registered owner was Estevan

---

[79]Agent Smith was not present for this surveillance. (9/28/10 Tr. at 8, 25).

AO 72A
(Rev.8/82)

Flores Mora, at the address 1391 N. Cliff Valley Way, Apartment G, in Atlanta, with a date of birth of August 16, 1979.[80]  (9/28/10 Tr. at 15, 26-27).

The next opportunity to conduct surveillance of a meeting involving "Sancudin" occurred on November 7, 2008.  Again, based on the wire intercepts involving conversations between "Sancudin" and Romero, a meeting to transfer a sample of drugs from "Sancudin" to Romero for a customer was arranged at a location regularly used by members of the drug trafficking organization to do business.  (9/28/10 Tr. at 10-11).  Agent Smith was part of the surveillance team on this date and testified that, as indicated during the intercepted conversations, the same red Mustang arrived and the individual inside, understood to be "Sancudin" based on the wire intercepts, met with Romero.  The red Mustang then left the area.  (9/28/10 Tr. at 10, 12, 29).  Again the agents could not positively identify "Sancudin."  (9/28/10 Tr. at 12).  However, based on the wire intercepts, the agents believed that the same individual, "Sancudin," was present for the September and November 2008 transactions.  (9/28/10 Tr. at 29-31).  The tag on the red Mustang came back to the same non-existent address.  (9/28/10 Tr. at 29).

---

[80]Agents could not locate the address on the registration, although there is a N. Cliff Valley *Road* in Atlanta.  (Tr. at 15, 27-28).

Additional intercepts of conversations between the drug trafficking participants, specifically Romero and an unidentified person, "UM4," indicated that a drug transaction was to take place on January 12, 2009, at a Carniceria, Tres Hermanos, located on Cruz Road in Lawrenceville. (9/28/09 Tr. at 12-14). The intercepted conversations indicated that "Sancudin," on behalf of "UM4," would be delivering a sample of drugs to Romero and that Romero was sending an individual named Pedroza to collect the sample. [9/28/10 Tr. at 12-13]. Agent Smith, who was part of the surveillance team, testified that the events observed exactly followed the intercepted conversations. (9/28/10 Tr. at 13). The agents observed Pedroza arrive in a dark colored Audi. During this time, "Sancudin" was intercepted talking to Romero concerning his anticipated arrival at the location. Romero asked if "Sancudin" would be in the "red one?" "Sancudin" responded, "No, I'm in the maroon one. . . ." (9/28/10 Tr. at 14). When Romero asked "which?", "Sancudin" responded, "The Cadillac, the truck like the one you used to own." (Id.). At that time, a maroon colored Cadillac Escalade arrived, and Romero, as intercepted, called Pedroza to inform him that "Sancudin" was there. After some discussion, Pedroza advised Romero to have the drugs put in the Audi. (Id.). Romero was then intercepted informing "Sancudin" to place the drugs in the Audi, and the agent observed the maroon Cadillac park next

210

to the Audi, "Sancudin" exit the Cadillac, and open the door of the Audi and place the sample inside.  (Id.).  "Sancudin" then entered the Cadillac and left.[81]  (9/28/10 Tr. at 14-15).

Agent Smith testified that he was able to get a good look at "Sancudin," observing his physical characteristics, and that he was able to take a photograph of the individual, whom he identified as Defendant Haces-Delgado in court.  (9/28/10 Tr. at 15, 33-35; Def. Ex. 1).  The tag on the maroon Cadillac was checked, and the tag came back to the same non-existent address and with the same registered owner as the red Mustang.  (9/28/10 Tr. at 16, 34).

Agent Smith stated that in late March 2009, he checked the tags on the red Mustang and the maroon Cadillac.  Although the registered owner for both vehicles remained Estevan Flores Mora, the address for both vehicles was the Tempo 2000 apartments located at 3538 Buford Highway N.E., Apartment 7, in Atlanta.  (9/28/10 Tr. at 15-16, 36).  To determine whether this address existed, on April 13, 2009, Agent Smith drove by the location and observed the red Mustang used by "Sancudin" parked

_____

[81]Because no positive identification of "Sancudin" had been made in September or November, Agent Smith could not state for sure that the same person was in the maroon Cadillac as had been in the red Mustang.  (9/28/10 Tr. at 31).

211

directly in front of the building with the address on the registration.[82]  (9/28/10 Tr. at 16-17, 36).  He did not see anyone associated with the red Mustang at that time. (9/28/10 Tr. at 17, 36).  On April 17, 2009, Agent Smith returned to the location to conduct surveillance.  When he arrived at 12:25 p.m., he did not observe the red Mustang.  (9/28/10 Tr. at 17-18, 38-39).  At approximately 12:31 p.m., he observed the red Mustang arrive, park in front of building 3538, and the single occupant exit the vehicle.  That person, according to Agent Smith, was the same person he observed driving the maroon Cadillac in January 2009 and whom was believed to be "Sancudin."  (9/28/10 Tr. at 18, 39).

After "Sancudin" exited the vehicle, "Sancudin" went in to an apartment in building 3538, but from the agent's location, he could not see which apartment.  Agent Smith therefore moved his surveillance vehicle to be able to see the breezeway with the door to apartment number 7.  (9/28/10 Tr. at 18-19).  About thirty minutes after the red Mustang arrived, Agent Smith observed "Sancudin" exit the door of apartment number 7, reenter the red Mustang, and leave the apartment complex.  (9/28/10 Tr. at

---

[82]Each apartment complex building had eight units.  (9/28/10 Tr. at 17).

212

19-21, 42).  As "Sancudin" left the apartment to reenter the red Mustang, Agent Smith took a photograph of "Sancudin."[83]  (9/28/10 Tr. at 20-21, 39; Gov't Ex. 1).

In late April 2009, FBI Special Agents Joseph Ladd and Scott Stephan were asked to participate in an operation to arrest an individual with an unknown first and last name but with a nickname "Sancudin" believed to be located at 3538 Buford Highway, Apartment 7.[84]  (3/19/10 Tr. at 4-7, 49).  Agent Ladd recalled being advised that several individuals may be in the apartment, including a husband, wife, several children and some other males.  He understood that there was an arrest warrant[85] for "Sancudin" and that the individual was in the apartment.  (3/19/10 Tr. at 6-7, 40).  He also stated that he understood that "Sancudin" had been observed driving a red Mustang during the investigation.  (3/19/10 Tr. at 39-40).  Agent Stephan testified that

---

[83]On either April 13 or April 17, 2009, Agent Smith also took photographs of the apartment complex and the breezeway with apartment number 7.  (9/28/10 Tr. at 20-22, 41; Gov't Exs. 2, 3, 4).

[84]Neither agent was part of the group that had investigated the drug trafficking organization but were asked to assist with the arrest.  Agent Stephan was the team leader for the operation, and Agent Ladd, who was proficient in Spanish, was asked to participate as an interpreter.  (3/19/10 Tr. at 5-6, 49).

[85]Repeatedly during his testimony, Agent Ladd referred to the arrest warrant as a search warrant.  There was no search warrant.  The arrest warrant (3/19/10 Tr. at 50; Gov't Ex. 19) was issued after return of an indictment [Doc. 1].  The warrant was issued for:  "FNU LNU # 3 a/k/a 'Sancudin', a/k/a 'UM1820'".  (Gov't Ex. 19).

at a briefing before the scheduled arrest on April 29, 2009, he was instructed to arrest FNU LNU with the nickname "Sancudin" who was located in the identified apartment and that he was given a surveillance photograph of "Sancudin" and a copy of the arrest warrant.[86]  (3/19/10 Tr. at 49-50, 88).  When asked specifics about the information provided, Agent Stephan stated, "I believe I was told that was where he had been observed residing and maybe not residing, at least been seen there on one or more occasion." (3/19/10 Tr. at 88).  Concerning the red Mustang, Agent Stephan testified that, although he did not have information about ownership of the red Mustang, he was advised "that the vehicle had been observed in surveillance and involved in drug deals" and that "was one of our indicators that we believed Mr. Delgado was in the apartment because we had been told that he used that vehicle."  (3/19/10 Tr. at 60).  On the morning of April 29, 2009, the red Mustang was parked in the closest parking space to the building with apartment number 7.  (3/19/10 Tr. at 88-89).

---

[86]The agent later stated that he was not sure if he had a surveillance photograph but recalled that the photograph was a head and shoulder shot of "Sancudin." (3/19/10 Tr. at 71, 85-86).

214

At approximately 6:00 a.m.,[87] on April 29, 2009, FBI agents, one or two immigration agents and Georgia Bureau of Investigation ("GBI") Agents, as well as the DeKalb SWAT, numbering in total approximately twenty agents and officers, were at 3538 Buford Highway to attempt to execute the arrest warrant for "Sancudin." (3/19/10 Tr. at 7-8, 27, 51-52, 69-70).   All of the agents and officers were in tactical gear, including vests with identification as police, and all agents and officers were armed.   (3/19/10 Tr. at 7-8, 27-28, 51-52, 70).   The SWAT, who numbered approximately six officers and who were making the initial entry into the residence, were assumed to have their weapons drawn at the time of entry.  (3/19/10 Tr. at 7-8, 28, 52, 69-70).

Agents Stephan and Ladd, as well as all other officers and agents present, remained downstairs from the breeze-way for apartment 7 as SWAT made the entry. (3/19/10 Tr. at 7-8, 28-30, 52, 68).   Agent Stephan stated that he heard the SWAT officers knocking and announcing their presence and that, when no one answered the door, SWAT breeched the door, forcing entry into the apartment.  (3/19/10 Tr. at 68). Once SWAT secured the occupants of the residence, within approximately ten minutes,

---

[87]Agent Smith testified that agents attempt to execute an arrest warrant at an individual's home at this time of day because the expectation is that individuals are still at home.  (9/28/10 Tr. at 23).

215

Agents Stephan and Ladd and a third agent initially entered the residence. (3/19/10 Tr. at 9, 30, 52). The agents observed three Hispanic males, who were handcuffed, two Hispanic females and three children seated on a sofa in the living room area.[88] (3/19/10 Tr. at 9, 30, 44, 52; Def. Ex. 3). The agents also observed three firearms, which had been found by SWAT in the entry-way closet and rendered safe, and ammunition lying on the dining table. (3/19/10 Tr. at 25, 47, 62). Using the photograph provided of "Sancudin" and being aware from the debriefing that he was looking for a younger, Hispanic male, Agent Stephan quickly eliminated the older, heavy-set male as being "Sancudin." The two younger males had similar characteristics. (3/19/10 Tr. at 52, 71, 73, 92-93).

Upon entry, using Agent Ladd as an interpreter, after advising everyone why the agents were there, that is, to execute an arrest warrant for "Sancudin," and that they were being detained for everyone's safety, Agent Stephan requested identification from each adult. The agents also asked who was "Sancudin," and no one responded or

---

[88]SWAT agents advised that the Hispanic male later determined to be "Sancudin," that is, Defendant Haces-Delgado, was found sleeping on the sofa when SWAT entered the apartment. (3/19/10 Tr. at 13, 62). A wallet and cellular telephone were either found on his person or next to him. (3/19/10 Tr. at 13, 47, 62). When Defendant gave permission, Agent Ladd looked through the wallet and found identification in the name Luis Haces-Delgado. (3/19/10 Tr. at 13).

pointed out anyone else as "Sancudin."  (3/19/10 Tr. at 9-11, 12-13, 31-34, 73-75).

Agent Stephan then asked for the assistance of GBI Agent Reid Montgomery to

identify "Sancudin" because he understood that Agent Montgomery had "some

familiarity with the individual from a case he was working." (3/19/10 Tr. at 52-53, 71-

72).  Agent Montgomery pointed out Defendant Haces-Delgado, and "he gave [Agent

Stephan] a yeah, that is definitely him."[89]  (3/19/10 Tr. at 54, 71-72, 89-90).

At approximately 6:30 a.m., voice exemplars were taken from the three Hispanic

males, including the individual determined to be "Sancudin."[90]  (3/19/10 Tr. at 10-11,

83; Gov't Ex. 18).  Miranda rights were not given to anyone prior to the taking of the

exemplars.  Agent Ladd simply explained to each male that he would be asked to

answer some questions about biographical information during a telephone conversation

---

[89]Agent Stephan conversed with the case agents, who approved of relying on Agent Montgomery's identification, and he determined that Defendant was "Sancudin."  (3/19/10 Tr. at 54, 90).

[90]The testimony at the hearing is not clear as to the exact sequence of events after the agents entered the apartment.  At one time, Agent Ladd testified as outlined by the court *supra*.  He later stated that the voice exemplars were taken prior to the request for identification and further attempts to identify "Sancudin." (3/19/10 Tr. at 9-13, 34).  However, for purposes of resolving Defendant's motions, the sequence of these events is not critical.

217

with a Spanish speaking individual.  (3/19/10 Tr. at 10, 12-13, 40).  After taking the voice exemplars, each individual was separately interviewed.

Agent Stephan recalled that one of the females present, Maricruz Haces, who advised that she was the leasee for the apartment and who presented the agents with bills in her name, was escorted to a bedroom and asked for consent to search the apartment.  (3/19/10 Tr. at 20-22, 55-56, 58).  Using a consent to search form in Spanish, with the location handwritten on the form in English, Agent Ladd presented the form to Ms. Haces, which stated:

> This is a consent to search.  Item 1.  Agents of Federal Bureau of Investigation have asked many [sic] to permit a search, complete search. . . .  [Describe the person, place, things or objects that are going to be searched.] . . .  [3538 Buford Highway Apartment #7 Tempo 2000 Apartments Atlanta, Georgia 30329]. . . .  Item 2.  I have been informed that I have the right to refuse a search.  Item 3.  I make this declaration voluntarily.  Item 4.  I authorize the below signed agent to take whatever item which in their judgment is related to this investigation.

(3/19/10 Tr. at 19-21; Gov't Ex. 4).  Ms. Haces executed the consent form as witnessed by the agents.  (3/19/10 Tr. at 21).  While speaking with Ms. Haces, the agents did not

218

have any weapons drawn, and it does not appear that she was handcuffed.[91]  (3/19/10 Tr. at 9, 22).  The apartment was searched.[92]  (3/19/10 Tr. at 22).

The agents, specifically Stephan, Ladd and Reid, next spoke with Defendant Haces-Delgado in one of the bedrooms.  Defendant was advised at this time that he was under arrest and of his <u>Miranda</u> rights.  (3/19/10 Tr. at 14, 55-57, 91).  Using a rights form in Spanish, Agent Ladd read each line of the form to Defendant, asking if he understood that right, and Defendant responded, "yes."  (3/19/10 Tr. at 14-15).  The form read to Defendant stated:

> Before we ask you any questions, you have the right to - - you should know your rights.  You have the right to remain silent.  Anything that you say may be used against you in a court of law.  You have the right to consult an attorney so that he can counsel you before we ask you any questions.  You also have the right to have an attorney present during any questioning.  If you cannot pay the cost for an attorney, one will be assigned to you before beginning of the interview if you so desire.  If you answer the questions now without the presence of an attorney, you still

---

[91]During the interview with Ms. Haces, she stated that she and her husband, Estevan Flores Mora, her children and mother (or mother-in-law) lived in the apartment with her brother and half-brother.  These two men slept in the front room.  (3/19/10 Tr. at 22, 43).

[92]It is not clear from the evidentiary hearing testimony and inventory placed into evidence that any items, besides the three firearms and ammunition found by SWAT in the front closet, were seized pursuant to the consent search of the apartment.  (3/19/10 Tr. at 22, 25, 47, 62; Gov't Ex. 7).

219

have the right to not answer any questions at any moment.  You also have the right to stop answering questions at any moment.

I have read this declaration of my rights and I understand what they are. I am - - I agree to make this declaration and answer any questions without the presence of an attorney.

(3/19/10 Tr. at 18-19; Gov't Ex. 2).  Defendant signed the form at approximately 7:50 a.m. as witnessed by the agents.  (3/19/10 Tr. at 15).  Defendant appeared to understand Agent Ladd and seemed cooperative.  The agents did not have weapons drawn during this time.  Defendant did not ask that the interview be stopped.  The agents and Defendant were seated during the interview.  (3/19/10 Tr. at 14-15, 56-57). Although Defendant answered the agents' questions, Agent Stephan was not sure he was truthful.[93]  (3/19/10 Tr. at 57).

The agents also asked Defendant for consent to search the cellular telephone found near him when SWAT entered the apartment.  (3/19/10 Tr. at 16-17).  Using the same Spanish consent to search form, Agent Ladd filled in the item to be searched as "cellular . . . telephone Sony Erickson - silver/white 404-394-0066" on the form and

---

[93]Defendant advised that he drove the red Mustang "on occasion" to visit his girlfriend.  (3/19/10 Tr. at 76, 84).  He denied any knowledge of the maroon Cadillac or a black Accura.  (3/19/10 Tr. at 76).

presented the form to Defendant.  (3/19/10 Tr. at 16-18, 19; Gov't Ex. 3).  Defendant

executed the form as witnessed by the agents.[94]  (3/19/10 Tr. at 17).

The agents also spoke with Estevan Flores Mora.  He advised the agents that the

red Mustang was his, although Defendant Haces-Delgado primarily drove the vehicle.

Mr. Mora stated that he drove the red Mustang a few times but not within the last two

months.  (3/19/10 Tr. at 23, 35, 37-38, 60, 76-77).  Using the same Spanish consent to

search form, filled in as follows: "RED MUSTANG Georgia Tag WI77QJ VIN #

IFAFP45X7WF265187," Agent Ladd read and explained the form to Mr. Mora.  Mr.

Mora signed the form.  (3/19/10 Tr. at 20, 23, 35, 60, 77; Gov't Ex. 5).

At some point that morning, Sergeant ("Sgt.") Robert J. Brink, DeKalb County

Police Department, supervisor of the K-9 unit, arrived at the apartment complex.

(4/21/10 Tr. at 13, 16-17, 30-31).  The agents asked him to "K-9 a vehicle" and pointed

out a red Mustang.  (4/21/10 Tr. at 17).  Before doing so, Sgt. Brink asked to speak

with the vehicle's owner, and he entered the apartment to do so.  (4/21/10 Tr. at 17).

As he was beginning to identify himself to the person he believed to be the owner and

explain what he wanted to do, the sergeant was handed a consent to search form which

---

[94]Once the interview of Defendant was completed, he was transported to FBI
offices for processing.  (3/19/10 Tr. at 65).

221

had already been executed by Mr. Mora.  (3/19/10 Tr. at 25, 36, 79-82; 4/21/10 Tr. at 17).

Sgt. Brink returned outside and retrieved his K-9 from his vehicle.[95]  The sergeant first walked around the vehicle to ensure there were no hazards and then commanded Junior to conduct a "free air sniff" of the exterior of the vehicle.  (4/21/10 Tr. at 17).  Junior, who is a fast working dog, initially circled the vehicle at a quick pace, and then the second time around the vehicle, Junior slowed and gave an indication or alert to the presence of the odor of controlled substances from the interior of the vehicle by slowing and then sitting and staring at the driver's side door of the vehicle.  (4/21/10 Tr. at 17, 24).  Once Junior alerted to the odor of controlled substances in the vehicle, Sgt. Brink opened the door and placed Junior inside the vehicle, closing the door behind the K-9.  Junior alerted staring and placing his nose to the center console of the vehicle and sitting.  (4/21/10 Tr. at 17, 23, 25-26).  After removing Junior from the vehicle, Sgt. Brink searched the center console and popped out the cup holders finding a bag containing a white powder substance.  (3/19/10 Tr. at 24-25, 61-62, 80-81; 4/21/10 Tr. at 18).

---

[95]Sgt. Brink testified that both he and his K-9, Junior, are certified, and that Junior is trained to detect the odors of heroin, methamphetamine, cocaine and marijuana.  (4/21/10 Tr. at 14-14, 20-21).

222

Additional facts will be set forth as necessary during discussion of Defendant's claims.

## II.   Discussion

### a.   Entry of Apartment to Arrest "Sancudin"

The first issue before the court is whether the Government established that there was a "reasonable belief" that 3538 Buford Highway, Apartment 7, in Atlanta, was the residence of "Sancudin" and that there was "reason to believe" that "Sancudin" was in that apartment at the time of entry.  Magluta, 44 F.3d at 1533.  The arrest warrant was issued for "FNU LNU # 3 a/k/a 'Sancudin', a/k/a 'UM1820'" (Gov't Ex. 19), not for Luis Manuel Haces-Delgado or Estevan Flores Mora; accordingly, the issue is not whether the Government's evidence demonstrated a reasonable belief that either one or both of those individuals resided in and were in the apartment at 6:00 a.m., on April 29, 2009.  And, although contended by Defendant [Doc. 631 at 7] to the contrary, the arrest warrant was properly issued for "Sancudin" based on the probable cause finding by the federal grand jury.  See Garmon v. Lumpkin County, Ga., 878 F.2d 1406, 1409 (11th Cir. 1989).[96]

_____

[96]"The Fourth Amendment requires that arrest warrants be based 'upon probable cause, supported by Oath or Affirmation' - a requirement that may be satisfied by an indictment returned by a grand jury. . . ."  Kalina v. Fletcher, 522 U.S. 118, 129, 118

223

"The Supreme Court set the standard for entry into residences based upon an arrest warrant in Payton[ ], where the Court stated:  '[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is *reason to believe the suspect is within*.'" Magluta, 44 F.3d at 1533 (quoting Payton, 445 U.S. at 603, 100 S. Ct. at 1388) (emphasis in original).  Thus, in order to enter a dwelling to execute an arrest warrant, the Government must establish that there is "a reasonable belief that the location to be searched is the suspect's dwelling" and that there is "'reason to believe' that the suspect is within the dwelling." Id. "Elaborating on this inquiry, [the Eleventh Circuit Court of Appeals] . . . explained that 'for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location

_____

S. Ct. 502, 509, 139 L. Ed. 2d 471 (1997) (citation omitted).  As noted, the arrest warrant in this case issued following the return of a true bill of indictment by the federal grand jury.  "When an arrest warrant is based upon an indictment, the grand jury's determination that probable cause existed to return the indictment also establishes that probable cause existed for the issuance of an arrest warrant for the person charged." Garmon, 878 F.2d at 1409; see also Rodriguez v. Ritchey, 556 F.2d 1185, 1191 (5th Cir. 1977) ("[I]t has long been settled that an indictment by a properly constituted grand jury conclusively determines the existence of probable cause and provides the authority for an arrest warrant to issue.").

to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry.'" Bervaldi, 226 F.3d at 1263 (citation omitted). And in considering whether the evidence satisfies this test, "[c]ourts must apply common sense and evaluate all the facts and circumstances known to the agents in determining whether a reasonable belief exists."[97] United States v. Jean, 315 Fed. Appx. 907, 910-11 (11th Cir. 2009) (citing Bervaldi, 226 F.3d at 1263).

The first Payton prong is satisfied in this case. As outlined by Agent Smith, the individual identified on the wire intercepts as "Sancudin" was reasonably believed to be involved in two drug transactions with another known co-conspirator, Martin Romero, on September 23, 2008, and November 7, 2008. (9/28/10 Tr. at 8-12, 25, 29-31). Although agents were not "sure" that the individual in the red Mustang, the vehicle at both transactions, was the same person and were not able to "positively" identify "Sancudin," a reasonable belief, which does not even require probable cause,

---

[97]These facts and circumstances include the "collective knowledge" of all the investigating agents in this case given the communication among them prior to entry into the residence. See Grider v. City of Auburn, Alabama, 618 F.3d 1240, 1257 (11th Cir. 2010) ("Probable cause may exist based on the collective knowledge of law enforcement officials derived from reasonably trustworthy information."); United States v. Rodriguez, 198 Fed. Appx. 842, 844 (11th Cir. 2006) ("'Moreover, when a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause.'") (citation omitted).

225

is not based on being sure or positive.  The facts presented, that "Sancudin" was intercepted on the wire taps discussing meeting Romero for the drug transactions and that the transactions occurred at the location and time planned, establish a reasonable belief that the occupant of the red Mustang on both occasions was "Sancudin."  This belief was supported by the events surrounding the third transaction in January 2009 when "Sancudin" was sent by a third party to deliver a sample of drugs to Romero, who also sent a third party to the meeting.  (9/28/10 Tr. at 12-15, 31-34).

The interceptions of conversations between Romero and an unidentified person, "UM4," indicated that  a drug transaction was to take place on January 12, 2009, at a Carniceria, Tres Hermanos, located on Cruz Road in Lawrenceville.  (9/28/09 Tr. at 12-14).  The intercepted conversations indicated that "Sancudin," on behalf of "UM4," would be delivering a sample of drugs to Romero and that Romero was sending an individual named Pedroza, who apparently did not know "Sancudin," to collect the sample.  [9/28/10 Tr. at 12-13].  Tracking exactly the intercepted conversations, the agents observed Pedroza arrive in a dark colored Audi.  During this time, "Sancudin" was intercepted talking to Romero concerning his anticipated arrival at the location.  Romero asked if "Sancudin" would be in the "red one?", which the court concludes referenced the red Mustang used in the prior transactions.  And, "Sancudin" responded,

226

"No, I'm in the maroon one. . . ." (9/28/10 Tr. at 13-14). When Romero asked "which?", "Sancudin" responded, "The Cadillac, the truck like the one you used to own." (Id.). At that time, a maroon colored Cadillac Escalade arrived, and Romero called Pedroza to inform him that "Sancudin" was there. After some discussion, Pedroza advised Romero to have the drugs put in the Audi. (Id.). Romero was then intercepted informing "Sancudin" to place the drugs in the Audi, and the agent observed the maroon Cadillac park next to the Audi, "Sancudin" exit the Cadillac, and open the door of the Audi and place the sample inside. (Id.). "Sancudin" then entered the Cadillac and left. (9/28/10 Tr. at 14-15). Based on this evidence, as well as the fact both the red Mustang and maroon Cadillac were registered to the same individual at the same, although non-existent, address (9/28/10 Tr. at 15, 26-29, 34), the investigating agents reasonably concluded that the same person known as "Sancudin" participated in all three transactions. And, Agent Smith identified "Sancudin" during the January transaction, noting his physical characteristics and taking a photograph. (9/28/10 Tr. at 15, 32-34; Def. Ex. 1).

By the end of January 2009, the "Sancudin" involved in the drug transactions and being intercepted over the wire taps was connected to the red Mustang and the maroon Cadillac. The agents also linked "Sancudin" to the apartment at 3538 Buford

227

Highway.  As Agent Smith testified, when he re-checked the registrations on the red Mustang and the maroon Cadillac in March 2009, although both were still registered to Estevan Flores Mora, the address for both vehicles had been changed to 3538 Buford Highway, N.E., Apartment 7, in Atlanta.  (9/28/10 Tr. at 16).  When he attempted to locate the address on April 13, 2009, which did exist, he observed the same red Mustang parked at the building indicated on the registration.  He did not observe anyone associated with the red Mustang.  (9/28/10 Tr. at 16-17, 36).  However, when Agent Smith conducted surveillance on April 17, 2009, at mid-day, he observed both the red Mustang and "Sancudin" at the building listed on the registration.  He observed "Sancudin" arrive in the red Mustang, enter an apartment and then exit from apartment 7, before leaving in the red Mustang.  (9/28/10 Tr. at 17-21; Gov't Ex. 1).

Having associated the address on the registrations for vehicles used during the drug transactions with "Sancudin" and having observed "Sancudin" leaving from that address, the agents reasonably believed that "Sancudin" resided in the residence as of April 2009.  The Government need not establish that this location was "Sancudin's" permanent residence or that he stayed in that residence every night in order for the court to find that he resided there for the purpose of allowing entry pursuant to Payton. See Bervaldi, 226 F.3d at 1263 (finding the fact that the defendant's permanent

228

residence may have been at a different location was not "inconsistent" with his residence also being at a location where he stayed on a regular basis); United States v. Risse, 83 F.3d 212, 217 (8th Cir. 1996) ("so long as [the defendant] possesses common authority over, or some other significant relationship to, the Huntington Road residence . . . that dwelling can certainly be considered [her] home for Fourth Amendment purposes, even if the premises are owned by a third party and others are living there, and even if [the defendant] concurrently maintains a residence elsewhere as well") (citations and internal quotation marks omitted); Rolle v. West, 642 F. Supp. 2d 1307, 1309 (N.D. Fla. 2009) ("'The fact that a suspect may live somewhere else from time to time does not categorically prevent a dwelling from being the suspect's residence.'") (citation omitted).

And the Government's evidence established that the agents had "'reason to believe'" that "Sancudin" would be in the apartment when the arrest warrant was executed. Magluta, 44 F.3d at 1533 (quoting Payton, 445 U.S. at 603, 100 S. Ct. at 1388). First, the arrest warrant was executed at 6:00 a.m., a time when common sense dictates and the agents reasonably believed a residence's occupants would be at home. See, e.g., United States v. Bridgewater, 333 Fed. Appx. 470, 472 (11th Cir. 2009) ("Early morning police entry weighs in favor of finding that the officers reasonably

229

believed that Bridgewater was inside the house."); <u>Jean</u>, 315 Fed. Appx. at 911 ("in the absence of contrary evidence, officers may reasonably presume a suspect is at his residence at 6:00 A.M. and enter pursuant to an arrest warrant"); <u>Bervaldi</u>, 226 F.3d at 1267 (same); <u>Magluta</u>, 44 F.3d at 1535 (same).  Additionally, Agent Smith testified that the presumption that individuals are in their residence early in the morning is one of the reasons an arrest warrant is executed at that time of day.  (9/28/10 Tr. at 23).

Second, one of the vehicles associated with "Sancudin" and in which he had been seen arriving at and leaving from the residence was located just outside the building at the time the warrant was executed.  (3/19/10 Tr. at 39-40, 60, 88-89; 9/28/10 Tr. at 16-21).  As the Eleventh Circuit Court of Appeals has held, the presence at a residence of a vehicle associated with a suspect indicates that the suspect is present in the residence.  <u>See, e.g.</u>, <u>Bridgewater</u>, 333 Fed. Appx. at 472 (the defendant's vehicle's presence outside the residence "suggests that Bridgewater was inside the house"); <u>Magluta</u>, 44 F.3d at 1538 ("The presence of a vehicle connected to a suspect is sufficient to create the inference that the suspect is at home."); <u>United States v. Beck</u>, 729 F.2d 1329, 1331-32 (11th Cir. 1984) (agents reasonably believed that the defendant was at home, an apartment, because, having not monitored the defendant's apartment

230

for "his comings and goings" to indicate otherwise, the defendant's "car, identified by the agents, was parked nearby").

For these reasons, the Government's evidence, when considering Agent Smith's testimony, supporting the forcible entry by SWAT to execute the arrest warrant for "Sancudin" satisfied both prongs of <u>Payton</u>, and the officers and agents lawfully entered the residence on April 29, 2009.  Therefore, as stated by the Court in <u>Magluta</u>, "Once the [agents] possessed this valid justification to enter the residence[,] they were entitled, pursuant to <u>Maryland v. Buie</u>, 494 U.S. 325, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990), to engage in a protective sweep of the premises." 44 F.3d at 1538; <u>see also</u> <u>McGough</u>, 412 F.3d at 1237 (noting "that police officers have the right in certain instances to conduct a limited, protective search if they are executing an arrest warrant in a person's home[,]" the court stated "that police officers often face greater risks when arresting someone in their home, as opposed to on the street, and therefore are permitted 'to take reasonable steps to ensure their safety after, and while making, the arrest'") (citation omitted).  And while conducting the protective sweep, those officers may seize evidence found in plain view.[98]  <u>Jean</u>, 315 Fed. Appx. at 911 ("Because the

---

[98]The plain view doctrine is one exception to the warrant requirement.  <u>Horton v. California</u>, 496 U.S. 128, 133-34, 110 S. Ct. 2301, 2306, 110 L. Ed. 2d 112 (1990). "An officer may seize evidence that is in plain view despite the failure to obtain a

231

entry was permitted under <u>Payton</u>, the seizure of the evidence in plain view was also permissible."); <u>Hromada</u>, 49 F.3d at 690 ("The agents were free to seize any evidence they discovered in plain view within the proper scope of the protective sweep."); <u>United States v. Caraza</u>, 843 F.2d 432, 435 (11th Cir. 1988) ("If officers spot evidence in plain view during such a protective sweep, they may seize it.").

SWAT entered the apartment looking for "Sancudin" who was named as a defendant in a multi-district, multi-defendant drug trafficking and money laundering organization.   [Doc. 1; Gov't Ex. 19].   They found a person, later identified as Defendant, sleeping on the sofa in the living room, and in other areas of the residence, the officers located two more Hispanic males, two females and three children, all of whom were relocated to the sofa in the living room.  (3/19/10 Tr. at 9, 13, 30, 43, 52, 62).  Also SWAT found in the closet located at the entry-way of the apartment, three loaded firearms, posing a significant danger to the officers.  (Tr. at 25, 47, 62).  The protective sweep, including looking in the closet, a place in which a person could hide, did not exceed the proper scope of such a search.  See <u>Bervaldi</u>, 226 F.3d at 1268

---

search warrant if two elements are satisfied: (1) lawful access to the object seized, and, (2) the incriminating nature of the object seized is immediately apparent."  <u>United States v. Hromada</u>, 49 F.3d 685, 690 n.11 (11th Cir. 1995) (citing <u>Horton</u>, 496 U.S. at 136-37, 110 S. Ct. at 2308).

(finding "nothing in the record to indicate that the sweep exceeded its proper scope, i.e., it was limited to 'a cursory inspection of those spaces where a person may be found'") (citation omitted); <u>Beck</u>, 729 F.2d at 1332 (rejecting Beck's claim that it was unreasonable for the officers to look inside the closet, from which they seized evidence linked to the defendant's alleged criminal activity, because the officers were only "armed with an arrest warrant[,]" the court stated that "Beck could hide in a closet, therefore it was reasonable to look for him there").  Due to the fact that firearms are tools of the drug trade, the firearms were properly seized as evidence in plain view. <u>See</u> <u>United States v. Prather</u>, 279 Fed. Appx. 761, 766 (11th Cir. 2008); <u>United States v. Smith</u>, 918 F.2d 1501, 1509 (11th Cir. 1990).

For these reasons, the court finds that the forcible entry into the apartment to execute the arrest warrant for "Sancudin" was lawful and that seizure of the three firearms and ammunition from the closet in the apartment did not violate Defendant's Fourth Amendment rights.  Likewise, to the extent that Defendant contends that any further search of the apartment, his cellular telephone and the red Mustang or that his statements were fruits of the alleged unlawful entry and violate his Fourth and Fifth Amendment rights, such claims fail.

**b.      Arrest of Defendant on the Warrant**

233

Defendant also contends that the agents lacked probable cause to believe that he was "Sancudin," the person for whom the arrest warrant was issued. [Doc. 12-13; Doc. 631 at 2-5]. The court disagrees and finds that Defendant was properly arrested on the warrant for "Sancudin."

Defendant did not offer any binding - or other - legal authority in support of his argument, and the Government did not directly address this issue. The court has not found a decision of the Eleventh Circuit Court of Appeals on point; however, the Third Circuit Court of Appeals has held, "To determine whether the police have probable cause to believe a particular suspect is the person named in a warrant, 'we apply a common sense approach and consider the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality.'" United States v. Rosario, 305 Fed. Appx. 882, 885 (3rd Cir. 2009) (quoting United States v. Veal, 453 F.3d 164, 167-68 (3rd Cir. 2006)); see also United States v. Valez, 796 F.2d 24, 26 (2nd Cir. 1986) (denying motion to suppress evidence seized following the arrest of the wrong individual when police had probable cause to arrest another person, the court, citing Supreme Court authority, stated "that the arrest is valid under the fourth amendment if the police have probable cause to arrest the person sought, and the arresting officer reasonably believed that the arrestee was that person") (citing Hill v.

234

California, 401 U.S. 797, 802, 91 S. Ct. 1106, 1110, 28 L. Ed. 2d 484 (1971)).[99]  And "[p]robable cause to arrest exists when the totality of the facts and circumstances support 'a reasonable belief that the suspect had committed or was committing a crime.'"  Lindsey, 482 F.3d at 1291 (citation omitted).  Based on the totality of the facts known to Agent Stephan, and applying common sense to those facts, he correctly concluded that Defendant Haces-Delgado was "Sancudin" and, therefore, had probable cause to arrest Defendant on the warrant.

As set forth *supra*, the agents had a basis for reasonably concluding that the person for whom the warrant was issued, "Sancudin," resided in the apartment and would be in the apartment at the time SWAT entered the residence.  Added to this reasonable belief that the subject of the warrant was in the apartment, the facts establish that three Hispanic males were found in the apartment, two of whom matched

_____

[99]The Eleventh Circuit Court of Appeals reached the same conclusion, citing Hill, in Rodriguez v. Farrell, 280 F.3d 1341 (11th Cir. 2002).  Rodriguez involved a civil action, brought against arresting officers, pursuant to 42 U.S.C. § 1983, by the allegedly wrongfully arrested plaintiff.  In rejecting the plaintiff's claim that his Fourth Amendment rights were violated by the arrest, the court first noted that the Supreme Court in Hill, a criminal case, had determined that "the mistaken arrest of one person (for whom no probable cause to arrest existed) based upon the misidentification of that person as a second person (for whom probable cause to arrest existed)" did not violate the Constitution.  Id. at 1345.  The court further stated that "the totality of the circumstances surrounding the arrest" must be evaluated "to determine its reasonableness."  Id. at 1347.

235

the description given Agent Stephan, that is, a young, Hispanic male, and resembled the photograph that the agent had of "Sancudin." (3/19/10 Tr. at 9, 30, 52-54, 71, 73). The third, an older and chubby Hispanic male, was quickly eliminated as being the suspect. (3/19/10 Tr. at 52, 73). Agents Stephan and Ladd testified that no one identified himself as "Sancudin" and that no one in the apartment pointed out anyone else as "Sancudin." (3/19/10 Tr. at 31-34, 73-75). Agent Stephan therefore requested the assistance of GBI Agent Reid to identify "Sancudin" because he understood that Agent Reid had "some familiarity with the individual from a case he was working." (3/19/10 Tr. at 52-53, 71-72). Agent Stephan elaborated during cross-examination explaining that he understood Agent Reid "was investigating the matters and had seen Mr. Luis Manuel Haces-Delgado prior to this time. . . ." (3/19/10 Tr. at 72). Agent Reid pointed out Defendant Haces-Delgado, and "he gave [Agent Stephan] a yeah, that is definitely him." (3/19/10 Tr. at 54, 71-72, 89-90). The totality of these circumstances, including the eye-witness identification of Defendant as "Sancudin" by Agent Reid, provided probable cause to arrest Defendant on the warrant. Cf. United States v. Smith, 318 Fed. Appx. 780, 792 (11th Cir. 2009) (finding that victim eye-witness identification provided probable cause to believe the defendant committed the crime) (citing, e.g., United States v. Burbridge, 252 F.3d 775, 778 (5th Cir. 2001)

236

(ordinary citizen's eye-witness identification of a perpetrator is usually sufficient to furnish probable cause to arrest the suspect); Woods v. City of Chicago, 234 F.3d 979, 996 (7th Cir. 2001) (identification by single, credible eyewitness can supply probable cause)); United States v. Beckham, 325 F. Supp. 2d 678, 687 (E.D. Va. 2004) (same).

For these reasons, the court finds that the agents had probable cause to arrest Defendant on the "Sancudin" warrant.  And, to the extent that Defendant contends that his statements were fruits of the alleged unlawful arrest, that claim fails.

**c.    Search of Defendant's Cell Phone and the Apartment and Red Mustang**

In his post-hearing briefs, Defendant does not raise any other grounds for suppression of any evidence seized during the searches of the apartment and the cellular telephone and of the red Mustang beyond contending that the evidence seized as a result of the searches should be suppressed as fruits of the unlawful entry and arrest.  [Docs. 569 and 631].  And the court finds that the search the apartment[100] and of Defendant's cellular telephone, as well as the search of the red Mustang (if Defendant could challenge the latter search) were lawful and did not violate Defendant's Fourth Amendment rights.

---

[100]As noted *supra*, a review of the record and exhibits does not disclose the seizure of any additional items based on the consent search of the apartment.

The Government does not contest that Defendant had a legitimate expectation of privacy in the apartment such as to allow him to challenge the search which was based on the consent provided by Ms. Haces.  [Docs. 577 and 624].  The legal authority guiding the court's decision on this issue was fully set forth *supra*.  See Defendants Anaya-Medina's, Cruz-Plancarte's & Cruz-Loya's Motions to Suppress Evidence and Statements, II.  Discussion, a.  Search of Residence.  Weighing the factors used in assessing voluntariness of a consent, that is, "'voluntariness of defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found[,]'" indicates that the consent was voluntary.  Blake, 888 F.2d at 798 (citations omitted).

Ms. Haces was not under arrest but merely, as explained to her, being detained for the safety of the agents and the apartment's occupants while the agents executed the arrest warrant.  She was not handcuffed.  (3/19/10 Tr. at 9, 11).  When the agents spoke with her, they did not have their weapons drawn.  (3/19/10 Tr. at 22).  She appeared cooperative with the agents, answering their questions.  (3/19/10 Tr. at 21, 43).  She was also provided with and signed a consent to search form, which advised

238

her of her right to refuse to consent to the search of the apartment.  (3/19/10 Tr. at 19-22; Gov't Ex. 4).  Nothing in the evidence before the court indicates that Ms. Haces was intimidated, threatened or otherwise coerced to obtain her consent, and the agents summoned medical attention for Ms. Haces, who appeared to be suffering from a serious cough and cold.  (3/19/10 Tr. at 45).

Defendant also provided a voluntary consent to search his cellular telephone. Although Defendant was in custody at the time of the consent, he had been advised of and waived, as will be discussed in more detail *infra*, his <u>Miranda</u> rights, and he was provided with a consent to search form which advised him of his right to refuse consent for the search.  (3/19/10 Tr. at 9, 14-20, 91; Gov't Exs. 2, 3).  The three agents involved in the interview did not have weapons drawn, and Defendant and the agents were seated as they spoke to him.  (3/19/10 Tr. at 14, 57).  Defendant appeared to understand Agent Ladd, who conversed with him in Spanish, and was cooperative. (3/19/10 Tr. at 14, 56). Nothing in the record before the court indicates that the agents' conduct was intimidating, threatening or coercive.

With respect to the search of the red Mustang, the Government does challenge Defendant's right to contest the search.  [Doc. 577 at 12-13].  And, as the Government notes, Defendant appeared to recognize that he did not have a legitimate expectation

239

of privacy because he asserted in his brief in support of the motion to suppress evidence that, "because the consent came as a result of the invasion of Mr. Mora's privacy in his apartment," the evidence seized should be suppressed. [Doc. 569 at 13].

To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search." United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989). It is Defendant's burden to prove that he has a legitimate expectation of privacy in the object of the search. See Cooper, 203 F.3d at 1283-84. Making this determination involves a two-part inquiry: (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate." Hastamorir, 881 F.2d at 1559 (citation omitted). In this regard, "[t]he Supreme Court has held that '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" United States v. Brown, 743 F.2d 1505, 1506 (11th Cir. 1984) (quoting Rakas v. Illinois, 439 U.S. 128, 134, 99 S. Ct. 421, 425, 58 L. Ed. 2d 387 (1978)). Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must

240

demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'" United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted). In other words, "Fourth Amendment rights are personal and may not be vicariously asserted." Lenz v. Winburn, 51 F.3d 1540, 1549 (11th Cir. 1995). Defendant cannot assert the rights of anyone else in seeking suppression of the evidence obtained from the red Mustang and must demonstrate that he personally had a reasonable expectation of privacy in the red Mustang.

Defendant has not met this burden. Although the agents observed an individual that they believed to be "Sancudin," who was subsequently identified as Defendant, driving the vehicle at two drug transactions and driving the vehicle in April 2009, and although Defendant admitted driving the vehicle "on occasion" to see his girlfriend, he did not assert any ownership interest in or control over the vehicle on April 29, 2009. Defendant, in fact, played down his association with the vehicle. (3/19/10 Tr. at 76, 84; 9/28/10 Tr. at 8-12, 17-21). The fact that the owner of the vehicle, Estevan Flores Mora, stated that he did not regularly drive the red Mustang but that Defendant used the vehicle (3/19/10 Tr. at 22-23, 35, 36-37, 76-77) does not provide sufficient control by Defendant over the vehicle to establish a legitimate expectation privacy to challenge the search. Defendant was not in possession of the red Mustang at the time

AO 72A
(Rev.8/82)

of the search on April 29, 2009.  See United States v. Glasgow, 658 F.2d 1036, 1044-45 (5th Cir. Unit B 1981) (finding that a defendant who had previously driven the vehicle searched, but who was not in possession of the vehicle when searched and who had no ownership interest in vehicle, did not show "that he had property rights, either by lawful possession or by control with the right to exclude, which would indicate that he had a legitimate expectation of privacy" in the vehicle); United States v. Viezca, 555 F. Supp. 2d 1254, 1260-61 (M.D. Ala. 2008) (finding that "presence in the vehicle alone is not sufficient to establish standing" given fact that the defendant did not "have any ownership or other possessory interest in the vehicle"); United States v. Hebron, 243 F. Supp. 2d 90, 96-97 (D. Del. 2003) ("With regard to an expectation of privacy in a motor vehicle, outright ownership is not required, but there must be 'clear evidence of continuing possession and control, as well as no evidence that the driver obtained the car illegitimately.'") (quoting United States v. Baker, 221 F.3d 438, 443 (3rd Cir. 2000)).

Even if Defendant established a legitimate expectation of privacy in the red Mustang, the search was lawful based on the probable cause provided by the K-9 alert or pursuant to a valid consent to search.  When the agents confirmed that Estevan Flores Mora, one of the other Hispanic males found in the apartment, was the owner

242

of the red Mustang, they requested his consent to the search the vehicle. (3/19/10 Tr. at 22-23, 35, 37-38, 60). Mr. Mora was provided with a consent to search form which advised him of his right to refuse to consent. (3/19/10 Tr. at 19-20, 23, 35, 60, 77; Gov't Ex. 5). Mora was not in custody, only being detained while the arrest warrant was being executed - as was explained to him. (3/19/10 Tr. at 9, 11-12). The agents speaking to him did not have weapons drawn, and nothing in the record indicates that their conduct was intimidating, coercive or threatening. And Mora appeared cooperative, answering the agents' questions about the various vehicles. (3/19/10 Tr. at 22-23, 37-38, 41-42). The consent was voluntary and provided a lawful basis for the search of the red Mustang.

However, before the consent search was executed, at the request of the agents, Sgt. Brink conducted a "free air sniff" of the red Mustang with his certified K-9, Junior. (3/19/10 Tr. at 25, 36, 79-82; 4/21/10 Tr. at 14-15, 17). As Junior examined the exterior of the vehicle, he alerted to the driver's side door indicating that he detected the odor of a controlled substance, either heroin, cocaine, methamphetamine or marijuana, coming from the interior of the vehicle (4/21/10 Tr. at 17, 23-24), thus providing the necessary probable cause to enter and search the red Mustang, which resulted in the discovery of the controlled substance hidden in the cup holder in the

243

center console of the vehicle (4/21/10 Tr. at 17-18, 25).  Junior had alerted, once in the vehicle, to the center console indicating that drugs were present.  (4/21/10 Tr. at 17, 25-26).

Although, as a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search,  see California v. Carney, 471 U.S. 386, 390-91, 105 S. Ct. 2066, 2069, 85 L. Ed. 2d 406 (1985), in Carroll v. United States, 267 U.S. 132, 153, 45 S. Ct. 280, 285, 69 L. Ed. 543 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles.  Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."  Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S. Ct. 2485, 2487, 135 L. Ed. 2d 1031 (1996); United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006) (indicating that "readily mobile" means "operational").  No separate exigent circumstances need to be shown.  See Maryland v. Dyson, 527 U.S. 465, 466, 119 S. Ct. 2013, 2014, 144 L. Ed. 2d 442 (1999); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) ("[T]his Court made it clear that the requirement of exigent circumstances is satisfied by the ready mobility *inherent* in all automobiles that reasonably appear capable of functioning.") (citation and internal

244

quotation marks omitted).  Nothing in the record indicates that the red Mustang was any less mobile on April 29, 2009, then when Agent Smith saw Defendant driving the vehicle on April 17, 2009.

The validity of the search turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime.  Dyson, 527 U.S. at 466, 119 S. Ct. at 2014; see also Lindsey, 482 F.3d at 1293 ("The key issue here is whether the police had probable cause for the search and seizure of the vehicle.").  "Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) (citations and internal quotation marks omitted).  Probable cause is established in this case by the alert of the drug certified K-9, Junior.[101]  The dog sniff of the exterior of the vehicle did not constitute a search.  See United States v. Nelson, 309 Fed. Appx. 373, 375 (11th Cir. 2009); Glinton, 154 F.3d at 1257.  But the alert by the trained narcotic detector dog provided probable cause for the subsequent search of the red Mustang which resulted

---

[101]This probable cause is supplemented by the fact that the vehicle was used on at least two occasions by "Sancudin" to conduct a drug transaction.  (9/28/10 Tr. at 9-12).

245

in the seizure of the controlled substance.  <u>See</u> <u>Nelson</u>, 309 Fed. Appx. at 375;[102]
<u>Glinton</u>, 154 F.3d at 1257.

For these reasons, the court finds that the searches of the apartment, the cellular telephone, and the red Mustang did not violate Defendant's Fourth Amendment rights.

### d.    Statements

Defendant also filed a motion [Doc. 341] to suppress statements; however, in his post-hearing briefs, besides challenging admissibility of the statements based on the alleged unlawful entry and arrest, Defendant did not make any other argument in support of suppression of either the pre-<u>Miranda</u> voice exemplars or the post-<u>Miranda</u> statements.  [Docs. 569 and 631].  The Government, likewise, offered no additional arguments in support of admissibility.  [Docs. 577 and 624].

The voice exemplars, which will be used solely for identification purposes, <u>see</u> footnote 75 *supra*, and as has been discussed *supra*, <u>see</u> Defendants Anaya-Medina's, Cruz-Plancarte's & Cruz-Loya's Motions to Suppress Evidence and Statements, II.  Discussion, b.  Statements, 2.  Voice Exemplars, are not subject to

---

[102]The evidence presented at the hearing established that both Sgt. Brink and Junior were "'well-trained.'"  <u>Nelson</u>, 309 Fed. Appx. at 375 (citation omitted).

suppression on the basis of the Fourth, Fifth or Sixth Amendments.  Defendant's statements following being advised of and waiving his rights are also admissible.[103]

First, Defendant Haces-Delgado was advised in Spanish of his <u>Miranda</u> rights. (3/19/10 Tr. at 14-16, 18-19; Gov't Ex. 2).  Each right was read to Defendant, and he was asked if he understood that right, responding that he did understand.  (3/19/10 Tr. at 14-15).  Defendant executed the waiver form.  (3/19/10 Tr. at 15).  The three agents conducting the interview did not have their weapons drawn, and Defendant and the agents were seated during this interview.  (3/19/10 Tr. at 14-15, 57).  Defendant appeared to understand the agents and was cooperative.  (3/19/10 Tr. at 14, 56).  He never requested that the interview be terminated.  (3/19/10 Tr. at 15).  Nothing in the record indicates that Defendant was intimidated, coerced or threatened to waive his rights.  Defendant's waiver was knowing, voluntary and intelligent.

For these reasons, the court finds that the voice exemplars, for the purpose of identification, and Defendant's post-arrest statements are admissible.

## III.    Conclusion

---

[103]The court discussed *supra*, <u>see</u> Defendants Anaya-Medina's, Cruz-Plancarte's & Cruz-Loya's Motions to Suppress Evidence and Statements, II.  Discussion, b. Statements, 3.  Post-<u>Miranda</u> Statements, the legal framework for waiver of a defendant's Fifth and Sixth Amendment rights to counsel.

247

For the foregoing reasons and based on the cited authority, the court **RECOMMENDS** that Defendant Haces-Delgado's motions [Docs. 340 and 341] to suppress evidence and statements be **DENIED**.

### Bill of Particulars

Defendants Alfonso Rios, Jr., and Noe Aguilar-Camudio filed motions [Docs. 335 and 338] seeking a bill of particulars.  Both Defendants are seeking evidentiary detail to support the Government's allegations in the superseding indictment of the amounts of controlled substances alleged to be involved in the charged offenses and specifically attributed to each Defendant.  Defendants contend that although the conspiracy count in the indictment alleges that all of the named Defendants conspired to possess with the intent to distribute at least five kilograms of cocaine, at least five-hundred grams of methamphetamine, and at least one-thousand pounds of marijuana, the evidence provided in discovery does not demonstrate that individually either Defendant possessed those amounts of drugs.  [Id.].  The Government opposes the motions stating the superseding indictment fully apprises Defendants of the charges against them and that the voluminous documents, recordings, and physical evidence provided in discovery apprise Defendants of the nature of the evidence against them.  [Doc. 368].

248

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." United States v. Warren, 772 F.2d 827, 837 (11th Cir. 1985); see also United States v. Hassoun, 477 F. Supp. 2d 1210, 1227-28 (S.D. Fla. 2007) ("A request for bill of particulars is, *inter alia*, befitting in those instances where defendant seeks further clarity and precision with regard to the charges that he is facing in order to adequately prepare a defense."). "Generalized discovery is not the proper function of a bill of particulars." Warren, 772 F.2d at 837 (citing United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981)); see also United States v. Roberts, 174 Fed. Appx. 475, 477 (11th Cir. 2006) (same). While the court "is vested with broad discretion in deciding whether a bill of particulars should be granted[,]" United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985), "'where an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense, failure to grant a request . . . may constitute reversible error[,]'" id. (quoting United States v. Crippen, 579 F.2d 340, 349 (5th Cir. 1978)). The superseding indictment sets forth the elements of the charged offenses and contains specific allegations as to the total amount of drugs the Government contends

249

was involved in the conspiracy, the latter being relevant for sentencing but not for proof of the underlying offense.  And, likewise, the amount of drugs attributable to each Defendant is not material to whether that Defendant is guilty of the charged conspiracy.[104]  The indictment fully apprises Defendants of the charges.

The court notes that the fact discovery materials are provided to Defendants is an appropriate factor to consider in deciding whether a bill of particulars is warranted. See Roberts, 174 Fed. Appx. at 477 ("A bill of particulars is not required where the information sought has already been provided by other sources, such as the indictment and discovery. . . ."); United States v. Al-Arian, 308 F. Supp. 2d 1322, 1359 (M.D. Fla. 2004) ("However, a bill of particulars is not typically warranted in so far as it seeks information already available through other sources.") (citing United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986) ("Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other

_____

[104]While the amount of and type of drugs for which each defendant is held responsible may be relevant at sentencing, see United States v. Bacon, 598 F.3d 772, 777-78 (11th Cir. 2010); Wilson, 314 Fed. Appx. at 249-50, they are not necessary for a determination of guilt or innocence on the drug conspiracy charged in the superseding indictment and are not elements of that offense, see United States v. Aguirre-Orozco, 340 Fed. Appx. 626, 633 (11th Cir. 2009); United States v. Baker, 432 F.3d 1189, 1233-34 (11th Cir. 2005); United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997).

250

sources such as the indictment or discovery and inspection.")); see also United States v. Kunzman, 54 F.3d 1522, 1526 (10th Cir. 1995) (bill of particulars is not necessary when indictment is sufficiently specific and the defendant has access to the government's file); United States v. Caputo, 288 F. Supp. 2d 923, 925 (N.D. Ill. 2003) (same); United States v. Cooper, 283 F. Supp. 2d 1215 (D. Kan. 2003) (same). As the Government outlines, Defendants were provided with a wealth of information in discovery to enable them to adequately prepare for a defense at trial. [Doc. 368].

Quite simply, Defendants are seeking evidentiary detail to which they are not entitled in a bill of particulars and which is not pertinent to the trial of this case. See Roberts, 174 Fed. Appx. at 477 (a bill of particulars "'is not designed to compel the government to detailed exposition of its evidence'") (citation omitted); United States v. Scrushy, 2004 WL 483264, *9 n.5 (N.D. Ala. March 3, 2004) ("[T]here is a difference between being surprised by the charge and being surprised by the evidence supporting a charge. The function of the bill of particulars is to reduce surprise at the *charge*, that is, to enable the defendant to identify what he is alleged to have done in violation of law. It is not to eliminate surprise with respect to evidence offered in support of a charge that is clearly understood by the defendant.") (emphasis in original); United States v. Giffen, 379 F. Supp. 2d 337, 346 (S.D. N.Y. 2004) ("The

251

ultimate test in deciding whether a bill of particulars should be ordered is whether the information sought is necessary, as opposed to helpful, in preparing a defense.").

For these reasons, the court **DENIES** Defendants Rios' and Aguilar-Camudio's motions [Docs. 335 and 338] for a bill of particulars.

### Motions for Severance of Defendants

Defendants Otha Barnes and Luis Manuel Haces-Delgado filed motions [Docs. 306 and 381] in limine or to sever their cases. The motions focus on the reasons why certain types of evidence, such as, drug profile evidence, Fed. R. Evid. 404(b) evidence, and expert testimony, should not be allowed at trial. [Id.]. In the alternative, but providing no grounds for so requesting, Defendants ask to be severed from the remaining Defendants for trial. [Doc. 306 at 4; Doc. 381 at 5]. Defendants Andres Bautista-Gallegos and Noe Aguilar-Camudio filed motions [Docs. 329 and 333] to sever their trials from that of co-Defendants based on Fed. R. Crim. P. 14 alleging prejudicial spillover, the need for potential testimony of co-Defendants, potential Bruton issues,[105] and a better opportunity for a fair and impartial trial. [Id.]. Defendant Aguilar-Camudio also contends that a joint trial will violate his Sixth Amendment right

---

[105]Defendants have not made any showing, and the Government responds that there is no Bruton issue [Doc. 367 at 7], to establish that severance is required pursuant to Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

to a speedy trial, and he seeks an evidentiary hearing to present "academic experts" in support of his claim of prejudicial spillover of evidence.  [Doc. 333 at 5, 8-9].  The Government opposes the motions for severance.  [Docs. 367 and 579].

To the extent Defendants Barnes and Haces-Delgado move in limine to exclude evidence from trial, the court defers ruling on those motions [Docs. 306 and 381] to the trial court with the Government's response thereto [Doc. 579].  Having read and considered Defendants' motions for Rule 14 severance, the court recommends that the motions be denied.

Defendants allege that a joint trial with their co-defendants will deny them a fair trial and will unduly prejudice them.  Accordingly, they seek a severance based on Fed. R. Crim. P. 14.  "Rule 14(a) states, 'If the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials, or provide any other relief that justice requires.'"  United States v. Blankenship, 382 F.3d 1110, 1120 (11th Cir. 2004) (citation omitted).  The Eleventh Circuit Court of Appeals further stated, "We have long recognized that 'a District Court confronted with a Rule 14 Motion for Severance is required to balance any . . . prejudice [to the defendants] against the interests of judicial economy, a consideration involving substantial discretion.'"  Id. (citation omitted).  "In practice, the general rule

253

is that defendants who are jointly indicted should be tried together, particularly in conspiracy cases." Baker, 432 F.3d at 1236; see also United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007) (same). To justify severance, a defendant must show compelling prejudice to the conduct of his or her defense resulting in fundamental unfairness. See Baker, 432 F.3d at 1236; United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997). "'This is a heavy burden, and one which mere conclusory allegations cannot carry.'" United States v. Walser, 3 F.3d 380, 386 (11th Cir. 1993) (quoting United States v. Hogan, 986 F.2d 1364, 1375 (11th Cir. 1993)); see also Browne, 505 F.3d at 1268.

Defendants are charged in a conspiracy, in violation of 21 U.S.C. § 846. It is the general rule in conspiracy cases that "defendants indicted together should be tried together." United States v. Cassano, 132 F.3d 646, 651 (11th Cir. 1998); see also Browne, 505 F.3d at 1268 (noting that it "is particularly true in conspiracy cases" that persons indicted together be tried together); United States v. Gossett, 877 F.2d 901, 904 (11th cir. 1989) ("Generally, coconspirators should be tried jointly."). In order to overcome this presumption and to establish that severance of Defendants is mandated pursuant to Rule 14, Defendants must not only show specific prejudice but also that "'there is a serious risk that a joint trial would compromise a specific trial right of one

254

of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" Blankenship, 382 F.3d at 1123 (citation omitted).

Defendant Aguilar-Camudio's motion includes a conclusory contention that the delay in preparing this multi-Defendant, multi-count case for trial may violate his Sixth Amendment right to a speedy trial. [Doc. 333 at 5]. The court, however, notes that Defendant has filed several motions requesting evidentiary hearings, including the instant motion, and that an evidentiary hearing was in fact held on Defendant's motion to suppress evidence and that Defendant was provided with an opportunity make an *in camera* showing on his motion to disclose the identity of the confidential informant. Preparing these motions for submission to the court necessitated a delay in certifying the case ready for trial. Defendant's motions seeking suppression of evidence and statements, severance, a bill of particulars, and disclosure of informants, contributed to part of the time period required to certify the case ready for trial, and he cannot show as of this date that a joint trial has violated any constitutional rights.

The second category mandating a severance, that is, preventing the jury from making a reliable judgment, applies generally to three situations. "First, severance is mandated where compelling evidence that is not admissible against one or more of the co-defendants is to be introduced against another co-defendant." Blankenship, 382

255

F.3d at 1123.  However, this situation does not involve the mere disparity in the quality or amount of evidence introduced against one or more defendants and only applies where there is a minimal chance that limiting instructions will provide adequate relief. See Baker, 432 F.3d at 1236 (holding that "a defendant does not suffer 'compelling prejudice simply because much of the evidence at trial is applicable only to his codefendants,' . . . even when the disparity is 'enormous'") (quoting Schlei, 122 F.3d at 984 same).  Severance is also mandated upon a showing of prejudice "in an extremely narrow range of cases in which the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently." Blankenship, 382 F.3d at 1124.  And, "[f]inally, severance is required . . . where one defendant is being charged with a crime that, while somehow related to the other defendants or their overall criminal scheme, is significantly different from those of the other defendants." Id. at 1125.  Defendants have not established that any one of these three situations applies to the pending case.  And numerous Eleventh Circuit and former Fifth Circuit cases have rejected severance requests based on conclusory claims that the complexity of the charges, length of trial and number of defendants and counts will result in prejudice

256

finding that limiting instructions mitigated against defendants demonstrating compelling prejudice. See, e.g., United States v. Starrett, 55 F.3d 1525, 1553 (11ᵗʰ Cir. 1995); United States v. Russo, 796 F.2d 1443, 1449-50 (11ᵗʰ Cir. 1986); United States v. Kopituk, 690 F.2d 1289, 1320 (11ᵗʰ Cir. 1982); United States v. Martino, 648 F.2d 367, 385-86 (5ᵗʰ Cir. 1981). Thus, Defendants have not established that a severance is required on these claims of prejudice.[106]

Defendant Bautista-Gallegos also contends that severance is required because Defendant may wish to call a co-Defendant and based on other general claims that the testimony of co-Defendants are unavailable in a joint trial. [Doc. 329]. To obtain a severance on this ground, Defendant "must first demonstrate: '(1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the codefendant would indeed have testified at a separate trial.'" Browne, 505 F.3d at 1269 (citing United States v. Cobb, 185 F.3d 1193, 1197 (11ᵗʰ Cir. 1999); see also United States v. Van Hemelryck, 945 F.2d 1493, 1501 (11ᵗʰ Cir. 1991) (same). If Defendant establishes those prerequisites, "the court must then: '(1) examine the significance of the testimony in relation to the

_____

[106]And the evidence against Defendant Aguilar-Camudio, as outlined in the Government's response to the motion for severance [Doc. 367 at 2-4], is not nearly so minimal as Defendant would ask the court to find in seeking the motion for severance.

257

defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion.'" Browne, 505 F.3d at 1269 (quoting Baker, 432 F.3d at 1239); see also Cobb, 185 F.3d at 1197 (same); Van Hemelryck, 945 F.2d at 1501 (same). Defendant Bautista-Gallegos made no showing as required to obtain a severance on this ground. [Doc. 329].

As noted, Defendant Aguilar-Camudio seeks an evidentiary hearing to present "ACADEMIC EXPERTS" *probably* in the field of cognitive psychology "who *may* testify about the inability of human beings to process or correctly maintain information, when asked to analyze the evidence and render individualized verdicts against twenty, ten or even five defendants." [Doc. 333 at 9 & n.3 (emphasis added)]. The court denies Defendant's request. The evidence which Defendant seeks to introduce appears speculative and of little relevancy to the presentation of evidence at a trial under the careful supervision of the trial court in whom is placed the responsibility of ensuring each Defendant receives a fair trial. As stated by the Supreme Court in Zafiro v. United States, 506 U.S. 534, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993), "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." Id. at 541, 113 S. Ct.

258

at 939.  If compelling prejudice is established at any point in time, this discretion may

be exercised by the trial court before or even during trial.  See United States v. Pedrick,

181 F.3d 1264, 1272 (11th Cir. 1999) (based on its continuing duty to grant a severance

when compelling prejudice is demonstrated, trial court granted a severance of a

defendant during the course of trial); Kopituk, 690 F.2d at 1316 ("[T]he court fulfilled

its 'continuing duty at all stages of the trial to grant a severance if prejudice does

appear.'") (quoting Schaffer v. United States, 362 U.S. 511, 516, 80 S. Ct. 945, 948,

4 L. Ed. 2d 921 (1960)).  The Supreme Court in Zafiro specifically noted that even if

prejudice is shown or the risk of prejudice is high, severance is not required and that

"less drastic measures, such as limiting instructions, often will suffice to cure any risk

of prejudice."  506 U.S. at 539, 113 S. Ct. at 938.  All of these decisions are left to the

sound discretion of the trial court.  Quite frankly, the court does not believe that an

expert witness is in a better position than the trial judge in this case to determine

whether, as the evidence is presented at trial, substantial prejudice which cannot be

cured by cautionary instructions is established requiring severance.

For these reasons and cited authority, the court **RECOMMENDS** that

Defendants Barnes', Bautista-Gallegos', Aguilar-Camudio's, and Haces-Delgado's

motions [Docs. 306, 329, 333 and 381] for severance be **DENIED** and that Defendants

259

Barnes' and Haces-Delgado's motions [Docs. 306 and 381] in limine be **DEFERRED**
to the trial court.  The court **DENIES** Defendant Aguilar-Camudio's request [Doc.
333] for an evidentiary hearing.

### Motions to Compel Disclosure of Confidential Informants

Finally, pending before the court are Defendant Otha Barnes' motion [Doc. 309]
to compel disclosure of confidential informant, Defendant Aguilar-Camudio's motion
[Doc. 330] for production of name and location of confidential informant, and
Defendant Haces-Delgado's motion [Doc. 382] for production of name and location
of confidential informant.  Defendants Aguilar-Camudio and Haces-Delgado requested
an *in camera* hearing in order to present reasons to the court for the necessity of the
disclosure of the informant's identity.   [Doc. 330 at 3; Doc. 382 at 3].   The
Government opposes the motions for disclosure stating that the confidential informant
only had dealings with Obiel Pineda-Pardo (a/k/a "Beto") and did not have any
dealings with Defendants Barnes, Aguilar-Camudio, or Haces-Delgado.[107]  [Doc. 581
at 1-3].

---

[107]And nothing in the record indicates that a witness who provided information
about Defendant Martina Flores had any association with Defendants Barnes, Aguilar-
Camudio or Haces-Delgado.  [Doc. 581 at 2 n.1].

260

In order to determine whether disclosure of a confidential informant is appropriate, "a court must engage in a balancing test, taking into account the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony." United States v. Gutierrez, 931 F.2d 1482, 1490 (11th Cir. 1991) (citing Roviaro v. United States, 353 U.S. 53, 62, 77 S. Ct. 623, 627-28, 1 L. Ed. 2d 639 (1957)).  This inquiry focuses on three factors:  "(1) 'the extent of the informant's participation in the criminal activity'; (2) 'the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant'; and (3) 'the government's interest in nondisclosure.'" United States v. Flores, 572 F.3d 1254, 1265 (11th Cir. 2009) (quoting United States v. Tenorio-Angel, 756 F.2d 1505, 1509 (11th Cir. 1985)).  The burden is on Defendants to "prove that the informant's probable testimony would bear a direct relationship on the defendant's asserted defense. . . .  However, '[m]ere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure.'"  United States v. McDonald, 935 F.2d 1212, 1217 (11th Cir. 1991) (citations omitted).

The Eleventh Circuit Court of Appeals does not require that an *in camera* hearing be held when the identity of an informant is being sought.  See United States

261

v. Vann, 336 Fed. Appx. 944, 950 (11th Cir. 2009) ("'[a]n *in camera* hearing may be helpful in balancing the interests of the appellants against those of the government, but the precedent of this Court holds that an *in camera* hearing is not required whenever the identity of an informant is requested'") (quoting United States v. Kerris, 748 F.2d 610, 614 (11th Cir. 1984)); see also Tenorio-Angel, 756 F.2d at 1509 n.7 (decision whether to conduct *in camera* hearing "'depends upon whether the trial court has the information necessary to determine if disclosure of the informant's identity is required without holding an *in camera* hearing'") (citation omitted).   However, the court allowed [Doc. 591] Defendants until August 30, 2010, to present under seal in writing for *in camera* consideration by the court information supporting a finding "that the informant's probable testimony would bear a direct relationship on the defendant's asserted defense."  McDonald, 935 F.2d at 1217.  Defendants did not make any *in camera* presentation to the court.

Based on the facts presented to the court, the court finds the informant's involvement in the charged activity, as relates to Defendants Barnes, Aguilar-Camudio, and Haces-Delgado, is non-existent.  [Doc. 581 at 1-3].  And, even if the court had found that the first factor weighed in favor of disclosure of the informant's identity, Defendants have failed to carry their burden of demonstrating the directness of the

262

relationship between the asserted defenses and the anticipated testimony of the informant.  As noted, the burden is on Defendants to "prove that the informant's probable testimony would bear a direct relationship on the defendant's asserted defense. . . ."  McDonald, 935 F.2d at 1217.  Because Defendants have failed to establish this factor, the court is not required to "consider the strength of the government's interest in preserving the confidentiality of the informant."  Kerris, 748 F.2d at 614.

For these reasons, the court **DENIES** Defendants Barnes', Aguilar-Camudio's and Haces-Delgado's motions [Docs. 309, 330, 382] to disclose confidential informant.

### Conclusion

For the foregoing reasons and based on the cited authority, the court **RECOMMENDS** that:

(1)  Defendant Jorge Anaya-Medina's motion [Doc. 301] to suppress voice exemplars and statements obtained on April 29, 2009, and motion [Doc. 302] to suppress evidence seized pursuant to a warrantless search on April 29, 2009, at 2265 Ranch Trial, Norcross, Georgia, be **DENIED**; that Defendant Alejandro De La Cruz-Plancarte's motion [Doc. 322] to suppress evidence obtained during the same warrantless search be **DENIED**; and that Defendant Javier De La Cruz-Loya's motion

263

[Doc. 297] to suppress be **GRANTED IN PART** and **DENIED IN PART**, denied as to the voice exemplars taken for purpose of identification on April 29, 2009, and granted as to the post-<u>Miranda</u> statements obtained on April 29, 2009, and as to the evidence seized during the same warrantless search;

(2)  Defendant Otha Barnes' motion [Doc. 315] to suppress evidence and the voice exemplars be **DENIED**;

(3)  Defendant Gerald Durrance's motions [Doc. 304 and 455] to suppress evidence be **GRANTED**;

(4)  Defendant Martina Flores' motion [Doc. 349] to suppress evidence seized on April 29, 2009, be **GRANTED IN PART** and **DENIED IN PART**, denied as to the warrant for the residence located at 608 Sandyhills Avenue, McAllen, Texas, and granted as unopposed by the Government for the residence located at 604 Sandyhills Avenue, McAllen, Texas;

(5)  Defendant Noe Aguilar-Camudio's motions [Docs. 331, 332, and 334] to suppress be **DENIED**;

(6)  Defendants Jorge Anaya-Medina's motion [Doc. 328], Defendant Luis Haces-Delgado's motion [Doc. 342] and Defendant Martina Flores' motion [Doc. 351] to suppress the evidence obtained from the wiretap orders be **DENIED**;

264

(7) Defendant Luis Haces-Delgado's motions [Docs. 340 and 341] to suppress evidence and statements be **DENIED**; and

(8)   Defendants Otha Barnes', Andres Bautista-Gallegos', Noe Aguilar-Camudio's, and Luis Haces-Delgado's motions [Docs. 306, 329, 333 and 381] for severance be **DENIED**.

For the foregoing reasons and based on the cited authority, the court **ORDERS** that:

(1)  Defendant Jorge Anaya-Medina's request [Doc. 487] for a hearing on his wire tap motion be **DENIED**;

(2)   Defendant Martina Flores' request [Doc. 575] for a <u>Franks</u> hearing in connection with her wire tap motion be **DENIED**;

(3)  Defendants Otha Barnes' and Luis Haces-Delgado's motions [Docs. 306 and 381] in limine be **DEFERRED** to the trial court;

(4)  Defendant Noe Aguilar-Camudio's request [Doc. 333] for an evidentiary hearing in connection with his motion for severance be **DENIED**;

(5)  Defendants Alfonso Rios' and Noe Aguilar-Camudio's motions [Docs. 335 and 338] for a bill of particulars be **DENIED**; and

AO 72A
(Rev.8/82)

(6)    Defendants Otha Barnes', Noe Aguilar-Camudio's and Luis Haces-Delgado's motions [Docs. 309, 330, 382] to disclose confidential informant be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.[108]

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED AND ORDERED** THIS 30TH DAY OF DECEMBER, 2010.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

---

[108]The following Defendants have already been certified ready for trial or have pled guilty: Martin Arreola-Romero (2); Angel Luis Ayala (3); Belisario Gil Mendoza (9); Juan Manuel Mendoza (10); Raphael Pedroza Perez (11); Jose Cesar Almeida (14). Defendants Jorge Lucatero-Torres (8) and Obiel Peneda-Pardo (12) have never been arraigned.

266